UNITED STATES DISTRICT COURT
FOR THE STATE OF MARYLAND
NORTHERN DIVISION

---

|  |  |  |
|---|---|---|
| DIRECT BENEFITS, LLC, a Maryland Limited Liability Company and ANDREW C. GELLENE, | : | |
| Plaintiff(s), | : | |
| v. | : | CIVIL ACTION NO: 1:13-cv-1185 |
| TAC FINANCIAL INC, a Corporation of the State of Nevada, ROY EDER, Chief Executive Officer and Chairman of the Board of Directors of TAC FINANCIAL INC., and RHETT MCNULTY CLARK MCNUTLY DANIEL LINDBERG, Members of the Board of Directors of TAC Financial, Inc., | : | |
| Defendant(s). | : | |

---

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO AMEND THE FIRST AMENDED COMPLAINT**

Defendants' contend that Plaintiff's proposed Second Amended Complaint fails to meet the standards required for pleading in a security fraud case and that any amendment of Plaintiffs' pleadings would be futile.  Defendants' assertions are belied by the strong evidence of scienter which has been set forth in the Proposed Second Amended Complaint.  In addition, Plaintiffs' Revised Proposed Second Amended Complaint,

attached hereto as Exhibit "A", strengthens and makes more clear the sustainability of plaintiffs' case against the defendants.

**1.   The Revised Proposed Second Amended Complaint Satisfies the Pleading Requirement Under the PLRSA And F.R.C.P. 9b**

Any private securities complaint alleging that the defendant made a false or misleading statement must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading 15 U.S.C. § 78u–4(b)(1). In addition, with respect to each act or omission, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A) .

Construing this standard, the Supreme Court of the United States has held that it must be ascertained, "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets [the strong-inference] standard." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 208 (1997) at 323 (emphasis in original).  To be "strong" such an inference of scienter must be more than "permissible" or "reasonable," "it must be cogent and compelling" compared to other, nonculpable explanations. Tellabs, 551 U.S. at 324.

Plaintiffs have alleged a number of material misrepresentations and omissions made by specifically, the Defendant Roy Eder and the other individual defendants.

First, and most directly, Eder is alleged to have represented that TAC possessed 18,000 'active' debit cards.  Plaintiffs' complaint alleges, buttressed by statements made

2

by Eder in the within action, that he was well aware of the difference in industry definitions of active cards.  He knew that there were important differences between those definitions.  He knew that Direct Benefits and Gellene were relying on his statement regarding active cards in order to measure the relative worth between TAC and Direct Benefits.  He also knew, as is set forth in the Asset Purchase Agreement itself, the "APA", that Direct Benefits was using a very restrictive definition of active cards that warranted that DB's 7,000 cards were "valid, in use and subject to the fee and payment obligations applicable to such cards."  See Section 3.5 of the APA attached to the Revised Proposed Amended Complain as Exhibit AI to the Revised Proposed Amended Complaint. (Emphasis Added).

There is no "nonculpable" explanation for Eder, on behalf of TAC not to reveal to DB that it was using a materially less restrictive definition.  The only reason not to inform Direct Benefits and Gellene that he was using this materially different definition was so Direct Benefit's assets would be undervalued as compared to TAC's as, in fact, occurred. It is difficult to ascribe mere recklessness to this omission.

It has been held that the scienter requirement is satisfied by a showing of reckless conduct, "defined as a highly unreasonable omission.... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Schlifke v. Seafirst Corp., 866 F.2d 935 (7th Cir. (Ill.)1989); Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1045 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977) (citation omitted). See also Rowe v. Maremont Corp., 850 F.2d 1226, 1238 (7th Cir.1988).

The actual count of TAC's "used" cards falls squarely into this definition.  Eder clearly was familiar with and in access of a plethora of information about the "metrics" of the use of TAC's cards.  See, for example, the 17 pages of "metrics' that were supplied with the Declaration he filed in this case, the information all culled from reports of FIS Global, TAC's card processor.  Document 15-1, pages 40 to 56.   See Paragraph 13j to the revised Proposed Second Amended Coimplaint.

