IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DIRECT BENEFITS, LLC, et al.,    :

    Plaintiffs,              :

v.                               :
                         Civil Action No. GLR-13-1185
TAC FINANCIAL INC., et al.,      :

    Defendants.              :

                             :

**MEMORANDUM OPINION**

THIS MATTER is before the Court on Plaintiffs' request to rescind an asset purchase agreement due to Defendants' alleged violations of federal and Maryland securities laws, among other things. Pending before the Court is Defendants', TAC Financial Inc., Roy Eder, Rhett McNulty, Clark McNulty, and Daniel Lindberg (collectively, "Defendants"), Motion to Dismiss the First Amended Complaint for Failure to State a Claim (ECF No. 13); Plaintiffs', Direct Benefits, LLC and Andrew C. Gellene (collectively, "Plaintiffs"), Cross-Motion for Leave to Amend the Complaint (ECF No. 20); and Defendants' Motion for Leave to File Surreply Arguments in Response to Plaintiffs' Reply Brief (ECF No. 47).

The Court, having reviewed the pleadings and supporting documents, finds no hearing necessary. See Local Rule 105.6 (D.Md. 2011). For the reasons outlined below, the Court will

grant in part and deny in part Defendants' Motion to Dismiss, grant Plaintiffs' Cross-Motion for Leave to Amend, and grant Defendants' Motion for Leave to File Surreply.

## I.    BACKGROUND[1]

Plaintiff Direct Benefits, LLC ("DB") is a limited liability company that provides prepaid cards to the public through their employers.  At all times relevant to this action, DB had a large, diverse client base consisting of over seventy-five employers, including Starbucks, Genesis Healthcare, and franchisors from Burger King, Taco Bell, IHOP, and Holiday Inn.  Plaintiff Andrew Gellene ("Gellene") is the president of DB.

### A.    DB's Introduction to TAC Financial

Around October 2010, Plaintiffs began searching for a new strategic partner that would assist DB with establishing and maintaining financial processing systems for its business.  By December 2010, a business associate had referred Plaintiffs to Defendant TAC Financial Inc. ("TAC").  Upon the referral, Gellene and TAC's CEO, Roy Eder ("Eder"), held preliminary discussions to determine the possibility of a mutually beneficial business arrangement between the two entities.

---

[1] Unless otherwise noted, the following facts are taken from Plaintiffs' proposed Second Amended Complaint (ECF No. 20-1). The well-pled allegations in the Second Amended Complaint are accepted as true and viewed in the light most favorable to Plaintiffs.  See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007)).

During an introductory call on December 28, 2010, and again in a letter of intent attached to a January 10, 2011 email, Eder informed Gellene that TAC was a financial and employee-benefit services company that provided various programs, including prepaid cards, mobility services, online bill pay, and affordable health care. To further facilitate discussions, the parties signed a non-disclosure agreement on January 5, 2011, and soon thereafter, on January 13, TAC proposed that DB become its value added reseller, which would have enabled DB to use TAC's platform of services for DB's clients ("VAR Agreement"). The proposal was memorialized in a non-binding strategic alliance term sheet the same day.

Soon thereafter, however, Plaintiffs requested, in lieu of the previous VAR Agreement, that TAC consider permitting DB to sell and transfer its principal assets and business to TAC in exchange for cash and stock as consideration. TAC agreed to the request, and the agreement was memorialized in a February 11, 2011 email TAC's VP of Sales Operations sent to Gellene.

B.  **Merger Negotiations and the Due Diligence Process**

During negotiations, Defendants made various representations to Plaintiffs regarding TAC's business. Specifically, on February 2, 2011, Eder and the TAC negotiating team emailed Gellene a discussion document that stated

> With just two years of selling under our belt, we
> have grown our revenue generating cards from 53
> cards in 2008 to approximately 18,000 at the end
> of 2010 with average revenue per month per card
> of $7.00 at a gross margin of just under 50%.  We
> finished 2011 [sic][2] at $1.1M in revenues and
> expect to triple revenues in 2011 to
> approximately $3M in revenues.

(2d Am. Compl. ¶ 12).  On February 16, 2011, a TAC employee sent Gellene an email stating the valuation of TAC's common stock was $1.10 per share.

As part of the due diligence process, on February 26, 2011, Gellene sent TAC and Eder a letter requesting documentation, including but not limited to, TAC's formation, capital stock, and financial data.  Of the financial disclosures, Gellene requested copies of TAC's financial statements covering the last two years and year-to-date financials.  In response, TAC informed Gellene that its 2010 financials were not officially complete and its year-to-date financials were unavailable.

On March 3, 2011, Eder sent Gellene an email with an attachment that represented, "Over the last 18 months, TAC has grown to 63,000 Members in the U.S., Canada, the United Kingdom, Puerto Rico, and Mexico.  This growth is due to its overall services platform, creating safe and healthy financial benefit environments for families and individuals." (Id. ¶ 14).  The attachment also provided that TAC's services included "Non-

---

[2] Plaintiffs believe Defendants meant 2010, not 2011.

Qualified and Qualified Affordable Healthcare Programs" and "Discount Auto Insurance." (Id.).

