**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **DIRECT BENEFITS, LLC**, *et al.*, | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **v.** | * | **Civil Case No. SAG-13-1185** |
| | * | |
| **TAC FINANCIAL, INC.**, *et al.*, | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>**MEMORANDUM OPINION**</u>

Plaintiffs Direct Benefits, LLC ("Direct Benefits") and Andrew C. Gellene ("Gellene") (together, "Plaintiffs") filed a Third Amended Complaint against Defendants TAC Financial, Inc. ("TAC Financial") and Roy Eder ("Eder"), TAC Financial's former CEO (together, "Defendants"), on June 20, 2014.[1] ECF 77. Specifically, Count III seeks a damages award from TAC Financial and Eder, pursuant to an alleged sale of unregistered securities in violation of the Maryland Securities Act. *Id.* ¶¶ 91-96.

On October 31, 2014, Plaintiffs filed a Motion for Partial Summary Judgment on Count III of the Third Amended Complaint, ECF 98, and an accompanying Memorandum of Law, ECF 98-1 (collectively, "the Motion"). Defendants filed a Cross-Motion for Partial Summary Judgment on Count III on December 1, 2014, ECF 104, along with a Memorandum of Law in support thereof and in opposition to Plaintiffs' Motion, ECF 104-1 (collectively, "the Cross-Motion"). However, after TAC Financial filed a Suggestion of Bankruptcy, the Court administratively closed this case on January 25, 2015. ECF 120, 122. The Court reopened the

---

[1] The parties have informed the Court that Eder passed away during the stay in this case. ECF 139-1 at 2 n.1.

case more than four years later, on March 12, 2019, ECF 129, and reinstated the Motion and Cross-Motion on October 28, 2019, ECF 185. The Court has reviewed those Motions, and the associated Oppositions and Replies thereto. *See* ECF 98, 104, 109, 118. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, Plaintiffs' Motion will be denied, and Defendants' Cross-Motion will be granted.

## I.     FACTUAL BACKGROUND

In 2010, both Direct Benefits and TAC Financial were operating prepaid debit card businesses. ECF 98-2 at 74-75 (Eder Dep.); *id.* at 1, ¶¶ 1-2 (Gellene Aff.). By the end of December, 2010, Direct Benefits was experiencing a cash shortage, and one of its major business partners advised that it would not be renewing its contract. ECF 104-2 at 4-7 (Direct Benefits internal update from December 31, 2010). To address this situation, Andrew Gellene, the Managing Member of Direct Benefits, began engaging in conversations with Roy Eder, TAC Financial's CEO and Chairman of its Board of Directors, to consider the potential for TAC Financial to purchase Direct Benefits's assets. ECF 98-2 at 17 (December 28, 2010 email from Gellene to Eder); *id.* at 69, 75 (Eder Dep.); *id.* at 1-2, ¶ 2 (Gellene Aff.). Shortly after negotiations began, on April 14, 2011, Direct Benefits and TAC Financial executed an Asset Purchase Agreement ("the APA"). ECF 98-2 at 6, ¶ 14 (Gellene Aff.); ECF 104-2 at 68 (the APA). TAC Financial's Board of Directors did not ratify the APA until May 20, 2011. ECF 98-2 at 161 (TAC Financial Board of Directors Meeting Minutes from May 20, 2011).

Under the APA's terms, Direct Benefits agreed to transfer to TAC Financial: all of Direct Benefits's intellectual property, permits, and licenses; all of Direct Benefits's "know-how, good will, and going concern value associated" with its business; and all of the rights Direct Benefits had under its contracts with holders of its Money Manager Cards ("the MMCs"), Direct

Benefits's brand of prepaid debit cards.[2]  ECF 104-2 at 45-46 (APA § 2.1).  In exchange, Direct

Benefits would receive two forms of consideration from TAC Financial:  (1) a cash payment of

$50,000; and (2) an unenumerated number of shares of TAC Financial common stock, valued at

$1.10 per share, based upon the number of MMCs Direct Benefits transferred to TAC Financial.

*Id.* at 47 (APA § 2.4).  The parties agreed that the total purchase price would roughly equate to

$819,000, but that number was subject to recalculation, because the price was based on "an

assumption" that Direct Benefits would transfer 7,000 MMCs.  *Id.*

To complete the transfer of the MMCs to TAC Financial, TAC Financial would need to

reissue its own prepaid debit cards to Direct Benefits's MMC customers.  ECF 98-2 at 7-9, ¶¶

17-18, 24-25 (Gellene Aff.).  This process would take time and coordination with third parties.

*Id.* at 9-11, ¶¶ 24-29.  Accordingly, the APA provided for a 150-day period under which this card

transfer process would occur.   ECF 104-2 at 47-48 (APA § 2.5(a)).  Upon the expiration of that

period, TAC Financial would calculate the precise number of cards transferred (referred to as

"New MMCs").  *Id.*  The beginning of the 150-day period, however, was not precisely identified

in the APA.  *Id.* at 42 (APA Art. I, defining "Card Order Ready Date"); *id.* at 47 (APA § 2.5(a)).

Once the proper calculation of New MMCs occurred, the APA called for Direct Benefits to

receive 100 shares of TAC Financial common stock, valued at $1.10, per New MMC.  *Id.* at 47,

64 (APA § 2.4(b) & Ex. A); ECF 98-2 at 8, ¶¶ 18-20 (Gellene Aff.).

The APA also called for Gellene to become a TAC Financial employee.  ECF 104-2 at

48, 70-71 (APA § 2.6(b) & Ex. D).  Exhibit D to the APA set forth Gellene's Employment

Agreement, which indicated that Gellene would "become a full-time employee of TAC

---

[2] In simplified terms, Direct Benefits executed contracts with employers, under which Direct
Benefits would provide employers with MMCs to use for employee compensation.  ECF 109-1
at 2, ¶ 3 (Gellene Aff.).  The MMC, and its related account, acted as a debit card, allowing the
employee to access the funds at ATMs and retailers.  *Id.*

Financial" effective upon the APA's execution. *Id.* at 70. Under the arrangement, Gellene would receive an annual salary of $125,000 from TAC Financial, as well as "a grant for options to purchase 140,000 shares of TAC Common Stock," which would vest "equally over four years with a one-year cliff." *Id.* at 70-71. After the APA's execution, Gellene worked, as a TAC Financial employee, to facilitate the transfer of Direct Benefits MMCs to TAC Financial. ECF 98-2 at 9-11, ¶¶ 24-29. Throughout 2011 and into 2012, Gellene also worked on projects and assignments unrelated to the MMC transfer, including training new TAC Financial hires on its card ordering and funding process, as well as creating a new system design for one of TAC Financial's new clients. *Id.* at 12-13, ¶¶ 35-39.

From the end of 2011 through all of 2012, Direct Benefits and TAC Financial worked to compute an accurate count of New MMCs, in order to finalize the stock transfer to Direct Benefits. ECF 98-2 at 10-12, ¶¶ 28-34. Eder worked with Gellene and Tom Loftus, the Chairman of Direct Benefits, on this issue. *Id.*; ECF 98-3 at 1-2, ¶¶ 2-3. On August 1, 2012, Eder sent a final New MMC and share transfer count estimate to Gellene and Loftus, indicating that there had been a total of 9,733 New MMCs transferred. ECF 98-2 at 174. Because this amount was higher than the 7,000 MMCs originally estimated, Direct Benefits would receive a grand total of 989,783 shares of TAC Financial common stock, valued at $1,088,761 ($1.10 per share). *Id.* Loftus disagreed with this calculus, however, because it failed to take into account a certain Direct Benefits client that had yet to be transferred to TAC Financial. ECF 98-3 at 2, ¶ 3; *id.* at 8 (August 9, 2012 email from Loftus to Eder expressing these concerns). According to Eder, TAC Financial ultimately decided to give Gellene and Direct Benefits "the benefit of the doubt," and awarded an extra 30,000 shares of stock "as a sign of good faith." ECF 109-1 at 16 (Eder Dep.). This, in turn, brought the total number of shares to 1,019,783.