Plaintiffs, without discovery, are at a disadvantage at producing the actual number of used cards, but present a reasonable and reliable method of calculating them by extrapolating from the number of "used" cards in March, 2011 to December, 2010, when Eder claimed to have had 18,000 "revenue generating" cards.  See Paragraphs 13g to 13i of the Revised Proposed Second Amended Complaint.  The Revised Proposed Second Amendment Complaint alleges that, "Eder had access to and consulted" the referenced reports directly or indirectly through TAC employees the information contained in these reports.  See Par. 13j.  This allegation is supported by Eder's familiarity with the FIS data as set forth above.  Thus Plaintiffs allege more than the fact that this information was simply available.

Even if Eder's in-house definition of cards that generate "any service revenue", which includes monthly fees, is considered, the available evidence is that TAC had only approximately 13,000 cards.  This number is generated through use of Eder's statement to Gellene that TAC's cards in December 2010 were producing an average revenue of $7.00 per card.   See Par 13m of the Revised Proposed Second Amended Complaint.  Eder, during the months of January to April of 2011, the period of time during which

negotiations took place, came into possession of the December monthly card revenue.   He

contends in his Declaration filed in this case that this information was sent by him or at his

direction to Gellene during the negotiation period.  If that is true, than it follows logically

that he had that information.  See Eder's Declaration at Par. Paragraph 23 at Pages 6-7.

See also Paragraph 13g of the Revised Proposed Second Amendment Complaint.  Either

the statement that TAC's per card revenue at that time was $7.00 was false, or, dividing

$7.00 into the December income figure of $90,291, gives a result of 12,898 cards.  This is

a third less than Eder represented to Gellene and DB and upon which the relative values of

the two companies was determined.

Eder, in paragraph 29 of his Declaration contends that he gave the documents

denoted as Attachment 2, consisting of TAC's financials, pages 67 to 72 of his Exhibits, to

Gellene during the negotiation period and before the APA was signed.   While Gellene

will contest the assertion that he was given those documents, it is clear that Eder had them

during the negotiation period.  On page 4 of those financials, Exhibit 15-1, Page 70, is the

figure for revenue in December, 2010.  Thus he had the December, 2010 revenue figures

during the negotiation period.  Representing during that period both that TAC had $7.00

per card revenue and that it had 18,000 cards generating fees is a gross and reckless

distortion of the truth.

Defendants contend in their brief that Eder's statement to Gellene that TAC had a

gross margin of 50% was "ambiguous".   Defendant's Reply Brief at page 7.  Under the

circumstances, assuming that the statement was ambiguous and not purposely calculated

to deceive, Eder was grossly reckless in not correcting that ambiguity.  The gross margin

of a company is a highly significant factor in analyzing its worth.   Eder, who was in the

process of negotiating a stock sale to DB and Gellene, had a duty to make clear statements

free from ambiguity about TAC's financial condition.

Moreover, in light of Eder's other calculated misstatements, any ambiguity in the

statement can be seen as purposeful.

Plaintiffs do not concede the ambiguity of this statement.

Defendants assert in their Reply Brief that Plaintiffs have failed to establish any

representation by TAC or Eder that TAC was a growing company.  Reply Brief at page 5.

Eder made that representation to DB in 3 different ways.  First, it is contained in the

statement Gellene alleges Eder made to him and DB contained in an attachment to an

email that TAC had "grown" its revenue generating cards from 53 cards in 2008 to

approximately 18,000 at the end of 2010…"  See Exhibit "B" to the initial and Revised

Proposed Second Amended Complaints.

Eder also represented in the "Company Overview" document supplied to DB and

Gellene during the negotiation process, Exhibit "L" to the initial and revised Proposed

Second Amended Complaints, that "Over the past 18 months, TAC has grown 63,000

Members…." and that, "This growth is due to its membership platform…."  Emphasis

added.

Further, Eder represented to DB and Gellene that he expected TAC's revenue to

triple in 2011.  See Par. 13t of the initial and revised Proposed Second Amended

Complaints.

As to TAC's revenue, it is clear that Eder knew that TAC's revenue had declined

between July, 2010 and December, 2010 by over $25,000.  See Attachment 2 to Eder's

Declaration, at page 70.   This was a decline of 22%.  Plaintiffs can also prove that TAC's

revenue continued to decline between January, 2011 to February, 2011 by another $20,000

to $70,728.  See Exhibit "H" to Plaintiffs' initial and Revised Propose Second Amended

Complaint.  This is a decline of another 20%.  Although Plaintiffs cannot point to any

specific document that shows that Eder knew that TAC's revenue was continuing to

decline precipitously during the early months of 2011, it is doubtful that there is a Chief

Executive Officer of a company in the United States in his or her right mind that would

not have his or her finger on the pulse of their company's revenue figures after the decline

shown between July and December, 2010.