## C. <u>The Asset Purchase Agreement and Discovery of TAC's Alleged Omissions</u>

On April 14, 2011, the parties executed an Asset Purchase Agreement ("APA"), which solidified TAC's purchase of DB's principal assets consisting of approximately 7,000 prepaid debit card accounts marketed under the name the Money Manager Card®. Per the APA, TAC agreed to provide Gellene $50,000 upon signing the agreement, shares of TAC's common stock valued at $1.10 per share, and a nominal purchase price of $819,000 for DB's assets as consideration. In tandem with the APA, Gellene entered into an employment agreement whereby he assumed the role of TAC's VP of Product Management. Under the terms of the agreement, Gellene was entitled to, <u>inter alia</u>, an annual salary of $125,000 with the opportunity to earn an additional $50,000 in annual incentive compensation, a stock option to purchase 140,000 shares of TAC common stock, reimbursement for business expenses, and accrued vacation days. Around the signing of the APA and thereafter, TAC engaged in various fundraising activities via stock offers to potential investors.

Around February 2012, Gellene began to discover, through internal documents, that TAC failed to disclose several facts regarding its financial condition throughout pre-merger

negotiations and the due diligence period in violation of the warranties provided in the APA.  Specifically, Plaintiffs allege Defendants made five omissions of fact: (1) during negotiations TAC was experiencing a substantial reduction in income from its primary revenue source; (2) TAC experienced a seventy-percent decline of card usage from May 2010 to February 2011; (3) TAC owed its card processor, FIS Global, over $300,000; (4) TAC owed its managerial employees more than $180,000; and (5) TAC did not have the then-present ability to pay Gellene his $50,000 at signing or to assume DB's operating costs.  On March 26, 2013, Plaintiffs' counsel sent a letter to TAC disclosing the alleged omissions and seeking rescission of the APA pursuant to a breach of the warranties contained therein.  Gellene resigned from his position at TAC the same day, a little more than two years after signing the APA.

**D.**   **Procedural History**

On April 22, 2013, Plaintiffs filed a ten-count Complaint against Defendants in this Court alleging violations of the federal and Maryland securities acts as well as various common law claims.  (ECF No. 1).  After amending their complaint on May 3, 2013, (see ECF No. 6), Plaintiffs filed a Motion for Preliminary and Interlocutory Relief and Request for Expedited Hearing on May 30, 2013.  (See ECF No. 10).  While Plaintiffs' request for preliminary and interlocutory relief was pending,

Defendants filed the pendant Motion to Dismiss on June 14, 2013, (ECF No. 13), and Plaintiffs filed their Cross-Motion for Leave to Amend the Complaint on June 28. (ECF No. 20). After a hearing on July 12, 2013, the Court denied Plaintiffs' motion for preliminary and interlocutory relief, referred the case to a U.S. Magistrate Judge for an early settlement conference, and stayed the case pending the outcome of mediation. (See ECF No. 33).

After the settlement discussions proved to be unfruitful, the Court lifted the stay in this matter and issued a briefing schedule for submission of the remaining pleadings related to Defendants' Motion to Dismiss. (ECF No. 43). Thereafter, Plaintiffs submitted their Reply, which includes a "Revised Proposed Second Amended Complaint," (see ECF No. 46), and Defendants filed a Motion for Leave to File Surreply Arguments in Response to Plaintiffs' Reply Brief. (ECF No. 47).

## II. DISCUSSION

### A. **Motion to Dismiss**

#### 1. Standards of Review

##### a. In General

The purpose of a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the legal sufficiency of a complaint. Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999). Pursuant to Federal Rule of

Civil Procedure 8(a)(2), a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)) (internal quotation marks omitted).

In considering a Rule 12(b)(6) motion, this Court must construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true. See Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 783 (4th Cir. 1999). But, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 555). A complaint is also insufficient if it relies upon "naked assertions devoid of further factual enhancement." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557) (internal quotation marks omitted).

A complaint must allege sufficient facts to "cross 'the line between possibility and plausibility of entitlement to relief.'" Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Twombly, 550 U.S. at 557); see also Simmons v. United Mortg. & Loan Inv., LLC, 634 F.3d 754, 768 (4th Cir. 2011) ("On a Rule 12(b)(6) motion, a complaint must be dismissed

if it does not allege enough facts to state a claim to relief that is plausible on its face." (quoting Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008)) (internal quotation marks omitted)).

A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 555 U.S. at 556). Thus, if the well-pled facts contained within a complaint "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown— that the pleader is entitled to relief." Francis, 588 F.3d at 193 (quoting Iqbal, 556 U.S. at 679) (internal quotation marks omitted).

### b. Heightened Pleading Standard for Fraud

Where, as here, a claim alleges fraud or mistake, a party must "state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). To satisfy Rule 9(b)'s heightened pleading standard, a plaintiff must allege facts establishing the "who, what, when, where, and how" of the claimed fraud. United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 379 (4th Cir. 2008) (quoting United States ex rel. Willard v. Humana Health Plan of Tex. Inc., 336

F.3d 375, 384 (5th Cir. 2003)). More specifically, district courts within the Fourth Circuit have established that:

> To state a fraud claim under Maryland law, a plaintiff must allege five elements with particularity: (1) the defendant made a false statement of fact; (2) the defendant knew the statement was false or acted with reckless disregard for the truth of the statement; (3) the defendant made the statement for the purpose of defrauding the plaintiff; (4) the plaintiff reasonably relied on the false statement; and (5) the plaintiff was damaged as a result.

Thompson v. Countrywide Home Loans Servicing, L.P., No. L-09-2549, 2010 WL 1741398, at *3 (D.Md. Apr. 27, 2010); In re Medimmune, Inc. Sec. Litig., 873 F.Supp. 953 (D.Md. 1995) (citing Martens Chevrolet, Inc. v. Seney, 439 A.2d 534 (Md. 1982)).