In addition to working with Eder to finalize the New MMC count, from sometime in April, 2012 through the end of the year, Loftus also sought to work with Eder to amend the APA to "minimize[e] the tax burden on [Direct Benefits] members."  ECF 98-3 at 2, ¶ 4 (Loftus Aff.).  Loftus, Eder, and TAC Financial's counsel exchanged various proposed amendments aimed at achieving this goal, but the parties could not agree on a mutually beneficial amendment.  *Id.* at 2, ¶¶ 4-5; *id.* at 9-10 (August 25, 2012 email between Loftus and Eder regarding proposed amendment to Ex. A of the APA).

Eventually, by March, 2013, Gellene became concerned about the financial status and well-being of TAC Financial.  ECF 98-2 at 14-15, ¶¶ 41-45 (Gellene Aff.).  Thus, on March 26, 2013, after Gellene consulted with other Direct Benefits members, Direct Benefits decided that it "should not complete the transaction."  *Id.* at 15, ¶ 46.  Direct Benefits, through counsel, sent a demand letter to TAC Financial demanding that it consent to the APA being unwound.  ECF 98-2 at 184-89 (March 26, 2013 Direct Benefits Demand Letter).  TAC Financial, also through counsel, responded three days later.  *Id.* at 190-93 (March 29, 2013 TAC Financial Response Letter).  In that letter, TAC Financial admitted that the common stock shares had not yet been transferred to Direct Benefits, but asserted it was because of Direct Benefits's repeated attempts to restructure the APA to diminish its tax liability.  *Id.* at 190-91.  TAC Financial stated that it would "no longer cooperate" in this effort, that it would "now print Direct Benefits' stock certificates, dated 2012 on the day Roy [Eder] and Andrew [Gellene] agreed upon the number of shares," and that it would report the stock issuance to the IRS as it was "legally required to do."  *Id.* at 191.  In discovery, Direct Benefits and Gellene obtained a certificate indicating a transfer of 1,019,783 shares TAC Financial common stock to Direct Benefits on July 20, 2012, ECF 98-2 at 194, which Gellene avers neither Plaintiff had received before this lawsuit, *id.* at 16, ¶ 47

(Gellene Aff.).   Direct Benefits and Gellene together initiated the instant suit on April 22, 2013. ECF 1.

## II.    LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   The moving party bears the burden of showing that there is no genuine dispute of material facts.   *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)).   If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial.   *Id.*   The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial."   *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)).   The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor.   *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).   Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another."   *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case.   *Id.* at 352.   The non-moving party "must produce competent evidence on each element of [its] claim."   *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671).   If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case

"necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)).  In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.   ANALYSIS

The parties' Motions for Partial Summary Judgment focus on Count III of Plaintiffs' Third Amended Complaint, alleging the sale of unregistered securities.  ECF 77, ¶¶ 91-96.  As a general rule, the Maryland Securities Act mandates that securities be registered before an entity sells, or offers to sell, them.  Md. Code Ann., Corps. & Ass'ns § 11-501 (West 2019).  A securities seller is civilly liable to the buyer if the sale violates § 11-501.  *Id.* § 11-703(a)(1)(i).  Defendants admit that they sold Plaintiffs unregistered securities – namely, common stock in TAC Financial.  ECF 78, ¶ 93 (Defendants' Answer to the Third Amended Complaint).  By selling these unregistered securities, Plaintiffs argue, Defendants are strictly liable to Plaintiffs for damages.  ECF 98-1 at 10-12; *see* § 11-703(a)(1)(i), (b)(1); *see also id.* § 11-101(s)(1)(ii) (including "stock" in the definition of a "security").  Defendants, however, challenge the premise that their securities needed to be registered, arguing that the transaction satisfied the Maryland Limited Offering Exception (MLOE), thereby vitiating the registration requirement.  ECF 104-1 at 15-22; *see* § 11-501(2); *id.* § 11-602(9) (establishing the MLOE); Md. Code Regs. 02.02.04.09 to .13 (2019).

Antecedent to this question, however, Plaintiffs must satisfy the Maryland Securities Act's statute of limitations for bringing a private cause of action.  Section 11-703(f)(2) of the Act

specifies that a buyer may not maintain an action to "enforce any liability" under § 11-703(a)(1)(i), including an unlawful sale of an unregistered security, "unless brought within one year after the violation on which it is based." § 11-703(f)(2)(i).[3]

Plaintiffs assert that the APA contemplated two sales of securities:  one to Direct Benefits, through the exchange of TAC Financial common stock and cash for Direct Benefits's assets; and one to Gellene, through the exchange of stock options in exchange for his agreement to become a TAC Financial employee.  ECF 109 at 8-11.  The statute of limitations for each purported sale is addressed in turn.

> ### A. The Execution, and TAC Financial's Board's Subsequent Ratification, of the Asset Purchase Agreement Between Direct Benefits and TAC Financial Completed a Sale of Securities by May 20, 2011, Rendering Direct Benefits's Claim in Count III Time-Barred

Direct Benefits's claim for relief in Count III is time-barred.  Defendants argue that the sale of Direct Benefits assets to TAC Financial in exchange for cash and TAC Financial common stock occurred on April 14, 2011, when TAC Financial and Direct Benefits executed the APA.  ECF 104-1 at 10-15.  Thus, according to Defendants, the statute of limitations expired on April 14, 2012, well before Plaintiffs initiated this suit.  *Id.*  Plaintiffs counter that no sale could have occurred in 2011 for two reasons.  ECF 109 at 8-11.  First, according to Plaintiffs, the number and nature of securities Direct Benefits would receive under the APA was not finalized until March 26, 2013, meaning that no sale occurred until then.  *Id.* at 11.  Second, Plaintiffs argue

---

[3] Section 11-703(f)(2)(ii) provides that if liability is premised on a sale of securities in which the seller engages in fraud or some other material misrepresentation or omission, the one-year statute of limitations period begins from the time the buyer discovered, or reasonably should have discovered, the false statement or omission.  While Plaintiffs' Third Amended Complaint alleges certain fraudulent conduct on Defendants' part, those allegations appear separate from the sale of unregistered securities alleged in Count III.  *See* ECF 77, ¶¶ 92-95.  More importantly, Plaintiffs make no argument in their Motion or Opposition that the § 11-703(f)(2)(ii) statute of limitations applies.  Accordingly, the Court proceeds by analyzing the statute of limitations issue as to Count III under § 11-703(f)(2)(i).

that the APA contemplated a second sale of securities, namely stock options, to Gellene. Because a stock option is merely an issuer's commitment "to sell shares of stock at a certain exercise price," Plaintiffs conclude that no sale to Gellene occurred until TAC Financial specified an option exercise price to Gellene on March 29, 2013. *Id.* at 8-9. The parties' arguments, then, hinge on when a "sale" is complete under the Maryland Securities Act.

1.   Only Direct Benefits Has Standing to Challenge the Sale of Securities Contemplated in the APA

As an initial matter, to the extent that Gellene argues that he is a party to the APA, such argument is unpersuasive. *See* ECF 109 at 11. There was no "sale" of securities to Gellene under the APA. Indeed, the APA does not list Gellene as a party. ECF 104-2 at 42 (the introductory material to the APA, defining TAC Financial as the "Buyer," and Direct Benefits as the "Seller," collectively referring to the two as the "Parties"). Instead, the APA refers to Gellene in § 2.6(b), which explains that TAC Financial and Gellene would execute an Employment Agreement concurrent with the APA's execution. *Id.* at 48 (APA § 2.6(b)). The Employment Agreement, in turn, is what provides Gellene the stock options he references. *Id.* at 71 (Ex. D). Whether the provision of stock options is itself a "sale" is considered in Section III.B, *infra*. But for the purposes of the "sale" of over 1 million shares of TAC Financial common stock in exchange for Direct Benefits's assets, the APA's language demonstrates that there were only two parties to the transaction – Direct Benefits and TAC Financial. Gellene therefore has no statutory standing to challenge the sale of unregistered securities in the APA. *See* Md. Code Ann., Corps. & Ass'ns § 11-703(a)(i) (providing that a seller is only liable "to the person *buying* a security from him" (emphasis added)). Because Direct Benefits was a buyer under the APA's terms, the Court proceeds to determine whether its claim in Count III is time-barred.