It is impossible to conceive of a factual circumstance in which Roy Eder and the

other individual defendants were not aware of the company's steady income slide.  This is

not a case like Proter, supra in which esoteric accounting violations had occurred that had

been overlooked even by the company's auditors.  Revenue streams are at the heart of

information necessary to govern a corporation.  In any case, Eder knew that revenue was

declining at a rapid pace during the last part of 2010 and failed to disclose it.   See revenue

monthly totals contained in Exhibit 15-1 at page 70 annexed to Eder's Declaration in this

matter.

In Paragraphs 13m of the initial Proposed Second Amendment Complaint and

Paragraph 13s of the Revised Proposed Second Amended Complaint, Plaintiffs assert that

Eder failed to disclose that 90% of TAC's business came from 1 customer, Ardyss.  That

Eder knew that Ardyss was their preeminent client by far is established by Par. 17 of

Eder's Declaration in this case and in Document 15-1, page 23 attached thereto.

The fact that a single client constitutes a large percent of a company's business is material.  The Security and Exchange Commission regulations state that a company must disclose in a registration statement any customer that constitutes more than 10% of a company's business.  See 17 CFR 229.101(c)(vii).   Eder knew that Ardyss was much more than 10% of its business, in fact 90%.  That fact was undisclosed.  And, as Eder admits in his Declaration, revenue from that source was declining steadily sufficient to give TAC concern. Failure to disclose this was an omission, at least reckless if not purposeful.  It also violated Sec. 4.11 of TAC's warranties under the APA since it Eder and TAC omitted a material fact that was "necessary to make the statements contained herein or therein [in the documents supplied by Eder and TAC during the negotiation period] not misleading."

Motive has been described as one means to supply and inference of scienter. Defendants aver that the Plaintiffs can show no more than the fact that TAC was desirous of obtaining DB's revenue.  Certainly profit and revenue are the legitimate and natural urges of all private economic entities.  But DB and Gellene have shown much more than a natural tendency to seek gain.  TAC was in severe financial trouble.  TAC's revenue had fallen sharply to dangerously low levels by January 2011 when discussions commenced in earnestness between the two companies.  Card usage was way down.  TAC had cash on hand at the end of 2010 of less than $50,000.  This was despite a continuous fundraising effort on behalf of the company through hundreds of thousands of dollars of stock sales.  It had fallen behind to the tune of over $300,000 to its principal and most crucial vendor, FIS

and was in default of its agreement with that company.    In order to keep the wolf from

the door, TAC required the infusion of over $500,000 in loans and/or stock sales between

January 1, 2011 and April 14, 2011, the date of the execution of the APA.  See Revised

Proposed Second Amended Complaint at Par. 24.  See also Exhibit "S" to the initial and

revised Proposed Second Amended Complaints. TAC was not just thirsty for gain, it was

facing an existential crisis.

The Revised Proposed Second Amended Complaint adds this frantic fundraising as

an additional fact supporting Plaintiffs' claims of breach of Warranty.  See Paragraphs 37

to 40.  Eder, as Chief Executive Officer of TAC would have necessarily known of and

signed off on these sales/loans.  The same is true of the TAC Board of Directors.

TAC's very need for some sort of emergency respiration was another material

omission by Eder and TAC known to both Eder and TAC's Board members.

TAC had boasted, through Eder, that the company expected revenues to exceed $3

million dollars in 2011.  This was despite the fact that revenue had fallen steadily for the

last 6 months and that there was no strategy in place to correct that slide.  No change in

company structure or the structure of its products were planned.  No sweeping aside of

failed management was contemplated.   No market trends had been identified that would

justify a reasonable belief that an upswing in TAC's revenue was conceivable within the

next 12 months.  In light of this published projection it was the height of recklessness, at

least, for Eder and TAC not to disclose to DB and Gellene the revenue slide.  While the

declaration of expected revenue of $3 million dollars alone might not be actionable it  at

least created a duty on behalf of TAC and Eder to dispel the misapprehension that TAC

was a growing company when all the evidence was to the contrary.