"In evaluating whether a cause of action must be pled with particularity, a court should examine whether the claim requires an essential showing of fraud." Balt. Cnty. v. Cigna Healthcare, 238 F.App'x 914, 921 (4th Cir. 2007). It is axiomatic that claims brought pursuant to the Exchange Act, 15 U.S.C. § 78j(b) (2012), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (2014), are subject to Rule 9(b). See Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 629 (4th Cir. 2008).

### c. Pleading Standard for Securities Fraud Actions

Iqbal and Twombly notwithstanding, to survive a threshold dismissal motion, a securities fraud complaint must do more than state a facially "plausible" claim. The Private Securities

Litigation Reform Act of 1995 ("PSLRA") provides a special pleading standard for certain elements of a securities fraud claim brought under Section 10(b) of the Exchange Act. To succeed in a Section 10(b) private suit, a plaintiff must prove:

> (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

Matrixx Initiatives, Inc. v. Siracusano, 131 S.Ct. 1309, 1317 (2011) (quoting Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008)); see also Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc., 576 F.3d 172, 181 (4th Cir. 2009) (quoting the same).

Prior to the enactment of the PSLRA, the heightened pleading standard set forth in Rule 9(b) was the principal mechanism used to determine the sufficiency of a complaint for securities fraud under Section 10(b) of the Exchange Act. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007). In 1995, Congress strengthened and clarified the particularity requirement vis-à-vis federal securities class action lawsuits. Thus, under the PSLRA, to survive a motion to dismiss, a complaint for violation of the federal securities laws must meet the heightened requirements set forth under 15 U.S.C. § 78u-4(b). Matrix, 576 F.3d at 181-82.

First, any private securities complaint alleging that the defendant made a false or misleading statement must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[.]" 15 U.S.C. § 78u-4(b)(1). Second, with respect to each act or omission, the plaintiff must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." Id. § 78u-4(b)(2)(A) (emphasis added).

Construing this standard, the Supreme Court of the United States noted that it must be ascertained "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets [the strong-inference] standard." Tellabs, 551 U.S. at 323 (emphasis in original). To be sure, as has been laconically observed in other contexts, "a brick is not a wall." See Advisory Committee's Note, Fed.R.Evid. 401 (2012). Thus, to be "strong," such an inference of scienter must be more than "permissible" or "reasonable," "it must be cogent and compelling" compared to other, nonculpable explanations. Tellabs, 551 U.S. at 324.

It follows then that, under the comparative analysis set forth in Tellabs, the threshold inquiry for a court is whether the facts alleged "permit an inference of scienter, and if so, the persuasiveness of that inference." Matrix, 576 F.3d at 183.

Next, if the court finds the inference that the defendants "acted innocently, or even negligently, more compelling than the inference that they acted with the requisite scienter," the complaint should be dismissed. Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 313 (4th Cir. 2009).

Under the strong inference standard, negligence is insufficient to support a Section 10(b) claim. Id. To establish a strong inference of scienter "plaintiffs must do more than merely demonstrate that defendants should or could have done more." Id. at 314. Indeed, "Congress did not merely require plaintiffs to . . . allege facts from which an inference of scienter rationally *could* be drawn." Tellabs, 551 U.S. at 323 (emphasis in original). Rather, plaintiffs must allege scienter by pleading intentional misconduct or severe recklessness. Cozzarelli*, 549 F.3d at 623.

In the Section 10(b) context, a reckless act is one that is "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Pub. Emps.' Ret. Ass'n*, 551 F.3d at 313 (quoting Ottmann v. Hanger Orthopedic Grp., Inc., 353 F.3d 338, 344 (4th Cir. 2003)) (internal quotation marks omitted). Nevertheless, "when the facts as a whole more plausibly suggest that the

defendant acted innocently—or even negligently—rather than with intent or severe recklessness, the action must be dismissed." _Cozzarelli_, 549 F.3d at 624.

Furthermore, where, as here, plaintiffs allege fraud claims against individual defendants, they "must allege facts supporting a strong inference of scienter as to each defendant." _Matrix_, 576 F.3d at 182 (citing _Teachers' Ret. Sys. of La. v. Hunter_, 477 F.3d 162, 184 (4th Cir. 2007)). "[I]f the defendant is a corporation, the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation, since corporate liability derives from the actions of its agents." _Teachers'_, 477 F.3d at 184.

### 2. Analysis

The Court will grant Defendants' Motion to Dismiss as to Counts VIII, X, and part of IX, but will deny the Motion as to all other counts.

### a. Federal and State Securities Fraud Allegations (Counts II and IV)

Defendants' Motion will be denied as to Plaintiffs' federal and state securities fraud claims because the proposed Second Amended Complaint successfully alleges material misrepresentation and scienter.

Plaintiffs allege Defendants made material misrepresentations and omissions of fact regarding TAC's financial health to inflate the value of its stock and induce Gellene to transfer DB and its principal assets to TAC. As to the misrepresentations, Plaintiffs allege Defendants mischaracterized its number of revenue-generating cards ("RGCs") (2d Am. Compl. ¶¶ 12-13), held itself out as a growing multilayered company with varied income streams (id. ¶¶ 8, 14, 20), and claimed its common stock was valued at $1.10 per share (id. ¶ 18).