2.      No Maryland Case Has Decided When a "Sale" Is Complete Under
the Maryland Securities Act.

Direct Benefits begins by asserting that the issue of when a "sale" is complete has already

been decided.  ECF 98-1 at 28.  Pointing to United States District Judge George L. Russell III's

Opinion on Defendants' Motion to Dismiss, Direct Benefits argues that Judge Russell's Opinion,

and § 11-703(b)(1), establish that the statute of limitations begins to run only when TAC

Financial tendered the securities at issue (TAC Financial common stock) to Direct Benefits on

March 29, 2013.  *See id.* (citing ECF 48 at 31).[4]  In making this argument, Direct Benefits

emphasizes language that Judge Russell cited from *Mathews v. Cassidy Turley Maryland, Inc.*

*See* ECF 98-1 at 28 (quoting ECF 48 at 31).

In *Mathews*, the plaintiff Mathews bought certain securities in October, 2004, using

Cassidy Turley as his real estate broker.  435 Md. 584, 592-93, 608-09, 614 (2013).  Mathews

filed suit against Cassidy Turley in March, 2010, and alleged that Cassidy Turley was involved

in the sale of unregistered securities.  *Id.* at 610-11.  The Court deemed the claim time-barred

under § 11-703(f), because the statutory scheme showed no intent to apply any tolling provision

to suits brought to prosecute registration violations under § 11-501.  *Id.* at 614-15.  The Court

found that the sale was complete in October, 2004, *id.* at 614, but the Court did not indicate when

the securities were delivered to Mathews, or otherwise describe the facts leading to its

conclusion that the sale was complete in October, 2004, *see id.* at 592-94, 613-15.

In describing the Maryland Securities Act, the *Mathews* Court noted that it "provides a

remedy only when a sale has completed," citing to § 11-703(b)(1).  *Id.* at 614.  Judge Russell

---

[4] Judge Russell's Opinion is also available at *Direct Benefits, LLC v. TAC Fin., Inc.*, No. GLR-13-1185, 2014 WL 671616 (D. Md. Feb. 20, 2014).

referred to this language in laying out the law applicable to the statute of limitations argument Defendants made in their Motion to Dismiss:

> Under Maryland law, a person may file suit upon receipt of the security or of the consideration paid for the security. *See id.* § 11-703(b)(1),(2); *see also Mathews v. Cassidy Turley Md., Inc.*, 80 A.3d 269, 286 (Md. 2013) ("[T]he statute provides a remedy only when a sale has been completed" (citing Md. Code Ann., Corps. § Ass'ns § 11-703(b)(1))).

ECF 48 at 31. Direct Benefits asserts that Judge Russell's reasoning amounts to a holding that the statute of limitations here did not begin to run until the time TAC Financial transferred the common stock to Direct Benefits. ECF 98-1 at 28.

Direct Benefits's arguments are unpersuasive. First, even assuming *arguendo* that Judge Russell's one sentence contains the ruling that Direct Benefits ascribes to it, it is only dicta. Judge Russell ultimately refused to consider the statute of limitations issue altogether, because the Second Amended Complaint lacked "any indication of the time the sale was completed." ECF 48 at 32.

Second, as a textual matter, neither *Mathews* nor § 11-703(b)(1) plainly states that the delivery of the security interest completes a "sale" under the Act. Section 11-703(b)(1)(i) provides that a buyer, "on tender of the security," may sue to recover the consideration paid for the security at issue. Yet the Act's general statute of limitations refers not to delivery of the security, but instead to "the *contract of sale* or purchase." § 11-703(f)(1) (emphasis added). The statute of limitations specific to the violation alleged here, § 11-703(f)(2)(i), similarly refers not to delivery of the security, but to "the *violation* on which [the suit] is based." (emphasis added). The violation, of course, is a *sale* of securities that violates one of the four provisions listed in § 11-703(a)(1)(i). Inherently, there can be no violation if there is no completed sale. Section 11-703(b)(1), as *Mathews* concluded, reinforces that a remedy is available for a completed sale that

violates the Act.  *See* 435 Md. at 614.   The provision merely sets forth which remedies are available to the buyer when he sues, depending on whether he is, or is not, in possession of the violative security.

The question that both *Mathews* and § 11-703(b)(1)(i) leave unanswered, however, is whether a "sale," as defined in § 11-101(q), is completed only by delivery of the security instrument to the buyer.   To the Court's knowledge, there exists no Maryland case law addressing this precise issue.   Accordingly, this Court must "endeavor to decide the issue in the way it believes the [Maryland Court of Appeals] would decide it."  *Hatfield v. Palles*, 537 F.2d 1245, 1248 (4th Cir. 1976).   In doing so, the Court may consider "all of the authority that the state high court[] would," and "should give appropriate weight to the opinions of [Maryland's] intermediate appellate court[]."  *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 512 (4th Cir. 1999).

3.   <u>Maryland Courts' Statutory Interpretation Principles</u>

The Maryland Court of Appeals has relied upon a consistent set of statutory interpretation principles in its decisions.  *See, e.g.*, *Gardner v. State*, 420 Md. 1, 8-9 (2011); *State v. Johnson*, 415 Md. 413, 421 (2010); *Lockshin v. Semsker*, 412 Md. 257, 274-77 (2010).   The Court's overarching goal "is to ascertain and effectuate the real and actual intent of the Legislature." *Lockshin*, 412 Md. at 274.   To do so, first, the Court ascertains the plain meaning of the statute's language.  *Id.* at 275.

After the Court elucidates a plain meaning from the statutory language, if it finds that the meaning is unambiguous "and clearly consistent with the statute's apparent purpose," then the Court applies that meaning, thereby ending the inquiry.  *Id.* at 275.  If the Court finds that there is more than one reasonable interpretation of the statute, however, then the statute's language

must be deemed ambiguous.  *E.g.*, *Moore v. State*, 388 Md. 446, 453 (2005); *Price v. State*, 378 Md. 378, 387 (2003).  The Court must then glean the Legislature's intent from other sources, to resolve the ambiguity.  *Lockshin*, 412 Md. at 276.  These other sources include legislative history, other sources "intrinsic and extrinsic to the legislative process," the statute's structure and "general purpose," how the law relates to other laws, and "the relative rationality and legal effect of various competing constructions."  *Id.*

In resolving ambiguities, the Court must be mindful to "not read statutory language in a vacuum."  *Id.* at 275.  Any plain meaning that the Court ascertains "must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute."  *Id.* at 275-76.  The Court is instructed to "presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law," and must therefore strive, "to the extent possible," to apply only an interpretation that furthers that end.  *Id.* at 276.  The Court must also avoid interpreting language in a way that "is absurd, illogical, or incompatible with common sense."  *Id.* at 277.

    4.    <u>The Plain Meaning of the Word "Sale" in the Maryland Securities Act is Ambiguous.</u>

As it must, the Court begins its analysis with the statutory definition of "sale."  *See Gilmer v. State*, 389 Md. 656, 667 (2005).  The Maryland Securities Act defines "sale" as including "every contract of sale of, contract to sell, or disposition of a security or interest in a security for value."  § 11-101(q).  This definition remains nearly unchanged from that contained in the original bill, passed in 1962.  *See* 1962 Md. Laws 20.  The Act also expressly excludes certain items from the definition of "sale," but those examples do not provide any more clarity into when a sale is completed for statute of limitations purposes.  *See* Md. Code Ann., Corps. & Ass'ns § 11-102.

Generally, a word's popular understanding governs the Court's plain meaning analysis. *See Deville v. State*, 383 Md. 217, 223 (2004) (citing *Gargliano v. State*, 334 Md. 428, 435 (1994)). In analyzing a term's plain meanings, however, the Court may also consult dictionary definitions, both from current dictionary editions and those available to the Legislature upon the Act's passage in 1962. *See Ali v. CIT Tech. Fin. Servs., Inc.*, 416 Md. 249, 262-63 (2010) (quoting *Harvey v. Marshall*, 389 Md. 243, 261 n.11 (2005)).

Both a common sense understanding of the word "sale," as well as dictionary definitions from both before and after the Act's passage, demonstrate that an ambiguity exists as to when a "sale" is complete. For instance, the second edition of Webster's New International Dictionary lists, as the first definition of "sale,"

> 1. *Law*  Act of selling; a contract whereby the absolute, or general, ownership of property is transferred from one person to another for a price, or sum of money, or, loosely, for any consideration; also, a contract for such transfer or ownership in the future or upon the future fulfillment of some condition (this latter being by some differentiated as an *agreement to sell*).