Revenue projections when linked with other circumstances have been held to be actionable.  Goldman v. Belden, 754 F.2d 1059 (2d Cir.1985); Marx v. Computer Sciences Corp., 507 F.2d 485 (9th Cir.1974).   Cited with approval in Hillson Partners Ltd. Partnership v. Adage, Inc. 42 F.3d 204 (4th Cir 1994) at 215.

There can be no innocent explanation for Eder, TAC and the other individual defendants not to have acted to correct this unjustified misapprehension.

Defendants contend that Plaintiffs' allegations regarding the materiality of the omission to disclose the debt to its employees is not relevant to considerations of fraud since the information is not attributed to any document from the 2010 or 2011 time periods during which the APA negotiations were ongoing.  Defendants' Brief at p. 6.   In fact, Eder has stated in this action that he was aware of the indebtedness and pointed to the balance sheet disclosed to DB and Gellene as evidence that it was known, although he ascribed the indebtedness to unpaid bonuses.  In actuality, the 2010 balance sheet did not disclose any line item which would have alerted DB and Gellene that that line item represented debts to employees.  See Exhibit AJ to the Revised Proposed Second Amended Complaint.

Defendants also rely on the canard that the financials for 2010 on that balance sheet were noted as incomplete as evidence that that the very facts therein were not known to Eder and the individual defendants.  It is not uncommon for yearend financial statements to contain caveats of this nature when final audits have yet to be made.  If Eder had any doubts as to the credibility of the Balance Sheet that was actually sent, it was highly

reckless of him to give it to DB and Gellene to rely on.

In  short, there are an ample number of materially false allegations and material omissions made recklessly or knowingly by Eder and the other individual defendants.  As stated, a brick is not a wall.  But Plaintiffs do not rely on a single statement or fact to demonstrate the defendants' culpability.  The courts are to analyze all of the facts collectively to determine whether a strong showing of fraud has been made.  <u>Tellabs</u>, supra.  The collective facts in this case demonstrate a continuous course of false statements and material facts concealed knowingly or recklessly made.


**2.  Plaintiffs' Warranty Claims Are Valid**

Defendants also contend that the warranty contained in the APA as to no change in circumstances applies to events that occurred after the time period covered by the 2010 balance sheet.  See Defendant's Reply Brief at Page 6.  This is true enough.  However it is disingenuous to maintain that a continuous slide in TAC's revenues and in card usage was not material merely because it is part of a continuous trend commencing some 6 months earlier.  The Revised Proposed Second Amended Complaint makes clear in Par. 34, that Plaintiffs are alleging that Defendants' failure to disclose this continuous slide is the relevant breach of warranty.

**3. Plaintiffs Have Shown A Continuous Scheme Of Sales Of Stock By Defendants Sufficient To Negate Any Finding That The APA Was A Private Sale.**

Defendant's statement that since DB and Gellene first proposed a stock sale transaction to TAC leads "heavily" to the conclusion that the APA was a private placement is unfounded.  Defendants' Reply Brief at page 10.  In <u>Vicioso v. Watson</u>, 325 F.Supp. 1071 (C.D. Cal. 1971), cited by Defendants for this proposition, the fact that the plaintiffs had approached the defendants to purchase the oil and gas leases was only one of a number of factors considered.   Moreover, in <u>Vicioiso</u>, the defendant had made one offer to the two physician partners.  Here, plaintiffs have shown multiple offers of TAC securities to multiple parties, corporate, individual and institutional over a long period of time, January, 2011 to November 2011.  See Plaintiffs' initial Proposed Second Amended Complaint at Pars., 39 to 44, Plaintiffs' Revised Proposed Amended Complaint at Pars. 44 to 49.  The circumstances of this case and of <u>Vicioso</u> can hardly be compared.

**4. Plaintiffs' Common Law Maryland Fraud Claims are sufficiently pled for the same reasons that support its Federal Security Fraud Claims**

Defendants' attack on Plaintiffs' claim under Maryland state law for failure to register its securities must also fail.  Defendants' arguments as to Plaintiffs' cause of action for common law fraud under Maryland law must also fail for the same reasons its arguments on securities fraud is deficient.

5.