### i. The APA Merger Clause

As a preliminary matter, Defendants aver Plaintiffs' reliance upon pre-merger statements is "unreasonable as a matter of law" because the APA is a comprehensive document that covers all representations and warranties applicable to the agreement. Section 7.2 of the APA provides the "Agreement . . . constitutes the sole understanding of the Parties with respect to the subject matter hereof. [sic] contain [sic] the entire agreement between the Parties with respect to the transactions contemplated hereby and supersedes all prior agreements, written or oral, with respect thereto." (Compl. Ex. A, at 46,[3] ECF No. 1). According to Defendants, Plaintiffs could not have reasonably relied upon their alleged pre-merger statements given

---

[3] All page numbers refer to CM ECF pagination.

the merger clause. The APA's merger clause, however, merely references the agreement itself, not the representations and omissions, allegedly made to induce Plaintiffs to sign the agreement. Moreover, although Defendants rely upon Dresner v. Utility.com, Inc., 371 F.Supp.2d 476, 491-92 (S.D.N.Y. 2005), in support of their argument, there are district court cases within the Fourth Circuit that have rejected clauses purporting to waive one's right to claim reliance upon misrepresentations. See, e.g., Jadoff v. Gleason, 140 F.R.D. 330, 334-36 (M.D.N.C. 1991) (rejecting defendant's argument that the acknowledgements signed by plaintiffs constituted waiver or conclusive evidence that plaintiffs did not rely on the complained of misrepresentations). Conversely, there are cases within the Second Circuit that have foreclosed securities claims based upon pre-agreement misrepresentations when the subject agreements involve provisions that specifically disclaim such representations. See, e.g., One Commc'ns Corp. v. JP Morgan SBIC LLC, 381 F.App'x 75, 79 (2d Cir. 2010) (plaintiff precluded from alleging reasonable reliance due to the merger clause and contract provision specifically disclaiming representations that were not in the agreement); Harsco Corp. v. Segui, 91 F.3d 337, 343 (2d Cir. 1996) (same). Nonetheless, the Court concludes the APA merger clause does not prohibit Plaintiffs from claiming reliance upon Defendants' alleged pre-merger statements.

## ii. Material Misrepresentations/Omissions

In Count II, Plaintiffs allege violations of § 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5,[4] based upon the aforementioned allegations. Defendants argue Plaintiffs failed to successfully allege the first two elements of a PSLRA claim: (1) a material misrepresentation (or omission); and (2) scienter. The Court disagrees.

In their Motion to Dismiss the First Amended Complaint, Defendants correctly aver that Plaintiffs failed to attribute their purported true facts to any source and, therefore, could not properly plead why Defendants' alleged misrepresentations and omissions were misleading. In response, Plaintiffs filed their proposed Second Amended Complaint which, on its face, appears to provide the missing sources and explanations of why the representations and omissions were misleading. Plaintiffs claim Defendants made the following statements and omissions during negotiations to induce Gellene to transfer DB and its principal assets to Defendants:

- During a December 28, 2010 introductory call and in a letter of intent attached to a January 10, 2011 email, Eder held TAC out to be a financial and employee

---

[4] Section 10(b) and SEC Rule 10b-5, which implements § 10(b), prohibits the use of deceptive tactics in connection with the purchase or sale of any security. <u>See</u> 15 U.S.C. § 78j(b).

benefit services company that provided prepaid cards, a mobility services program, an online bill pay program, and affordable health care programs. (2d Am. Compl. ¶ 8);

- On February 2, 2011, TAC emailed Gellene a discussion document that stated, "With just two years of selling under our belt, we have grown our revenue generating cards from 53 cards in 2008 to approximately 18,000 at the end of 2010 with average revenue per month per card of $7.00 at a gross margin of just under 50%. We finished 2011 [sic] at $1.1M in revenues and expect to triple revenues in 2011 to approximately $3M in revenues." (Id. ¶ 12);

- On February 16, 2011, a TAC employee sent an email to Gellene stating the valuation of TAC's common stock was $1.10 per share. (Id. ¶ 18);

- On March 3, 2011, Eder sent an email to Gellene with an attachment that represented, "Over the last 18 months, TAC has grown to 63,000 Members in the U.S., Canada, the United Kingdom, Puerto Rico, and Mexico. This growth is due to its overall services platform, creating safe and healthy financial benefit environments for families and individuals." (Id. ¶ 14). The attachment also stated TAC services included

"Non-Qualified and Qualified Affordable Healthcare Programs" as well as "Discount Auto Insurance." (Id.);

- During negotiations, Defendants failed to disclose a substantial reduction in income from their primary revenue source as Eder acknowledged in a June 17, 2013 declaration filed in this matter. (Id. ¶ 19);

- Defendants portrayed TAC as a growing company but the attachments to the aforementioned Eder declaration, and an attachment to an August 2012 email Gellene received from a TAC employee, show card usage "plummeted almost 70% from May 2010 to February 2011." (Id. ¶ 20);

- Defendants "failed to disclose [their] past due indebtedness in an amount exceeding $300,000 to [their] principal and most essential service provider, FIS Global, and was in default of [their] agreement with that service provider." (Id. ¶ 21). A fact that Gellene did not discover until he reviewed an internal document in March 2013. (Id.);

- Defendants failed to disclose "that as of December 2010 [they were] indebted and past due to [their] principal managerial employees in an amount exceeding

$180,000[,]" which Gellene discovered in February 2012 through an internal document. (Id. ¶ 22); and

- Defendants failed to disclose that they did not have the "the then present ability to fulfill [their] obligation under the APA to pay to DB the sum of $50,000 at time of the execution of the APA or to assume the operating costs of DB as [they were] required to do in the APA." (Id. ¶ 23).

In sum, Plaintiffs paint a picture of Defendants deceptively holding TAC out to be a profitable multi-layered company when, in actuality, it was sinking in the ocean of financial ruin without a paddle or life vest.