*Sale*, WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1934). Similarly, the Oxford English Dictionary provides, "1. a.  The action or an act of selling or making over to another for a price; the exchange of a commodity for money or other valuable consideration." *Sale*, OXFORD ENGLISH DICTIONARY (2d ed. 1989); *see also Sale*, AMERICAN HERITAGE DICTIONARY (1st College Ed. 1974) ("The exchange of property or services for a determined amount of money or its equivalent."). Taken as a term of art, Black's Law Dictionary lists four elements for a completed sale: "(1) parties competent to contract, (2) mutual assent, (3) a thing capable of being transferred, and (4) a price in money paid or promised." *Sale*, BLACK'S LAW DICTIONARY (10th ed. 2014).

Taken together, these sources show what is already plain from common experience: a sale can reasonably be interpreted in a number of different ways.  Looking at Black's Law's definition of a sale alone, a sale could be seen as requiring only "a price in money paid *or* promised." *Id.* (emphasis added).  If Person A agrees to buy an item from Person B, an ordinary person could consider the transaction a "sale," even if the consideration Person A provides is simply a promise to pay Person B come payday.  Alternatively, another ordinary person could (reasonably) disagree, and consider the sale complete only upon the delivery of the cash promised.  In the context of a transaction involving securities, then, the Court must look to other indicia of legislative intent to determine the proper meaning of "sale" in the context of the Maryland Securities Act.  *See People's Ins. Counsel Div. v. Allstate Ins. Co.*, 408 Md. 336, 352 (2009).

5.   Outside Indicia of Legislative Intent

i.   *The Maryland Securities Act Is Based on the Uniform Securities Act, Which Is Largely Modeled After Federal Securities Laws.*

At the outset, a brief history of the Maryland Securities Act's passage helps inform the context of the discussion.  In the midst of the Great Depression, Congress passed the Securities Act of 1933, Pub. L. No. 73-22, 48 Stat. 74, and the Securities Exchange Act of 1934, Pub. L. No. 73-291, 48 Stat. 881.  By the mid-1950s, the National Conference of Commissioners on Uniform State Law and the American Bar Association approved the newly minted Uniform Securities Act, designed by two Harvard law professors after conducting an extensive study of then-existing state securities laws.  Decatur H. Miller, *A Prospectus on the Maryland Securities Act*, 23 MD. L. REV. 289, 290-91 (1963).  The Uniform Securities Act "was designed in many respects to mimic or coordinate with related provisions of the federal securities law." *Mathews*, 435 Md. at 601 n.13 (citations omitted).

In 1961, Governor J. Millard Tawes, concerned that Maryland's securities laws had grown inadequate, commissioned a group to analyze whether Maryland should adopt the Uniform Securities Act.  *See* REPORT OF COMMITTEE TO STUDY THE ADMINISTRATION OF THE BLUE SKY LAW OF MARYLAND 1 (1962) [hereinafter "BLUE SKY LAW REPORT"].[5]  The Commission found that Maryland's securities laws, as compared to federal and other state laws, were inadequate in a number of ways, and ultimately recommended that the Uniform Securities Act be adopted, with some modifications.  *See id.* at 3-7, 39-49.  The Maryland State Legislature passed the proposed Maryland Securities Act with few further changes, and the Act took effect on June 1, 1962.  *See* 1962 Md. Laws 33; Miller, *supra*, at 291.

The context of the Maryland Securities Act's passage highlights two observations.  First, the definition of "sale" in both the federal and Maryland's securities law are identical, save for slight grammatical differences, demonstrating an intent to mirror federal law.  *Compare* Md. Code Ann., Corps. & Ass'ns § 11-101(q), *with* 15 U.S.C. § 77b(a)(3) (2018) ("The term 'sale' or 'sell' shall include every contract of sale or disposition of a security or interest in a security, for value.").  Indeed, Maryland's definition is nearly identical to the language Congress used in the Securities Act of 1933, the only difference being that Maryland separated its definition of "offer to sell" and "offer for sale" from its definition of "sale."  *Compare* 1962 Md. Laws 20 ("'Sale' or 'sell' includes every contract of sale of, contract to sell, or disposition of, a security or interest in a security for value."), *with* The Securities Act of 1933, Pub. L. No. 73-22, § 2(3), 48 Stat. 74, 74 ("The term 'sale,' 'sell,' 'offer to sell,' or 'offer for sale,' shall include every contract of sale or disposition of, attempt or offer to dispose of, or solicitation of an offer to buy, a security or

---

[5] This Report may be found at http://mdlaw.ptfs.com/awweb/pdfopener?md=1&did=7682.

interest in a security, for value . . . ."). This difference precisely accords with the Committee's recommendation. *See* BLUE SKY LAW REPORT, *supra*, at 25.

Second, federal securities law prohibits the sale of unregistered securities, and it too provides for a private right of action by the buyer against the seller. *See* 15 U.S.C. § 77e(a)(1) (the prohibition); *id.* § 77*l*(a)(1) (providing a buyer a private right of action against a seller who violates § 77e(a)(1)). Like Maryland, federal securities law requires the action to be brought "within one year after the violation" of § 77a(1). *Id.* § 77m. Congress amended § 77m in 1934 to provide for this one-year limit. *See* Pub. L. No. 73-291, tit. II, § 207, 48 Stat. 881, 908 (1934). Initially, the Maryland Securities Act contained a two-year statute of limitations for these private causes of action, *see* 1962 Md. Laws 27, but in 1968, the Legislature amended the Act to contain the one-year provision found today, in order to "conform with the Federal statute." 1968 Md. Laws 1487, 1493; *see also* 1975 Md. Laws 2013 (amending the law to its current form in the Maryland Code); Md. Code Ann., Corps. & Ass'ns § 11-703(f).

These marked similarities come as no surprise, given that the Maryland Securities Act was almost a mirror image of the Uniform Securities Act, which itself was modeled after federal and state securities law to create one unified law regulating securities. Perhaps most significantly, however, the Maryland State Legislature codified this apparent intent to create a securities law harmonious with that of the federal and other state governments, and directed courts to further that intent in interpreting the Act: "This act shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation and administration of this act with the related federal regulation." 1962 Md. Laws 32. This provision remains codified today. *See* Md. Code Ann., Corps. & Ass'ns § 11-804. Given this history, it is appropriate to look to case law from other jurisdictions

for guidance on the instant statute of limitations issue. *Cf. Mathews*, 435 Md. at 615 (looking to case law from other federal and state courts interpreting federal securities law to determine whether the Maryland Legislature intended to apply a tolling provision to the statute of limitations for illegal sales of unregistered securities).

        ii.    *Case Law Interpreting When a Securities "Sale" Is Completed Under Federal Law Demonstrates that Delivery Is Not A Per Se Requirement.*

Defendants, relying primarily on *United States v. Harris*, 919 F. Supp. 2d 702 (E.D. Va. 2013), argue that delivery is an unnecessary component of a "sale" under the Maryland Securities Act. ECF 104-1 at 11-15. Direct Benefits, however, argues that *Harris* is inapposite. ECF 109 at 7-8.

In *Harris*, the defendant Harris was indicted on October 15, 2012 under, *inter alia*, 15 U.S.C. § 77q(a). 919 F. Supp. 2d at 703. Generally speaking, the statute makes it illegal for "any person in the offer or sale of any securities" to use any means or instrumentalities of interstate commerce to commit fraud. 15 U.S.C. § 77q(a)(1)-(3). The Government alleged that, in October, 2006 and September, 2007, Harris made fraudulent representations to two different individuals, both of whom purchased stock from Harris. *Harris*, 919 F. Supp. 2d at 703-04. In one of those instances, however, Harris did not transfer the stock to the buyer until February 4, 2010. *Id.* at 704. Like its companion statute providing for civil liability to buyers, § 77q(a) relies on § 77b(a)(3) for the definition of "sale."[6] To keep the prosecution within the relevant five-year statute of limitations, the Government argued that the sales Harris allegedly made "were not concluded until the dispositions of stock occurred." 919 F. Supp. 2d at 705. The

---

[6] As previously mentioned, 15 U.S.C. § 77b(a)(3) defines "sale" as "every contract of sale or disposition of a security or interest in a security, for value."