**6.  Plaintiffs Claim Of Violation Of Maryland Law For Failure To Register TAC's Securities Is Within The Statute Of Limitations**

As stated in Plaintiffs' prior Brief on this issue, although the offer was made more than a year before the filing of the Complaint, since the securities have not been delivered, the sale is not complete.  Plaintiffs' cause of action nonetheless is ripe since DB has performed its part of the bargain by transferring its assets to TAC.

**7.  Gellene Has Plead Adequately In the Proposed Amended Complaint the Prerequisites for a Cause of Action**

In its Brief, Defendants contend that Gellene did not plead adequately the prerequisites for recovery under the Maryland Wage Payment and Collection Law ("**MWPCL**") or for recovery of his expenses in Counts Nine and Ten.  Without conceding Defendants' point, in the Revised Proposed Second Amended Complaint those complaints are properly plead.

As detailed in the Revised Proposed Second Amended Complaint the **MWPCL** covers "accrued vacation pay" when the employer does not explicitly state or provided notice to employees that vacation pay does not accrue.   Md. Code. Lab. & Emp. Sec. 3-505(b).  The Maryland General Assembly added Section 3-505(b) in response to the opinion issued in  Catapult Technology, LTD v. Paul Wolfe, Sept. Term No. 997 (Ct. Spec. Appeals August 20, 2007).  See Exhibit "B" annexed hereto. The intent of the Section is to confirm that accrued vacation constitutes wages unless the employer established a written policy regarding the payment of accrued leave.  See Fiscal Note SB 797 (2008) (available at http://mlis.state.md.us/2008rs/fnotes/bil_0007/sb0797.pdf)

Because TAC had no explicit statements or notices to Gellene that vacation pay is not accrued  or payable on termination, the **MWPCL** covers Plaintiff's claim for vacation pay.   Thus, Defendants argument that vacation pay is not covered under the **MWPCL** fails.

With regard to expenses, the **MWPCL** requires an employer to pay its employees' wages on time and in full.  Employees who leave their jobs must receive timely payment of all compensation to which they are entitled on account of their employment.   The **MWPCL** defines "wages" broadly.  In includes "all compensation that is due an employee for employment", "fringe benefits", or "any other remuneration promised for service":  MD CODE ANN. (Labor & Employment)  Sec. 3-501(c).

Rather than constituting an exhaustive list, the Court of Appeals of Maryland has explained that 3-501(c) is merely illustrative of the type of remuneration that could constitute "wages" under the statute.   Whiting-Turner Contracting v. Fitzpatrick, 366 Md. 295, 304-05 (2001).   Several courts have held that promised expenses are wages. E.g. Wardlaw v. Maternity Center, 06-cv-01641-DKC, slip, op at pp. 15019 (D.M.D. August 6, 2008) attached hereto as Exhibit "C", (holding that payment for a malpractice insurance premium is a wage under the Law; Nhung Le Phan v. Warner Cos., 2011 U.S. Dist. LEXIS 144257 (D.N.J. Dec. 14, 2011) attached hereto as Exhibit "D", applying Maryland law and holding that the payment of business expenses are wages under the Law.

Where, as here, it is disputed whether a particular form of remuneration is a "wage" a Court considers two factors: (1) Was the remuneration promised (and not merely

discretionary) and  (2) Did the employee do all the work necessary to earn the

remuneration?  Medex v. McCabe, 372 Md. 28, 36, 811 A.2d 297 (Md. 2002).

Here, the expenses at issue satisfy the first prong of this analysis.   TAC's obligation

to provide reimbursement for expenses arose from the employment agreement to Gellene,

which shows it was promised in exchange for and result of his labor.   TAC's promise to

pay business expenses is part of what induced Gellene to work for TAC. As in Medex,

the payment of business expenses "formed part of the inducement for Gellene's initial

and continuing employment." Medex, 372 Md. At 42.

These expenses satisfy the second Medex prong.  Gellene "performed all the work

necessary to earn [it]."  Medex, 372 Md. at 37.   As discussed above, Gellene went above

and beyond what was required of him in his employment at TAC.  Gellene provided

detail and timely expense reports that were submitted in accordance with the terms of his

employment agreement providing detail summary and back up receipts for the payments

that were due.   Therefore, Gellene satisfied this prong of the analysis.  Gellene's expense

qualify as "wages" as defined by the **MWPCL**.