Defendants aver that, despite the proposed amendment, Plaintiffs fail to identify specific details of the alleged statements and failed to demonstrate they were false. Plaintiffs, however, are not required to "plead 'detailed evidentiary matter' in order to survive a motion to dismiss." Keeney v. Larkin, 306 F.Supp.2d 522, 528 (D.Md. 2003) (citing In re Health Mgmt. Inc. Sec. Litig., 970 F.Supp. 192, 208 (E.D.N.Y. 1997)). Furthermore, "neither Rule 9(b) nor the PSLRA requires plaintiff[s] to set forth facts which, because of the lack of discovery, are in the exclusive possession of the Defendants." Id.

As to the misrepresentations, Plaintiffs clearly identify the allegedly misleading statements and provide reasons why the statements are misleading with exhibits, available to Plaintiffs at this juncture, to support those reasons. The parties' disagreement over whether TAC intentionally utilized a different definition of RGCs is best addressed on a motion for summary judgment but is also not dispositive to the pending motion because Plaintiffs successfully allege the number of RGCs presented was inaccurate under either definition. Moreover, although Defendants correctly aver that the alleged forward-looking statements regarding tripled revenues in 2011 are generally not actionable,[5] such statements are actionable upon a showing of actual knowledge that the projection is false or misleading.[6] Defendants' alleged omissions, discussed <u>infra</u>, intimate Defendants' actual knowledge of the false or misleading nature of the projection. Read collectively, Plaintiffs'

---

[5] <u>See</u> <u>Hillson Partners Ltd. P'ship v. Adage, Inc.</u>, 42 F.3d 204, 213 (4th Cir. 1994) ("An inability to foresee the future does not constitute fraud." (quoting <u>Eckstein v. Balcor Film Investors</u>, 8 F.3d 1121, 1132 (7th Cir. 1993)) (internal quotation marks omitted)); <u>Raab v. Gen. Physics Corp.</u>, 4 F.3d 286, 290 (4th Cir. 1993) ("[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws." (quoting <u>Krim v. Banctexas Grp., Inc.</u>, 989 F.2d 1435, 1446 (5th Cir. 1993)) (internal quotation marks omitted)).

[6] <u>See</u> 15 U.S.C. § 78u-5(c)(1)(B) (forward looking statements not accompanied by meaningful cautionary language may be actionable upon a showing of actual knowledge that the statements were false or misleading).

allegations regarding Defendants' fraudulent misrepresentations, including TAC's growth, profitable prepaid card program, ancillary services, and international membership, are sufficient to pass muster.

To accompany its purported growth, TAC allegedly experienced significant financial challenges, which, according to Plaintiffs, Defendants failed to disclose during negotiations. Specifically, Defendants allegedly omitted information regarding TAC's substantial loss of revenue from its primary source; TAC's debt to managerial employees and card processor, FIS Global; TAC's plummeting customer card usage; and TAC's then-present inability to pay Gellene his bargained-for $50,000 and assume DB's operating costs as provided in the APA. Defendants argue these allegations are insufficient because Plaintiffs either "fail to provide details to make any reasonable inference of falsity, or the contents of the documents do not support the conclusion Plaintiffs wish to draw." (Defs.' Opp'n to Pls.' Cross Mot. for Leave to Amend Compl., & Defs.' Reply to Pls.' Opp'n to the Mot. to Dismiss ["Defs.' Opp'n"] at 5-6, ECF No. 31). The Court partially agrees.

Of the omissions alleged, only Defendants' alleged then-present inability to pay Gellene or assume DB's operating costs fails to pass muster. Although Plaintiffs allege Defendants had

a then-present inability to pay Gellene and financially support DB, they do not allege Defendants failed to provide the bargained-for compensation or support. As to the remaining omissions, Defendants acknowledged a substantial loss in revenue from its primary customer during negotiations (see Eder Decl. ¶ 17, ECF No. 15-1), and Plaintiffs provide documentation to support their card usage allegation.

The parties disagree on whether Defendants disclosed their indebtedness to FIS Global and its employees. As alleged, Defendants failed to provide the amount of the aforementioned debt in response to the due diligence request. According to Plaintiffs, during the due diligence process in March 2013, TAC claimed it did not have the information available. (See 2d Am. Compl. ¶ 53). In his declaration, however, Eder states that not only did TAC have the December 2010 financials available, but it provided them to Plaintiffs prior to signing the APA. (See Eder Decl. ¶¶ 29-33). Assuming Plaintiffs' allegations to be true, as the Court must at this juncture, TAC failed to disclose information regarding its December 2010 indebtedness to FIS Global and its employees during negotiations with Plaintiffs. Despite alleging falsity, the question remains whether Defendants' alleged misrepresentations and omissions of fact are material.

It is axiomatic that any new partnership requires an analysis of the financial health of the entities involved. Knowledge of TAC's financial woes, however, are only material if they would have significantly altered the "total mix" of information made available to Plaintiffs prior to signing the APA. See Matrixx Initiatives, Inc., 131 S.Ct. at 1318 ("[The] materiality requirement is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" (quoting Basic Inc. v. Levinson, 485 U.S. 224, 238 (1988)). Indeed, TAC's representations regarding its growth, valuation, ancillary programs, and the success of its RGCs, among other things, compelled it to disclose any fact that would not render those representations misleading. See Matrixx Initiatives, Inc., 131 S.Ct. at 1321 ("Disclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" (citing 17 C.F.R. § 240.10b-5(b))(alteration in original)); see also Phillips v. LCI Int'l, Inc., 190 F.3d 609, 613 (4th Cir. 1999) ("If a reasonable investor, exercising due care, would gather a false impression from a statement, which would influence an investment decision,

then the statement satisfies the initial element of a § 10(b) claim.").