Government asserted that without the issuance and delivery of stock certificates, "the sales could not be completed." *Id.*

The District Court rejected the Government's arguments, finding that the sales at issue were complete for the purposes of § 77q(a) in October, 2006, and September, 2007. *Id.* at 706-07, 711. The court concluded that the only elements needed to complete a "sale," as defined in § 77b(a)(3), were: "(1) parties competent to contract, (2) mutual assent, (3) a thing capable of being transferred, and (4) a price in money paid or promised." *Id.* at 706 (citing *Sale*, BLACK'S LAW DICTIONARY (9th ed. 2009)). The court found that the inclusion of the word "disposition" in § 77b(a)(3)'s definition of "sale" did not incorporate delivery as a necessary element of a "sale," because "disposition is a catchall for unconventional transactions in which a security or rights in a security are transferred for value." *Id.* at 707 (citing *United States v. Gentile*, 530 F.2d 461, 466 (2d Cir. 1976)). Indeed, the court reasoned that, in practice, delivery of stock certificates is often unnecessary, given that ownership records can be kept digitally "with ease." *Id.* The court observed, "The rights contracted for will either transfer at the completion of the sale or by the manner provided in the contract. To hold that a sale requires delivery would suggest that those whose shares exist only in electronic form will never be able to complete their purchase . . . ." *Id.*

Other federal Circuit Courts of Appeal considering the meaning of a "sale" in the criminal context accord with the *Harris* Court's reasoning. *See, e.g.*, *United States v. Gentile*, 530 F.2d 461, 466 (2d Cir. 1976) (holding that pledging stocks as collateral for a loan constitute a "sale" under § 77b(a)(3) because "[t]here is no requirement that title pass to constitute a 'sale' within the meaning of the statute"); *Carroll v. United States*, 326 F.2d 326 F.2d 72, 85-86 (9th

Cir. 1963) (holding that the "sale" of securities is complete, and that the statute of limitations therefore runs, upon offer, acceptance, and payment; delivery of the security is immaterial).

Direct Benefits first takes issue with the *Harris* court's reliance upon *Gentile*. *See* ECF 109 at 7-8. Direct Benefits argues that the *Harris* court's broad view of the word "disposition" as a "catchall for transactions in which a security or rights in a security are transferred for value," 919 F. Supp. 2d at 707, "would not work" for the Maryland Securities Act because the Act excludes "[a]ny bona fide pledge or loan" from its definition of a "sale." ECF 109 at 7-8 (citing Md. Code Ann., Corps. & Ass'ns § 11-102(a)(1)). But even accepting this premise *arguendo*, it does not follow that the Maryland Legislature intended to exclude, from its conception of a "disposition," *all* types of transactions involving the transfer of securities, or rights in securities, for value by excluding one narrow example of that kind of transfer.

Direct Benefits also argues that the *Harris* court's reading of "sale" is too restrictive, because "the Act's purposes of protecting the purchase and placing an exacting burden on the seller of exempt securities favors a broad interpretation of the term 'sale.'" ECF 109 at 7. In making this argument, Direct Benefits takes issue with the *Harris* court's reliance on congressional policy "that limitations statutes are to be interpreted in favor of repose and supports a narrow construction of sale." *Id.* (quoting *Harris*, 919 F. Supp. 2d at 707).

Direct Benefits's argument has a fatal flaw: the Maryland Court of Appeals has expressly determined that the Maryland Securities Act's scheme regarding registration violations "operates as a statute of repose." *Mathews*, 435 Md. at 614-15. The Court of Appeals explained that while statutes of repose run "from a date that is unrelated to the date of injury," statutes of limitations "always run[] from the time the wrong is complete and actionable—and injury is always the final element of a wrong." *Id.* at 611-12. With regards to registration violations, the

Court reasoned that "a reasonably prudent buyer could determine at the time of sale from publicly available information whether a security is registered." *Id.* at 614.   In other words, "discovery [of the injury] was not expected to be an issue," making the statute look more like one of repose. *Id.*   Thus, the *Harris* court's reliance on canons of construction in favor of repose is in agreement with Maryland law.

The fact that most courts, in civil cases, have interpreted "sale" similarly to the *Harris* court further demonstrates *Harris*'s persuasive value.   This Court finds particularly apposite *Abrams v. Oppenheimer Government Securities, Inc.*, 737 F.2d 582 (7th Cir. 1984).   In that case, the Seventh Circuit held that under § 77b(a)(3), "[n]either delivery of nor the passing of title to the contracted-for security is required for the transaction to be considered a 'sale.'" *Id.* at 587. The parties had contracted for the purchase and delivery of GNMA (or Ginnie Mae) mortgage-backed pass-through certificates. *Id.* at 583.   The parties executed the contract on February 6, 1981, but the contract stipulated that the plaintiff would not pay for, or receive delivery of, the securities until May 20, 1981. *Id.* at 584.   The contract did not specify a specific initial deposit amount to be paid up front, but did indicate a total purchase price. *Id.* at 584-85.   After the parties disagreed about the proper deposit amount, the defendant refused to deliver the GNMAs to the plaintiff, and instead remitted a portion of the plaintiff's deposit. *Id.* at 584-85.

The Seventh Circuit held that, even though title to the GNMAs never passed to the plaintiff, a "sale" of securities occurred as defined under § 77b(a)(3) on February 6, 1981. *Id.* at 587.   The court noted the "well established" principle "that a contract to purchase and sell securities constitutes a purchase or sale of the securities for the purposes of securities law," and concluded that the fact that title to the GNMAs never passed to the plaintiff was immaterial. *Id.* (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750-51 (1975)).   The contract at

issue obligated the plaintiff to take delivery of the GNMAs on the settlement date listed, and entitled him to principal and interest from the GNMAs thereafter. *Id.* at 588. The court differentiated the agreement from a mere "standby commitment" that would have allowed the seller to deliver the GNMAs only if the seller desired. *Id.* Because the contract was sufficiently definite as to its essential elements and defined the rights and obligations of the parties, the Seventh Circuit held that a "sale" of securities occurred in February, not May, 1981. *Id.*

Other lower courts have reached similar conclusions. In *Eriksson v. Galvin*, the plaintiff's September 16, 1974, suit was time barred because the "sale" had occurred once the parties executed an "immediately enforceable" agreement on September 13, 1973. 484 F. Supp. 1108, 1117-20 (S.D.N.Y. 1980). Once the parties executed the agreement that provided for the purchase of securities, the sale was "completed," rendering any argument about when the stock certificates were delivered irrelevant. *Id.* at 1118-19. Similarly, the District Court for the District of Colorado dismissed an October 7, 1977 suit, based upon an agreement to purchase a security signed on June 24, 1976. *Rochambeau v. Brent Exploration, Inc.*, 79 F.R.D. 381, 384 (D. Colo. 1978). Although the plaintiff had the option to purchase an additional security interest under the contract, the court still found that the sale was complete on June 24, 1976, because "the rights and obligations of the parties were fixed by that agreement and were thereafter governed by that agreement, no matter what course of action either chose to take." *Id.* Since there was no evidence that a separate sale occurred, the court deemed the claim time-barred. *Id.*

At least one court has held that delivery of a stock certificate was required for a completed "sale." *See Stone v. Fossil Oil & Gas*, 657 F. Supp. 1449, 1455-57 (D.N.M. 1987). In that case, however, delivery was only required because no enforceable contract had been formed until delivery occurred. *See id.* at 1456. The plaintiff sent a check to the defendant in

response to the defendant's broad solicitation of buyers.  *Id.*  The check was not an acceptance, the court explained, but merely an offer to purchase, because the defendant needed to investigate the plaintiff's financial background to ensure he could become an authorized purchaser.  *Id.*  The parties further never agreed on which stock would be sold until the plaintiff was delivered the stock, thus making delivery the consummation of the final sale.  *Id.*

Considering the similarity of the facts presented in these above-cited cases, and the Maryland Legislature's directive to interpret the Maryland Securities Act to "coordinate" its implementation with federal securities law, Md. Code Ann., Corps. & Ass'ns § 11-804, this Court concludes that delivery is not a required element of a completed "sale" under the Maryland Securities Act.  By defining a sale as "every contract of sale of, contract to sell, or disposition of a security or interest in a security for value," this Court finds that the Maryland legislature intended to establish that a "sale" is complete once the parties have reached a final, enforceable agreement to sell a security.  Cases such as *Abrams* and *Rochambeau* show that delivery need not occur in every disposition of a security for the sale to be complete, because the parties' agreement almost always encompasses the essential terms of the contract or disposition, and establishes the parties' rights and obligations pursuant to the disposition.  To adopt a view of a completed sale that focuses on when delivery occurs, even after a final, enforceable agreement is reached, would read into § 11-703(f)(2)(i) a back-door tolling provision for registration violations that the Maryland Court of Appeals has already found the Legislature did not intend to permit.  *See Mathews*, 435 Md. at 614-15.  Thus, in a civil suit under § 11-703(a)(1)(i) alleging an unlawful sale of unregistered securities, in violation of § 11-501, the statute of limitations for that cause of action begins to run once the parties reach a final, enforceable agreement.  *See* § 11-703(f).  All that must be determined, then, is when Direct Benefits and Defendants reached a

final, enforceable agreement, for that inquiry determines when the statute of limitations began to run.