Plaintiff's claims can be contrasted with Whiting-Turner v. Fitzpatrick, 36 Md. 295,

299-300, 783 A.2d 667, 673 (Md. 2001), where the employer offered the employee a

bonus if he would remain employed with the employer.  In Whiting, the court stated that

where an employee's bonus "is not part of the compensation package promised, it is

merely a gift, a gratuity, revocable at any time before delivery." Id.  The Whiting

decision supports Gellene's argument that wages are promised a part of a compensation

agreement, the employee is not only entitled to such wages, but the employer is obligated

to pay them.  See *id*. at 305, 672 (stating that "[o]nce a bonus, commission or fringe benefit has been promised as part of the compensation for service, the employee would be entitled to its enforcement as wages.").  Here, the expenses were promised and therefore the employer is obligated to pay them.

8. **Defendants Irresponsibility in Performing Their Contractual Obligations to Create and Approve an Incentive Compensation Plan Does Not Negate Their Obligations in Awarding Gellene's Bonus.**

The Defendants argument that because TAC's officers and directors did not perform their obligations in regards to Gellene's employment contract Gellene is not entitled to his bonus is another unusual defense that fails.   Defendants may argue that they had discretion over the creation of a plan and approval of a plan but they lack discretion over the amount of bonus because it is provided as part of Gellene's employment contract.

Therefore the defense relies on Defendant's performing their required contractual obligations in creating a plan and approving a plan.   Gellene's demonstrative evidence that his performance in 2011 and 2012 met and exceeded the specific objectives communicated to the board and the goals of the company as a whole would be enough to award Gellene bonuses *under any plan*.

9. **Plaintiffs Add Count XI Claiming That TAC Board of Directors are Individually Liable for Payment of Gellene's Wages Under the Maryland Wage Payment and Collection Law.**

As Directors and Officers of TAC, the individual defendants are individually liable under the **MWPCL**  Campusano v. Lusitano Construction LLC, Court of Special Appeals,

Maryland, Case No. 1529, September Term 2011, attached hereto as Exhibit "E", holds that the four-factor economic reality test applied for finding individual liability under the <u>Fair Labor Standards Act ("FLSA")</u> 29 U.S.C. §§ 201 *et seq*., also applies to cases brought under the **MWPCL**.  This test sets forth the following four main factors:   1) whether the individual had the power to hire and fire employees; 2) whether the individual supervised and controlled the employee work schedules or conditions of employment; 3) whether the individual determined the rate of pay; and 4) whether the individual maintained employment records of the employee. <u>Newell v. Runnels,</u> 407 Md. 578 at 651 (2009).  See also <u>Barfield v. N.Y. City Health & Hosps. Corp.</u>, 537 F.3d 132, 142 (2d Cir. 2008).

The Directors of TAC all financially benefited from Gellene's labor and meet the above test.  The APA contained the employment agreement for Gellene to be hired as the VP of Product Development, and stipulates that Gellene, as a member of the Management Team, reports to the Board of Directors of TAC.  The Directors of TAC, hired Gellene, directly determined his compensation, supervised and controlled his work schedule and objectives and maintained Gellene's employment records.

All the Directors were either shareholders or stock option holders or debtors, and/or expected compensation from TAC for their service as Directors of TAC.   Rhett McNulty, Clark McNulty, Roy Eder, and Daniel Lindberg were all listed as stockholders of TAC shown in Exhibit "AH", a document provided by Eder on March 3, 2011 to Gellene during due diligence of the APA.

The Board of Directors had significant control over the financial affairs and Gellene's direct compensation.   Pursuant to the **MWPCL**, Md. Code, Lab. & Empl. §3-501

18

et seq., Gellene is entitled to triple damages, attorney fees and costs of suit from them for TAC's failure to pay to him his aforesaid wages.

## Conclusion

For the reasons expressed, the Court should permit the filing of the Revised Proposed Second Amended Complaint and deny the Defendants' Motion to Dismiss in its entirety.

Dated: October 21, 2013                    Respectfully submitted,

                                           /s/  Alfred V. Gellene, Esq.
                                           **Alfred V. Gellene, Esq.**
                                           Fusco & Macaluso, LLC
                                           150 Passaic Avenue
                                           P.O. Box 838
                                           Passaic, New Jersey 07055
                                           Tel. (973) 779-1163
                                           Attorney for Plaintiffs

.