Viewing the proposed Second Amended Complaint as a whole, Defendants lauded TAC's growth and made a projection regarding tripled revenues with knowledge that the economy precipitated a decline in revenue from a customer who accounted for more than fifty-percent of TAC's bottom line. In addition to not disclosing this decline, TAC also failed to disclose its debt to managerial employees and card processor, FIS Global, as well as its plummeting customer card usage. It is likely that a potential seller would have viewed this information as significantly altering the "total mix" of information made available prior to signing the agreement. Of particular import to Plaintiffs' situation is the information regarding the decline of TAC's principal RGC customer because the agreement involved the same enterprise.

Therefore, Defendants were required to disclose the alleged omissions because it would have revealed material facts necessary to make TAC's alleged representations not misleading under the circumstances. Accordingly, Plaintiffs have successfully alleged Defendants made material misrepresentations and omissions of fact.

### iii. Scienter

Plaintiffs have also alleged facts that give rise to a strong inference that Defendants acted with scienter.

Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 n.12 (1976). In pleading scienter, Plaintiffs must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind" for each omission. 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). Although the standard requires a showing of scienter for each omission, the Court must determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets [the strong-inference] standard." <u>Tellabs</u>, 551 U.S. at 323 (emphasis in original). Although the U.S. Supreme Court has yet to determine whether scienter may be shown through recklessness, <u>see</u> <u>Matrixx Initiatives, Inc.</u>, 131 S.Ct. at 1323, the Court will consider whether Plaintiffs' allegations sufficiently show Defendants made the aforementioned material misrepresentations and omissions of fact intentionally or recklessly.

According to Plaintiffs, Defendants made the material misrepresentations and omissions of fact "intentionally and

willfully with the purpose and intent of inducing DB and Gellene to enter into the APA and in order that TAC might have access to DB's revenue stream, save their salaries and jobs and to stave off the financial ruin of the company . . . ." (2d Am. Compl. ¶ 24). During the preliminary injunction phase of this matter, Eder acknowledged that TAC's acquisition of DB made sense because "it would help mitigate any revenue decline." (Eder Decl. ¶ 17). One logical inference from the facts alleged is that TAC intentionally withheld information regarding its revenue decline and liabilities because it did not want to disrupt the loss-mitigating merger. An equally logical inference is that TAC recklessly believed disclosure of its primary customer's revenue decline was not required, or important for that matter. Finally, one could also infer TAC's liability documentation was truly unavailable at the time of Plaintiffs' request. A reasonable person would deem the inferences of fraudulent activity just as compelling as any opposing inference of nonfraudulent acitivity. Assuming the facts of the proposed Second Amended Complaint to be true, Plaintiffs' allegations support a "cogent and compelling" inference that TAC withheld information related to its revenue decline and liabilities because it did not want to disrupt the loss-mitigating merger with Plaintiffs.[7] This is enough to plead

---

[7] Although Defendants correctly aver that a motivation to

scienter.     Accordingly,     Defendants'     Motion     to     Dismiss

Plaintiffs' Counts II and IV is denied.[8]

### b.   Illegal Sale of Securities (Counts I and III)

Defendants' Motion will be denied as to Plaintiffs' illegal

sale of securities claims because, as alleged, Plaintiffs did

not have access to the kind of information registration would

have disclosed.

Plaintiffs allege Defendants violated Sections 12(1) and 15

of the Securities Act, 15 U.S.C. §§ 77l, 77e, as well as Section

11-501 of the Maryland Corporations & Associations article of

the Maryland Code, Md. Code Ann., Corps. & Ass'ns § 11-501(1)

(West 2014), by offering and selling securities to Plaintiffs

that were neither registered nor exempt from registration.

Defendants aver these allegations should be dismissed because

---

engage in fraud to keep a merger on track is insufficient to
support a strong inference of scienter, see, e.g., Phillips, 190
F.3d at 622 ("Allegations that 'merely charge that executives
aim to prolong the benefits they hold' are, standing alone,
insufficient to demonstrate the necessary strong inference of
scienter."); In re Acterna Corp. Sec. Litig., 378 F.Supp.2d 561,
576 (D.Md. 2005) ("The Fourth Circuit has made clear that
allegations, like the ones asserted here, that merely charge
that executives committed fraud to prolong the benefits they
hold or to retain an executive position do not, in themselves,
raise a strong inference of scienter."), Plaintiffs' allegations
suggest more than a mere attempt to maintain the status quo.  As
alleged, TAC was experiencing a precipitous revenue decline and
engaged Plaintiffs while also engaging in other fundraising
efforts through the sale of stock.
    [8]  Similarly, Defendants' Motion to Dismiss Plaintiffs'
common law fraud (Count V) and fraudulent inducement (Count VII)
claims is denied.

TAC's offer to Plaintiffs was a private offering exempt from registration under the federal and Maryland laws. According to Defendants, the proposed Second Amended Complaint alleges Plaintiffs initiated the securities discussion and sought payment in TAC's stock, which heavily favors finding the exchange to be a private offering. Defendants also aver Plaintiffs claimed to have sufficient knowledge in making similar investments and the express language of the APA notifies Plaintiffs that the stock would not be registered.