> 6. <u>The Sale Between Direct Benefits and Defendants Was Completed by May 20, 2011, Compelling a Finding that Count III Is Time-Barred.</u>

The sale of TAC Financial common stock to Direct Benefits was complete, at the latest, upon ratification of the APA by TAC Financial's Board on May 20, 2011. While some of the cases discussed above have not relied on principles of contract formation in determining whether a "sale" is complete under federal securities law, an analysis of the APA under Maryland contract law strengthens the conclusion that a sale has occurred here. Direct Benefits's several attacks upon the APA focus on the purported lack of agreement on essential terms, and the alleged indefiniteness in those terms agreed upon. ECF 109 at 8-11.

For there to be an enforceable agreement, the parties must have mutually assented to all of the agreement's terms. *E.g.*, *Mitchell v. AARP*, 140 Md. App. 102, 116 (2001). Mutual assent encompasses two elements: (1) an intent to be bound by the agreement; and (2) "definiteness of terms." *Cochran v. Norkunas*, 398 Md. 1, 14 (2007). Questions of contract interpretation are questions of law for the Court. *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 340 (1999). As described below, the APA's unambiguous terms satisfy both of these elements.

> i. *The APA's Language Demonstrates Direct Benefits's and TAC Financial's Intent to Be Bound by its Terms.*

"The primary source for determining the intention of the parties is the language of the contract itself." *8621 Ltd. P'ship v. LDG, Inc.*, 169 Md. App. 214, 226 (2006). Maryland courts employ an objective approach to contract interpretation. *E.g.*, *B&P Enters. v. Overland Equip. Co.*, 133 Md. App. 583, 604 (2000). Accordingly, the Court's focus must remain on "the four corners of the agreement." *Walton v. Mariner Health of Md., Inc.*, 391 Md. 643, 660 (2006). If

24

the agreement's language is unambiguous, the Court implements its plain meaning, and does not consider the parties' subjective intent at the time of formation. *Cochran*, 398 Md. at 16; *see also Ashton*, 354 Md. at 340. When faced with an ambiguous provision, Maryland courts "will, if possible, so construe the contract as to carry into effect the reasonable interpretation of the parties if that can be ascertained." *8621 Ltd. P'ship*, 169 Md. App. at 226 (quoting *Quillen v. Kelley*, 216 Md. 396, 407 (1958)). If the parties fail to agree on an essential term, then this "may indicate" that mutual assent is lacking. *Cochran*, 398 Md. at 14. Maryland case law, however, "does not explicitly define what terms are deemed to be 'essential.'" *McKenzie v. Comcast Cable Commc'ns, Inc.*, 393 F. Supp. 2d 362, 370 (D. Md. 2005).

Direct Benefits characterizes the APA as "little more than the continuation of securities offering activity by the parties." ECF 109 at 9. This, however, is contradicted by the plain language of the APA. Direct Benefits bases its argument first on the Bill of Sale accompanying the APA, characterizing it as "merely a form," and stating that the parties actually contemplated an attachment that never made its way into the APA. *Id.* Even accepting this contention *arguendo*, the fact remains that the APA's plain language bound Direct Benefits to (1) transfer assets, including its intellectual property, MMC rights, and goodwill, to TAC Financial, and (2) execute a Bill of Sale "in substantially the form" as found in Exhibit B. ECF 104-2 at 45-46, 48 (APA §§ 2.1, 2.6(a)); *see also id.* at 61 (APA § 7.8, under which Direct Benefits agreed to perform all acts and deliver all documents necessary to "assure to [TAC Financial] all the rights and interests granted or intended to be granted under this Agreement"). In other words, the plain language of the APA demonstrates Direct Benefits's intent to be bound to transferring a specific subset of assets to TAC Financial, and to execute a Bill of Sale accordingly – even if that Bill of Sale was not executed immediately.

Direct Benefits next argues that the APA only served as a "continuation" of offers, because the Assignment and Assumption Agreement attached to the APA was merely a "form," and no contracts were ever actually assigned under the APA.  ECF 109 at 9-10.  This argument similarly fails.  Again, the plain language of the APA required Direct Benefits to transfer its IP rights, MMC rights, and goodwill to TAC Financial.  ECF 104-2 at 45-46, 48 (APA §§ 2.1, 2.6(a)).  Even assuming that transfers of, *inter alia*, IP rights never occurred, it does not diminish the fact that Direct Benefits, by the plain language of its agreement with TAC Financial, intended to be obligated to transfer those rights.

In sum, the undisputed facts demonstrate that, based on the plain language of the APA, Direct Benefits and TAC Financial intended to be bound by its terms.  The agreement sets forth precisely which assets Direct Benefits would transfer to TAC Financial, and also sets forth how TAC Financial would compensate Direct Benefits in exchange for those transfers.  *Id.* at 45-48 (APA §§ 2.1-2.2, 2.5-2.6).  The parties also agreed, in explicit terms, that the APA was the "sole understanding of the Parties," contained their "entire agreement," and superseded any and all prior agreements.  *Id.* at 60 (APA § 7.2).  Nowhere in the APA is there any language indicating that any party's duty is conditional, or that the agreement is only a preliminary one to be finalized at a later time.  Taken together, these facts sufficiently demonstrate that, as a matter of law, TAC Financial and Direct Benefits intended to be bound by the APA's terms.

ii.     *The APA's Terms are Sufficiently Definite.*

The APA's terms are also sufficiently definite to constitute a finalized agreement. Under Maryland law, an enforceable agreement must "express with definiteness and certainty the nature and extent of the parties' obligations."  *Kiley v. First Nat'l Bank of Md.*, 102 Md. App. 317, 333 (1994).  Even where all essential elements are present, if any are expressed with vagueness,

indefiniteness, or uncertainty, then the agreement is typically unenforceable. *First Nat'l Bank of Md. v. Burton, Parsons & Co.*, 57 Md. App. 437, 449 (1984); *see also Maslow v. Vanguri*, 168 Md. App. 298, 322 (2006) ("[A]n agreement that omits an important term, or is otherwise too vague or indefinite with respect to essential terms, is not enforceable.").  To be enforceable, the agreement's language must be sufficiently clear and definite to (1) "clearly inform the parties to it of what they may be called upon by its terms to do," and (2) allow courts enforcing the agreement to "know the purpose and intention of the parties." *Kiley*, 102 Md. App. at 334 (quoting *Robinson v. Gardiner*, 196 Md. 213, 217 (1950) (citations omitted)).

Direct Benefits first asserts that mutual assent is wanting in the APA because under its terms, the number of shares of TAC Financial common stock to be transferred to Direct Benefits – an essential term – could not be determined upon the APA's execution.  ECF 109 at 8.  This argument is unavailing.  Direct Benefits is correct that the APA did not specify a precise number of shares to be transferred.  *See* ECF 104-2 at 47, 64 (APA § 2.4(b) & Ex. A).  However, the APA – specifically, Exhibit A to the APA – unambiguously provided the means by which the number of shares would be calculated.  The APA did not merely provide that Direct Benefits and TAC would agree upon some number of shares in the future.  *Cf. Cochran*, 398 Md. at 20-21 (finding that the parties did not reach a final agreement because the letter of intent only demonstrated "an intent to memorialize the property sale through a final standard form contract").  Instead, Exhibit A contains mandatory language stating that TAC Financial (as the "Buyer") "shall determine" the number of New MMCs issued, "shall determine" which New MMCs have at least one transaction since their issuance in the relevant time period, and "shall issue" 100 shares of TAC Financial stock, per New MMC, under the established timeline.  ECF

104-2 at 64.  Section 2.4(b) also established that each share would be valued at $1.10 per share. *Id.* at 47.