It is unlawful for entities to offer to sell any security without filing a registration statement. See 15 U.S.C. § 77e(c); Md. Code Ann., Corps. & Ass'ns § 11-501(1). The law exempts, however, transactions that are private offerings. See id. § 77d(a)(2); id. § 11-602(9). Although the number and sophistication of the transferees may be considered in determining the private nature of an offering, the pivotal inquiry is whether the purchaser had "access to the kind of information which registration would disclose." SEC v. Ralston Purina Co., 346 U.S. 119, 124-27 (1953); see also United States v. Custer Channel Wing Corp., 376 F.2d 675, 678 (4th Cir. 1967) ("'[S]ophistication' is not a substitute for 'access to the kind of information which registration would disclose.'" (quoting Ralston Purina Co., 346 U.S. at 127)). Therefore, the parties' squabbles regarding the initiation of the sale and the number of

transferees involved need not be resolved at this juncture because Plaintiffs allege they did not have access to the kind of information a registration statement would have disclosed. See generally Schedule A to the Securities Act, 15 U.S.C. § 77aa (listing the information required in a registration statement).

The burden is on Defendants to prove the exemption applies. Ralston Purina Co., 346 U.S. at 126. As mentioned in the previous section, Plaintiffs allege they did not receive all of TAC's financial information prior to signing the APA, including the omissions of TAC's indebtedness to FIS Global and its employees as well as the loss of revenue from its primary customer. This missing information is exactly what is required to be furnished in a registration statement. See 15 U.S.C. § 77aa(25). Although Defendants contend they did provide the information, (see Eder Decl. ¶¶ 29-30), the Court must accept as true Plaintiffs' allegation they did not receive it. Moreover, even if Defendants provided the missing liability information after signing the APA, the information is alleged to have been unavailable prior to signing the agreement. See Custer Channel, 376 F.2d at 678 ("Even the few purchasers shown by the evidence to have gained access to the pertinent information when they later became directors of the corporation, lacked such access at the time they purchased most of their stock."). Without this

information, the Court does not find, at this juncture, that the private offering exemption applies.

Finally, Defendants argue Plaintiffs' allegations of state liability for illegal sale of securities is barred by the one-year statute of limitations.  See Md. Code Ann., Corps. & Ass'ns § 11-703(f).  Under Maryland law, a person may file suit upon receipt of the security or of the consideration paid for the security.  See id. § 11-703(b)(1),(2); see also Mathews v. Cassidy Turley Md., Inc., 80 A.3d 269, 286 (Md. 2013) ("[T]he statute provides a remedy only when a sale has been completed" (citing Md. Code Ann., Corps. § Ass'ns § 11-703(b)(1))).  Under the applicable statutory scheme, a "'[S]ale' . . . includes every contract of sale of, contract to sell, or disposition of a security or interest in a security for value."  Id. § 11-101(p). In their brief Plaintiffs allege the limitation period has not run because the sale was not completed until Spring 2013.  The proposed Second Amended Complaint, however, provides no allegations regarding the timing of the sale.  In fact, the only document that references a time period is Exhibit Y, a March 29, 2013 letter from TAC's counsel claiming TAC had not delivered the stock certificates because Plaintiffs requested they wait to avoid tax liability.  (See ECF No. 20-1, at 87-90).  Moreover, the letter intimates that the parties did not agree upon the number of shares until an unspecified date in 2012.  (See id. at

88).  The four corners of the proposed Second Amended Complaint allege a sale of unregistered stock without any indication of the time the sale was completed.  Moreover, although Plaintiffs claim to have submitted the consideration necessary in their brief, this lacks a time period as well.  Therefore, the Court will not dismiss this count on statute of limitations grounds at this time.

Accordingly, Defendants' Motion to Dismiss Counts I and III is denied.

### c.  Breach of Contract Claims (Counts VI and X)

Plaintiffs have successfully alleged their breach of contract claims.  In Count VI, Plaintiffs aver Defendants intentionally, recklessly and/or negligently breached the warranties contained in paragraphs 4.5, 4.6, 4.7, 4.9, and 4.11 of the APA.  Because the alleged breach is primarily based upon the material misrepresentations and omissions addressed supra, Plaintiffs have successfully alleged Defendants breached the warranties contained in the APA.

In Count X, Plaintiffs allege Defendants owe Gellene reimbursement for payments he made for goods and services on behalf of TAC.  The exhibit applicable to this claim provides the amount of business expenses owed to Gellene is $41,246.28.  (See 2d Am. Compl. Ex. AD, at 103, ECF No. 20-1).  Gellene's employment agreement provides that TAC would reimburse Gellene

"for reasonable business expense [sic] business and travel related expenses submitted with appropriate documentation on a monthly basis."  (2d Am. Compl. Ex. AC, at 102, ECF No. 20-1). Although Plaintiffs aver Gellene submitted the requisite documentation on a monthly basis as agreed, they fail to allege the expenses were reasonable.

Accordingly, the Court denies Defendants' Motion to Dismiss Count VI, but grants the Motion as to Count X.

### d.    Officers and Directors Liability (Count VIII)

With the exception of Eder, Plaintiffs have failed to allege officer and director liability for any of the remaining individual Defendants.  It is well-settled that allegations regarding fraud against individual defendants requires "facts supporting a strong inference of scienter as to each defendant." Matrix, 576 F.3d at 182 (citing Teachers', 477 F.3d at 184). Plaintiffs have not presented more than conclusory statements regarding Defendants', Rhett McNulty, Clark McNulty, and Daniel Lindberg, knowledge of the alleged actions.

As a result, Defendants' Motion to Dismiss Count VIII is granted as to each individual Defendant except Eder.