Thus, while the number of shares that would ultimately be transferred to Direct Benefits may not have been clear upon execution, the means by which the calculation would be reached was fully agreed upon in the APA.  That the parties apparently calculated the New MMC total under the definition laid out by APA § 2.5(a) during the course of performance, *see* ECF 98-2 at 174 (August 2, 2012 email from Eder to Loftus and Gellene); ECF 109 at 11, does not change the fact that the unambiguous language contained within the APA's four corners shows that the parties reached an agreement on this essential term on April 14, 2011, which TAC Financial's Board ratified on May 20, 2011.

Next, Direct Benefits argues that it and TAC Financial did not think they were entering into a binding contract when they signed the APA.  ECF 109 at 10.  It contends that some essential terms in the APA, including the "Card [Order] Ready Date" and the "Transaction Period," were "left to be agreed upon" at a later date.  *Id.*  Further, Direct Benefits points to the fact that "neither party reported a sale in 2011 to applicable tax regulatory authorities," as evidence of the APA being only a "manifestation of an offer" or a "work-in process [sic]."  *Id.*

These arguments similarly lack merit.  First, while the APA does provide for the parties to "cooperate in preparing, executing[,] and filing . . . tax returns relating to the purchase and sale of the Purchased Assets," ECF 104-2 at 47 (APA § 2.4), the fact that TAC only reported the $50,000 it paid in cash under the APA on a 2011 "tax document" is irrelevant.  The parties' conduct subsequent to the execution of the APA, with regards to their respective tax liabilities, plays no role in the Court's analysis, as the APA's unambiguous language establishing the rights and obligations of the parties is what governs.  *See Cochran*, 398 Md. at 16.

Second, there is no evidence in the four corners of the APA to corroborate Direct Benefits's assertions that terms like "Card Order Ready Date" and "Transaction Period" were intentionally left undefined.   The APA defined "Card Order Ready Date" as "the date on which a [New MMC] can be issued to and used by a customer" of TAC Financial.   This satisfies the *Kiley* standard for definitiveness.   While the APA did not provide an explicit Card Order Ready Date, both TAC Financial and Direct Benefits knew that it would take some time for New MMCs to be ready for issuance and use by a TAC Financial customer.   The fact that they could not set a precise Card Order Ready Date as of the APA's execution does not alter Direct Benefits's obligation under the APA to transfer all of its assets to TAC Financial upon the APA's execution, or TAC Financial's obligation to transfer cash and stock to Direct Benefits under the agreed-upon calculation method.   In other words, even without a precise Card Order Ready Date, an enforcing court could "know the purpose and intention of the parties," based on how they structured the transaction in the APA.   *Kiley*, 102 Md. App. at 334.

Third, with regards to the term "Transaction Period," Direct Benefits argues that the fact that it is left undefined in the APA shows that the APA was merely an offer.   ECF 109 at 10-11.   The term appears in APA § 5.3.   ECF 104-2 at 56.   Section 5.3 directs TAC Financial to continue operating its business as it was then-operated, so as to preserve it, and keep it intact "[d]uring the Transition Period."   The "Transition Period" is defined as the six-month period beginning immediately after the APA's execution.   *Id.* at 45.   Section 5.3, in the next sentence, prevents TAC Financial from taking actions during the "Transaction Period" that would impact either (1) the features of benefits offered under, or charges required to use, New MMCs, or (2) TAC Financial's capital structure.   *Id.* at 56.   At most, this discrepancy seems to be a typographical error.   It appears that section 5.3 is the only time that the term "Transaction Period" is used in the

APA, and it comes right after utilization of the defined term "Transition Period."  Even assuming that the use of "Transaction Period" was intentional, Direct Benefits has not adduced any evidence to show that this single provision was an essential element of the transaction.  Gellene avers that he and Loftus thought this term meant that TAC Financial could not make any adverse changes to the MMC program until Direct Benefits received full payment.  ECF 109-1 at 11-12, ¶¶ 22-23.  This, however, does not demonstrate how this term was essential to the deal between the parties – a deal that focuses on transferring *all* of Direct Benefits's rights in its MMCs to TAC Financial.

Indeed, the undisputed facts demonstrate that, under the plain language of the APA, Direct Benefits intended to transfer its MMC assets, as well as its intellectual property and goodwill, to TAC Financial in exchange for cash and TAC Financial common stock.  ECF 104-2 at 45-47 (APA §§ 2.1, 2.4).  Recognizing that the parties only had an approximation of the number of MMCs in Direct Benefits's control, the parties agreed upon a nominal purchase price of $819,000.  *Id.* at 47 (APA § 2.4(c)).  To determine the actual contract price, the parties' agreement established a scheme that would govern how the actual number of MMCs transferred would be calculated.  *Id.* at 47, 64 (APA § 2.4(b) & Ex. A).  This scheme, in turn, would be used to determine how many shares of TAC Financial stock (with an agreed-upon value of $1.10 per share) would be transferred to Direct Benefits.  *Id.*  The parties also agreed upon a method for determining how, if at all, Direct Benefits should refund part of TAC Financial's cash payment, should the amount of MMCs transferred by Direct Benefits be below the assumed amount.  *Id.* at 47-48 (APA § 2.5(a)).  Finally, as previously noted, the parties made explicit the terms for Direct Benefits's delivery of the relevant assets, and that title in those assets "passed concurrently" with the APA's execution.  *Id.* at 48 (APA §§ 2.6, 2.8).  Accordingly, the APA is sufficiently definite

as to its essential terms, compelling the conclusion that TAC Financial and Direct Benefits mutually assented to the APA.

        iii.     *The Execution, and TAC Financial's Board's Ratification, of the APA Constituted a "Sale" Under the Maryland Securities Act.*

The foregoing discussion demonstrates that the APA set forth, in sufficiently definite terms, the rights and obligations of both parties, and demonstrated both parties' intent that the agreement be final and binding. That agreement was executed on April 14, 2011, and approved by TAC Financial's Board on May 20, 2011. While TAC Financial did not execute a stock issuance certificate to Direct Benefits until March, 2013, the Maryland Securities Act only requires that the parties reach a final, enforceable agreement for a "sale" to be complete. Because the latest date by which TAC Financial agreed to be bound to the agreement was May 20, 2011, Direct Benefits's claim for relief in Count III of the Third Amended Complaint needed to be filed by May 20, 2012. *See* Md. Code Ann., Corps. & Ass'ns § 11-703(f)(2)(i). Direct Benefits did not initiate suit until April 22, 2013. ECF 1. Its claim is therefore time-barred, requiring entry of summary judgment in Defendants' favor on Count III.

**B.    Any "Sale" of Securities to Gellene, Pursuant to his Receipt of Stock Options in His Employment Agreement, Was Also Completed on May 20, 2011.**

Gellene's claims in Count III are also time-barred. The Maryland Securities Act provides that a "guarantee of," or "right to subscribe or to purchase," stock is a "security." Md. Code Ann., Corps. & Ass'ns § 11-101(s)(1)(ii), (xvi). Because a stock option grants the option holder the right to purchase stock at a later time at the exercise price, the plain language of section 11-101(s)(1) encompasses stock options. The question remains whether the provision of stock options in Gellene's Employment Agreement constituted a "sale" of stocks under the Maryland Securities Act, and when that "sale" was complete.

Gellene first, conclusorily, asserts that the provision of stock options in his Employment Agreement was a "sale." ECF 109 at 9. To the Court's knowledge, there exists no case law interpreting whether the provision of stock options in an employment agreement is a "sale" under the Maryland Securities Act. Again, here, the word "sale" is ambiguous. Since the federal Securities Act's definition of "sale" is nearly identical to that of the Maryland Securities Act, case law interpreting the federal Securities Act, in the context of stock option grants in employment agreements, is instructive.