### e.    Maryland Wage Payment and Collection Act Claim (Count IX)

Plaintiffs allege Defendants owe Gellene $7,449 in salary, five weeks of vacation pay for 2011-2012, plus prorated vacation

pay for 2013, and $100,000 in bonuses, in violation of the Maryland Wage Payment and Collection Act ("Wage Act"), Md. Code (1991, 1999 Repl. Vol.), Lab. & Empl. §§ 3-501 et seq. (West 2014). The Wage Act provides "each employer shall pay an employee . . . all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated." Id. § 3-505(a). Although the term "wages" may include bonuses, see id. § 3-501(c)(2), a wage is more accurately defined as "all compensation that is due to an employee for employment," including "any other remuneration promised for service." Id. § 3-501(c)(1), (2)(v). Moreover, an employer is not required to pay accrued leave if a limitation is provided for in the employer's written policy. See id. § 3-505(b)(1).

As written, Plaintiffs' allegations regarding the salary and accrued vacation owed to Gellene are sufficient to withstand Defendants' Motion. Plaintiffs' allegations are less about the frequency of the payments, which Defendants contest, and more about the salary amount owed to Gellene. Moreover, Gellene's employment agreement clearly references an entitlement to accrued vacation and, at this juncture, there is no indication Defendants' written policy limited the payment of this accrued vacation upon termination. Moreover, Gellene's ability to

34

receive $50,000 in annual incentive compensation was premised upon his achievement of goals outlined in the Incentive Compensation Plan ("ICP").

Plaintiffs allege, however, that TAC never provided the ICP. (2d Am. Compl. ¶ 121). According to Plaintiffs, Gellene "met and exceeded every employment goal set for him . . . ." (Id. ¶ 119). Given the alleged omission of the ICP, and therefore a lack of information regarding the goals outlined therein, Plaintiffs' allegation regarding Gellene's performance is sufficient to withstand a motion to dismiss. As a result, Plaintiffs' have successfully alleged Gellene's entitlement to the $100,000 bonus payment.

Finally, Gellene's reimbursable business expenses are considered "wages" under the Wage Act, but Plaintiffs fail to allege the expenses were reasonable. As the Court of Appeals of Maryland explained, "Once a bonus, commission or fringe benefit has been promised as a part of the compensation for service, the employee would be entitled to its enforcement as wages." Whiting-Turner Contracting Co. v. Fitzpatrick, 783 A.2d 667, 672 (Md. 2001). Therefore, Gellene's business expenses are considered "wages" under the Wage Act if the they were promised as part of the compensation for his service and if all agreed-to conditions have been satisfied. As previously mentioned, the reimbursement of Gellene's business expenses was included in his

employment agreement, thereby satisfying the first prong of the wage test. As to the second prong, the only condition to reimbursement was that Gellene submit the appropriate documentation on a monthly basis for a reimbursement of the expenses TAC deemed reasonable. In the breach of contract section supra, the Court concluded Plaintiffs have failed to allege the business expenses were reasonable.

Accordingly, Defendants' Motion to Dismiss Count IX is granted as to business expenses but denied as to the salary and vacation pay.

## B. __Motion for Leave to File Surreply__

Defendants' Motion for Leave to File Surreply will be granted because Plaintiffs submitted a new complaint with their Reply.

Unless otherwise ordered by the court, surreply memoranda are not permitted to be filed. See Local Rule 105.2(a) (D.Md. 2011). "Surreplies may be permitted when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply." Khoury v. Meserve, 268 F.Supp.2d 600, 606 (D.Md. 2003) (citing Lewis v. Rumsfeld, 154 F.Supp.2d 56, 61 (D.D.C. 2001)). In their Reply to Defendants' opposition, Plaintiffs attached an amended complaint with new allegations presented to the Court for the first time.

Defendants' proposed surreply is meant to address the procedural dysfunction of Plaintiffs' pleading.

Accordingly, Defendants' Motion for Leave to File Surreply is granted.

## C.  <u>Motion for Leave to Amend the Complaint</u>

Plaintiffs' Cross-Motion for Leave to Amend the Complaint will be granted, but their attempt to file a "Revised Proposed Second Amended Complaint" must fail.

A party may amend its pleading once as a matter of course, but after the first amendment, the party must obtain written consent from the opposing party or leave of the court. Fed.R.Civ.P. 15(a).  The court should freely give leave to amend "when justice so requires."  Fed.R.Civ.P. 15(a)(2).  Leave to amend "should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile."  <u>Laber v. Harvey</u>, 438 F.3d 404, 426 (4th Cir. 2006). The Court grants Plaintiffs' Motion for Leave to Amend the Complaint because the analysis above illustrates that none of the aforementioned conditions for denial apply.

Plaintiffs' attempt to submit an additional amendment, however, is procedurally improper.  After amending the complaint once as a matter of course and submitting a motion to amend for the Court's consideration, Plaintiffs now seek a third bite at

37

the apple without requesting leave of the Court.  Not only is the third amendment futile in light of the Court's partial denial of Defendants' Motion to Dismiss, it is also prejudicial to Defendants who would have to address a new set of allegations.  Therefore, Plaintiffs' Revised Proposed Second Amended Complaint is not properly before this Court and will not be considered.

### III. CONCLUSION

For the foregoing reasons, the Court will, by separate order, GRANT IN PART and DENY IN PART Defendants' Motion to Dismiss (ECF No. 13); GRANT Plaintiffs' Cross-Motion for Leave to Amend the Complaint (ECF No. 20); and GRANT Defendants' Motion for Leave to File Surreply Arguments in Response to Plaintiffs' Reply Brief (ECF No. 47).


Entered this 20th day of February, 2014


_____/s/_____

George L. Russell, III
United States District Judge