Courts interpreting the federal Securities Act have reached differing conclusions on the issue, most of which are fact-dependent. Generally, courts find that the grant of stock options in an employment agreement only constitutes a "sale" if the employee received the options "as a part of a bargained-for exchange" for his labor. *See In re Cendant Corp. Sec. Litig.*, 76 F. Supp. 2d 539, 545 (D.N.J. 1999); *see, also, e.g.*, *Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 559-60 (2d Cir. 1985); *In re Enron Corp. Sec., Derivative, & "ERISA" Litig.*, 238 F. Supp. 3d 799, 835-37 (S.D. Tex. 2017); *Childers v. Nw. Airlines, Inc.*, 688 F. Supp. 1357, 1363-64 (D. Minn. 1988). In such a situation, the employee is required "to make an affirmative investment decision," thereby triggering the Securities Act's protections. *See Yoder*, 751 F.2d at 560 ("[W]e perceive no reason why that Congress should have wished the courts to exclude from the benefit of facially applicable language a person who parts with his or her established way of life in return for a contract to issue stock."); *In re Cendant Corp.*, 76 F. Supp. 2d at 544-45. Conversely, where an employee simply receives stock options from his employer pursuant to a compulsory, non-contributory grant, without ever bargaining for them, the stock option grant is not a "sale" under the Securities Act. *E.g.*, *Lampkin v. UBS Fin. Servs., Inc.*, 925 F.3d 727, 736-37 (5th Cir. 2019). At least one court, however, has rejected this dichotomy, and has broadly

32

held that the provision of stock options to an employee is a "sale" under the federal Securities Act. *See Falkowski v. Imation Corp.*, 309 F.3d 1123, 1129-30 (9th Cir. 2002) ("The grant of an employee stock option on a covered security is therefore a 'sale' of that covered security."), *amended*, 320 F.3d 905 (9th Cir. 2003), *abrogated on other grounds as recognized by Proctor v. Vishay Intertechnology Inc.*, 584 F.3d 1208 (9th Cir. 2009).   In light of the fact that Gellene's acquisition of stock options occurred in the context of his negotiation of his employment agreement, the Court will assume, without deciding, that Gellene's receipt of options to purchase 140,000 shares of TAC Financial common stock was a "sale" under the Maryland Securities Act.

Gellene asserts that the "sale" of stock options to him under his Employment Agreement was not complete until March, 2013, because "the APA did not specify an exercise price," nor was any exercise price specified, "until TAC sent Gellene the stock option under cover of its March 29, 2013 letter."  ECF 109 at 9.  Gellene refers to a letter sent to him by TAC Financial's counsel which addresses, *inter alia*, Gellene's contention that he "was entitled to an option to purchase 140,000 shares at $0.01 per share."  ECF 98-2 at 192.  In the letter, TAC Financial's counsel, Mr. Istvan Benko, asserted that Gellene was "incorrect" in asserting that the exercise price on the options was $0.01:

> The option that issued to Mr. Gellene was for 140,000 shares at an exercise price of $1.10 per share.  The $1.10 per share price is the same price that TAC Financial sold shares to an institutional investor a few months later, and was determined to be the fair market value of the shares (as you, [sic] under the IRS' rules, options to employees have to be granted at the air market value of the issuer's shares).  The total exercise of the options is $154,000, not the value [sic].  Attached is a copy of that option agreement.  Because Mr. Gellene has resigned, a portion of the option will not vest and has been forfeited.  Mr. Gellene is welcome to exercise the vested portion.

*Id.*

To be sure, Gellene's Employment Agreement does not explicitly list an exercise price. *See* ECF 104-2 at 70-72.  Nonetheless, the Court finds Gellene's argument unpersuasive, and concludes that the sale of securities here occurred no later than April 14, 2011, the date the Employment Agreement was executed.  As a number of courts have held, "a contract for the issuance of a security," as that term is defined under federal law, "may qualify as a sale under securities laws *even if the contract is never fully performed*."  *Yoder*, 751 F.2d at 559 (emphasis added); *accord Falkowski*, 309 F.3d at 1129 ("It follows from Congress's definition [of 'sale'] that if a person contracts to sell a security, that contract is a 'sale' even if the sale is never consummated.").  Indeed, when a plaintiff's claim is "explicitly based on the grant of the option," "[t]he fact that plaintiff[] would eventually make an affirmative investment decision— whether to exercise the option or let it expire—at some point in the future is of no consequence." *Lampkin*, 925 F.3d at 737.  This is because "[t]he option is a contractual duty to sell a security at a later date for a sum of money, should the employee choose to buy it.  Whether or not the employee ever exercises the option, it is a 'sale' under Congress's definition [of 'sale']." *Falkowski*, 309 F.3d at 1130.  Here, Gellene's affirmative investment decision to accept the employment offer from TAC Financial, in exchange for his labor, occurred in April, 2011.  In fact, Gellene worked for TAC Financial for nearly two years, before he decided to seek to unwind the APA in March, 2013.  Like in *Lampkin*, Gellene's claim is centered only upon the grant of stock options to him in April, 2011 – his subsequent efforts to exercise those options are irrelevant.  925 F.3d at 737.

Essentially, this Court is presented with two alternatives, both of which defeat Gellene's claim.  First, the Court could conclude – as Defendants urge – that an exercise price of $1.10 per share is implied from the course of the parties' dealings in negotiating the APA, and all but

34

cement the conclusion that the "sale" occurred in May, 2011, upon the TAC Financial Board's ratification of the APA.  ECF 118 at 6-7.  Second, the Court could conclude that no "sale" occurred in April or May, 2011, because the lack of an exercise price renders Gellene's stock options void for lack of mutual assent.  But under this logic, Gellene would have no vested right to acquire any TAC Financial common stock, since there was no purported "meeting of the minds."  Even when TAC Financial's counsel sent the March 29, 2013 letter, Gellene did not agree with TAC Financial's assessment that the exercise price was $1.10 per share; rather, he seemed to still believe that he could exercise his options for $0.01 per share.  *See* ECF 98-2 at 102.  Thus, even on March 29, 2013, no meeting of the minds occurred.  If agreement on the exercise price is needed to consummate a "sale," then, no such sale ever occurred in this case.

Were the Court to adopt Gellene's flawed logic, and have his claim proceed to trial, the Court would implicitly create a loophole to Maryland securities laws.  Employers would be incentivized to leave exercise prices out of employment agreements altogether, thereby allowing them to dodge any applicable registration requirements that are triggered by a "sale," until the employee seeks to exercise their options (if they ever choose to do so).  Such a loophole would be wholly contrary to the purpose of the Maryland Securities Act's registration requirement, and would further frustrate the Act's explicit goal of maintaining coordination with federal securities law.  *See* Md. Code Ann., Corps. & Ass'ns § 11-804.

Direct Benefits, Gellene, and TAC Financial negotiated, drafted, and executed both the APA, and Gellene's Employment Agreement, in the span of about a month.  The omission of an exercise price demonstrates, to say the least, an oversight in the drafting of the Employment Agreement.  But for nearly two years after the execution, and ratification, of the Employment Agreement, TAC Financial and Gellene performed their respective obligations under the

contract, and it was both parties' understanding that Gellene had obtained a grant of options to purchase 140,000 shares of TAC Financial common stock – the only disagreement was over the precise exercise price.   Under these circumstances, the Court concludes that this lone disagreement is not enough to upend the established principle that the granting of stock options to an employee is a completed "sale" upon the employee's receipt of the option, not his later attempt to actually exercise the options and purchase the subject stock.   Gellene and TAC Financial executed their agreement on April 14, 2011, and the TAC Financial Board ratified the APA (to which Gellene's Employment Agreement was an exhibit) on May 20, 2011.   Gellene therefore needed to bring his claim for the unlawful sale of unregistered securities, under Maryland law, on or before May 20, 2012.   *See* Md. Code Ann., Corps. & Ass'ns § 11-703(f)(2)(i).   Gellene did not do so until April 22, 2013, ECF 1, rendering his claim time-barred. Accordingly, summary judgment in Defendants' favor is appropriate.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Partial Summary Judgment, ECF 98, is DENIED, and Defendants' Cross-Motion for Partial Summary Judgment, ECF 104, is GRANTED.   A separate implementing Order follows.   Defendant's pending Motion for Partial Summary Judgment, ECF 192, will be addressed in a separate opinion.

Dated:  April 16, 2020

_____/s/_____
Stephanie A. Gallagher
United States District Judge