### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **DIRECT BENEFITS, LLC**, *et al.*, | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **v.** | * | **Civil Case No. SAG-13-1185** |
| | * | |
| **TAC FINANCIAL, INC.,** *et al.*, | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM OPINION

Plaintiffs Direct Benefits, LLC ("Direct Benefits") and Andrew C. Gellene (together, "Plaintiffs") filed a Third Amended Complaint against Defendants TAC Financial, Inc. ("TAC Financial") and Roy Eder[1], TAC Financial's former CEO (together, "Defendants"), on June 20, 2014. ECF 77. Defendants answered on July 10, 2014. ECF 78. Plaintiffs' claims arise out of Defendants' allegedly fraudulent conduct during the parties' negotiation of an Asset Purchase Agreement ("APA"), under which TAC Financial purchased essentially all of Direct Benefits's assets. Plaintiffs together assert eight claims for relief in the Third Amended Complaint: two arising under the Securities Act of 1933 and the Securities Exchange Act of 1934, ECF 77, ¶¶ 71-90 (Counts I and II); two arising under the Maryland Securities Act, *id.* ¶¶ 91-101 (Counts III and IV); common law fraud, *id.* ¶¶ 102-05 (Count V); breach of contract, *id.* ¶¶ 106-118 (Count VI); fraud in the inducement, *id.* ¶¶ 119-26 (Count VII); and director liability against Eder, seeking to hold him personally liable for TAC Financial's securities fraud as its CEO, *id.* ¶¶ 119-126 (Count VIII). Gellene individually asserts a claim under the Maryland Wage Payment and

---

[1] The parties have informed the Court that Eder passed away during the stay in this case. ECF 139-1 at 2 n.1.

Collection Law for unpaid wages, vacation time, and bonuses, *id.* ¶¶ 127-42 (Count IX), and a claim for the reimbursement of reasonable business expenses pursuant to his employment agreement with TAC Financial, *id.* ¶¶ 143-47 (Count X).

In late 2014, the parties filed cross-motions for partial summary judgment as to Count III. ECF 98, 104.  Shortly thereafter, TAC Financial filed a Suggestion of Bankruptcy, causing the Court to administratively close this case on January 25, 2015.  ECF 120, 122.  The Court reopened the case more than four years later, on March 12, 2019, and provided the parties with a second opportunity to file dispositive motions, ECF 184.  On April 16, 2020, this Court granted summary judgment in Defendants' favor as to Count III, pursuant to the cross-motions filed prior to the stay.  ECF 209; ECF 210; *see Direct Benefits, LLC v. TAC Fin., Inc.*, No. SAG-13-1185, 2020 WL 1890507 (D. Md. Apr. 16, 2020).  Now before the Court is Defendants' Motion for Partial Summary Judgment on the remaining seven counts that Gellene and Direct Benefits jointly assert, Counts I, II, and IV-VIII.  ECF 192; ECF 192-1 (collectively, "the Motion").  Plaintiffs opposed, ECF 202-03, and Defendants replied, ECF 208.  No hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2018).  As explained below, Defendants' Motion will be granted in part, and denied in part.

## I.    FACTUAL BACKGROUND

In 2010, both Direct Benefits and TAC Financial were operating prepaid debit card businesses.  ECF 98-2 at 74-75 (Eder Dep.); *id.* at 1, ¶¶ 1-2 (Gellene Aff.).[2]  In simplified terms, Direct Benefits executed contracts with employers, under which Direct Benefits provided employers with a Money Manager Card ("MMC").  ECF 109-1 at 2, ¶ 3 (Gellene Aff.).  The

---

[2] At the summary judgment stage, the Court "may consider other materials in the record," including affidavits and exhibits filed in support of previous summary judgment motions.  Fed. R. Civ. P. 56(c)(3).

MMC, and its related account, allowed the employer to directly deposit the employee's paycheck, and then acted as a debit card, allowing the employee to access the funds at ATMs and retailers. *Id.* TAC Financial acted primarily as a "program manager" in the prepaid payroll debit card business, facilitating the logistics necessary for a prepaid payroll debit card's functioning, by "maintaining contractual relationships with employers, a sponsor bank, and a processor." ECF 194-2, ¶ 3 (Eder Decl.).

### A.    Direct Benefits Loses an Important Business Relationship in November, 2010

In November, 2010, Prepaid Solutions, one of Direct Benefits's most important business relationships, informed Direct Benefits that it would not be renewing its contract when it expired in August, 2011. ECF 104-2 at 4-7 (December 31, 2010 Letter from Gellene to Direct Benefits members); ECF 202, ¶ 6 (Gellene Cert.); ECF 192-6 at 51:21-58:19 (Gellene Dep., Nov. 26, 2019).[3] In general terms, Prepaid Solutions acted as the MMC's program manager, maintaining the necessary relationships with vendors and debit card processors. It was also owned by the bank that sponsored Direct Benefits's MMCs. ECF 192-6 at 53:11-54:20, 58:8-19. Without Prepaid Solutions, Direct Benefits had four options for moving forward: (1) become its own program manager; (2) find a new program manager; (3) sell the company; or (4) form a partnership with a competitor. ECF 104-2 at 5. Andrew Gellene, the Managing Member of

---

[3] In its Reply, Defendants ask the Court to disregard certain paragraphs of Gellene's Certification. ECF 208 at 3 n.1. On February 10, 2020, the Court struck Plaintiffs' initial Opposition, because Gellene's accompanying certification "improperly conflate[d] matters of his personal knowledge with ones that he would not be competent to testify on at trial." ECF 201 at 3. The Court does not feel that any further action is necessary with regards to the instant certification Gellene proffers, especially considering (1) that Gellene largely cured most of the deficiencies the Court previously pointed out, and (2) this Court's repeated view that a motion to strike is generally appropriate only for matters contained in pleadings, "not those contained in other motions, briefs, or attachments." *Blake v. Broadway Servs., Inc.*, No. SAG-18-0086, 2020 WL 1675954, at *3 (D. Md. Apr. 6, 2020) (citations omitted). Instead, this Court weighed each portion of Gellene's certification and determined what weight it should be afforded.

Direct Benefits, expressed doubts about whether Direct Benefits had sufficient funds to become its own program manager.  ECF 192-6 at 62:9-20.  Indeed, at the end of 2010, Direct Benefits was "operationally break-even," but the efforts needed to replace the void left by Prepaid Solutions would require unforeseen expenses.  *Id.* at 6.  Direct Benefits therefore pursued the latter three options.

On December 28, 2010, Gellene reached out to Roy Eder, TAC Financial's CEO and Chairman of its Board of Directors, indicating that Direct Benefits was "interested in talking to other program managers/partners for a relationship."  ECF 98-2 at 17 (December 28, 2010 email from Gellene to Eder); *id.* at 69, 75 (Eder Dep.); *id.* at 1-2, ¶ 2 (Gellene Aff.).  By mid-January, 2011, Direct Benefits and TAC Financial executed a letter of intent, and  drafted a strategic alliance term sheet.  ECF 192-15.  Sometime also during this time period, Gellene visited TAC Financial's offices in La Jolla, California, and met with several of TAC Financial's executive-level personnel, including Eder.  ECF 203, ¶ 15.  TAC Financial had previously suggested the possibility of a merger with Direct Benefits and, after this in-person meeting, Gellene "requested that we accelerate" things "and move straight to a merger," as opposed to taking a "crawl, walk, run" strategy towards a merger.  *Id.* ¶¶ 14, 16.  Gellene memorialized this request on February 8, 2011, by sending TAC Financial a Letter of Intent.  ECF 192-18.  TAC Financial agreed with the idea of going "straight to a merger," viewing it as the "cleaner path," and expressed a desire to complete the deal "by the end of this quarter."  *Id.*  By February 2, 2011, TAC Financial provided Direct Benefits a document entitled "Discussion Document," detailing TAC Financial's vision for its future business, how Direct Benefits fit into that vision, what it estimated Direct Benefits to be worth, and how Gellene may play a role in the merger as a TAC Financial member.  ECF 192-32.

4

**B.      The Due Diligence Period, and the Subsequent Execution of the APA One Month Later**

On February 27, 2011, Tom Loftus ("Loftus"), the Chairman of Direct Benefits, sent TAC Financial a Preliminary Due Diligence Request List.  ECF 192-20.  The list was drafted by an attorney, Richard M. Graf, Esq., ECF 192-21, who was also a member of Direct Benefits, ECF 192-6 at 40:12-41:3 (Gellene Dep.).  In sending the list, Loftus informed TAC Financial that they should consider it "more of a 'wish list' rather than a mandate," and that, instead of adhering strictly to the list, TAC Financial "may have a standard package that [it] make[s] available to prospective investors and it is possible that will suffice."  ECF 192-20 at 2.

TAC Financial provided a number of responsive documents on March 3, 2011.  ECF 192-22 at 3; ECF 192-23 at 2; ECF 192-24 at 2; ECF 192-25 at 2; ECF 192-26 at 2; ECF 192-27 at 2.  Eder indicated to Loftus on March 3 that any documents that were on Direct Benefits's list, but not received, were deemed "not applicable."  ECF 192-27 at 2.  As relevant here, TAC Financial sent the following documents during the due diligence period:

- An Offering Memorandum, dated July 1, 2010, ECF 192-22;

- A TAC Financial Marketing Document, ECF 192-23 at 55;

- TAC Financial's Processing Agreement with FIS, TAC Financial's contracted prepaid debit card processor ("Processing Agreement"), ECF 192-27 at 3-25;[4] and

- A Microsoft Excel spreadsheet containing (1) TAC Financial's Profit and Loss Statements for 2009 and 2010 ("P&L Statements"); (2) TAC Financial's Balance Sheets for 2009 and 2010 ("Balance Sheets"); and (3) a forecast of TAC Financial's revenues for the years 2011 to 2015 ("Revenue Forecast"), ECF 192-27 at 26-37.

---

[4] FIS also served as Direct Benefits's debit card processor at the time.  *See* ECF 192-6 at 54:4-20.  FIS either merged with, or changed its name to, Metavante, *id.* at 54:9-12, which is the name that appears on the Processing Agreement, ECF 192-27 at 3.

Larry Cleary ("Cleary"), another TAC Financial executive involved in the due diligence process, arranged a phone call with Loftus for March 5 in order "to review what [TAC Financial] ha[s] sent, what is not applicable, and what remains outstanding, if anything."   ECF 192-28 at 2. Gellene reviewed the documents sent in due diligence, and discussed them with Direct Benefits's members.  ECF 203, ¶ 22.

On the same day that TAC Financial sent its first round of responsive due diligence documents, March 4, 2011, Direct Benefits's Board provided another update to its members. ECF 192-8.  At that time, Direct Benefits had talked with "10 banks and 2 program managers" since December, 2010, and had received proposals from both program managers, and two banks, with a third bank proposal pending.  *Id.* at 3.  The Board further noted, "Given our cash situation with [Prepaid Solutions] we do not have any more time to consider proposals."  *Id.*  The update provided the pros and cons of TAC Financial's proposed merger, as compared with the proposals received from other banks and program managers.  *Id.* at 5.  Ultimately, the Board recommended moving forward with TAC Financial's merger proposal, citing the fact that TAC Financial valued Direct Benefits's assets at over $720,000.  *Id.* at 6.

Shortly thereafter, on April 14, 2011, Direct Benefits and TAC Financial executed the APA.  ECF 98-2 at 6, ¶ 14 (Gellene Aff.); ECF 192-29 (the APA).  TAC Financial's Board of Directors did not ratify the APA until May 20, 2011.  ECF 98-2 at 161 (TAC Financial Board of Directors Meeting Minutes from May 20, 2011).  The APA called for Gellene to become a TAC Financial employee.  ECF 192-29 at 9, 31-33 (APA § 2.6(b) & Ex. D).  Exhibit D to the APA set forth Gellene's Employment Agreement, which indicated that Gellene would "become a full-time employee of TAC Financial" effective upon the APA's execution.  *Id.* at 31.  Under the arrangement, Gellene would receive an annual salary of $125,000 from TAC Financial, as well

6

as "a grant for options to purchase 140,000 shares of TAC Common Stock," which would vest "equally over four years with a one-year cliff." *Id.* at 31-33.

### C. Gellene Obtains More Facts Regarding TAC Financial's Fiscal Position During His Employment, and Eventually Calls for the Unwinding of the APA

After the APA's execution, Gellene worked as a TAC Financial employee to facilitate the transfer of the Direct Benefits MMCs to TAC Financial. ECF 98-2 at 9-11, ¶¶ 24-29. Throughout 2011 and into 2012, Gellene also worked on projects and assignments unrelated to the MMC transfer, including training new TAC Financial hires on its card ordering and funding process, as well as creating a system design for one of TAC Financial's new clients. *Id.* at 12-13, ¶¶ 35-39.

During his work for TAC Financial, Gellene reviewed a number of financial documents describing TAC Financial's economic wellbeing. Specifically, in February, 2012, in the course of helping a TAC Financial client, Gellene required TAC Financial's monthly P&L statements for the years 2010 and 2011. ECF 202, ¶ 55. Upon receiving those P&Ls, Gellene noted what he believed to be a decline in TAC Financial's monthly revenue from September, 2010, to April, 2011, concomitant with the APA's execution. *Id.* ¶¶ 55-56; *see* ECF 202-11 ("2010 Monthly P&L"); ECF 202-12 ("2011 Monthly P&L"). Gellene also observed, for the first time, that one TAC Financial client, Ardyss, represented over 75% of TAC Financial's monthly revenue from September, 2010, to April, 2011, and that the Ardyss revenues were decreasing leading up to April, 2011. ECF 202-12; ECF 208-1 at 11. Later, in December, 2012, Gellene learned that, at the end of 2010, TAC had only paid FIS $186,000 of over $520,000 in debt it owed at that time. ECF 202, ¶ 59. Thus, by the end of 2012, Gellene began to have concerns about the financial position of TAC Financial. ECF 98-2, ¶¶ 41-43. Those suspicions grew in March, 2013, when

he discovered that TAC Financial's active base of used prepaid debit cards was significantly lower than what he had understood it to be at the time of the APA. *Id.* ¶ 45; ECF 202, ¶¶ 61-64.

While Gellene was working as a TAC Financial employee, throughout the end of 2011 and all of 2012, Eder continued to work with Gellene and Loftus to solidify the final count of New MMCs, in order to finalize the stock transfer to Direct Benefits. ECF 98-2 at 10-12, ¶¶ 28-34; ECF 98-3 at 1-2, ¶¶ 2-3. While the parties appeared close to reaching an agreement on the final count, *see* ECF 98-3 at 2, ¶ 3; *id.* at 8 (August 9, 2012 email from Loftus to Eder), there is no evidence that the parties actually did, though Eder testified that he eventually gave into Gellene's and Loftus's demands surrounding the final count, ECF 109-1 at 16 (Eder Dep.).

Having not received any of the shares of TAC Financial common stock owed under the APA, and given the concerns regarding the financial well-being of TAC Financial, on March 26, 2013, Gellene and the other Direct Benefits members decided that Direct Benefits "should not complete the transaction." ECF 98-2 at 15, ¶ 46. Direct Benefits, through counsel, sent a demand letter to TAC Financial, demanding that it consent to the APA being unwound. ECF 98-2 at 184-89 (March 26, 2013 Direct Benefits Demand Letter). TAC Financial, also through counsel, responded three days later. *Id.* at 190-93 (March 29, 2013 TAC Financial Response Letter). In that letter, TAC Financial admitted that the common stock shares had not yet been transferred to Direct Benefits, but asserted it was because of Direct Benefits's repeated attempts to restructure the APA to diminish its tax liability. *Id.* at 190-91. TAC Financial stated that it would "no longer cooperate" in this effort, that it would "now print Direct Benefits' stock certificates, dated 2012 on the day Roy [Eder] and Andrew [Gellene] agreed upon the number of shares," and that it would report the stock issuance to the IRS as it was "legally required to do." *Id.* at 191. In discovery, Plaintiffs obtained a certificate indicating a transfer of 1,019,783 shares

8

of TAC Financial common stock to Direct Benefits on July 20, 2012, ECF 98-2 at 194, which Gellene avers neither Plaintiff received prior to this lawsuit, *id.* at 16, ¶ 47 (Gellene Aff.).  Direct Benefits and Gellene initiated the instant suit on April 22, 2013.  ECF 1.

## II.   LEGAL STANDARDS

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the burden of showing that there is no genuine dispute of material facts.  *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)).  If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial.  *Id.*  The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial."  *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)).  The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor.  *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).  Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another."  *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case.  *Id.* at 352.  The non-moving party "must produce competent evidence on each element of [its] claim."  *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671).  If the non-moving party fails to do so, "there can be no genuine

issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)).  In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.    ANALYSIS

Defendants' Motion for Partial Summary Judgment seeks judgment on Counts I, II, and IV-VIII of the Third Amended Complaint.  ECF 192-1 at 14-15.  Each count is addressed in turn.

### A.    Count I:  Unlawful Sale of Unregistered Securities under Federal Law

Count I seeks to hold TAC Financial and Eder liable for the unlawful sale of unregistered securities, pursuant to the Securities Act of 1933, 15 U.S.C. §§ 77*l*, o (2018).  The federal Securities Act deems it unlawful for any person to offer or sell an unregistered security in interstate commerce, *id.* § 77e(a), and explicitly provides civil plaintiffs with a private right of action if they suffer damages as a result of such an unlawful offer or sale, *id.* § 77*l*(a)(1). Further, any person who controls the seller of such unregistered securities "shall also be liable jointly and severally" with the controlled entity.  *Id.* § 77o(a).

The federal Securities Act sets the following statute of limitations:

> No action shall be maintained to enforce any liability created . . . under section 77*l*(a)(1) of this title, unless brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under section 77k or 77l(a)(1) of this title more than three years after the security was bona fide offered to the public . . . .

*Id.* § 77m.  This statute has been described as "cumulative."  *Nolfi v. Ohio Ky. Oil Corp.*, 562 F. Supp. 2d 904, 908 (N.D. Ohio 2008).  In other words, "[P]laintiffs must plead and prove facts tending to show that the present action was commenced within one year of the violation upon which it is based *and* not more than three years after the security was bona fide offered to the public." *Morley v. Cohen*, 610 F. Supp. 798, 815 (D. Md. 1985) (emphasis added).

As noted, this Court previously granted Defendants summary judgment as to Count III, which sought damages for the unlawful sale of securities under the Maryland Securities Act, Md. Code Ann., Corps. & Ass'ns § 11-703(a)(1)(i) (West 2019).  Maryland law similarly imposes a one-year statute of limitations for that claim, beginning from the date of the violation, i.e., the date of the completed sale.  *Id.* § 11-703(f)(2)(i).  Defendants argued that Plaintiffs' § 11-703(a)(1)(i) claim was time-barred.  *See* ECF 104-1 (Defendants' Cross-Motion Partial for Summary Judgment).  This Court agreed, and held that under Maryland law, the "sale" contemplated under the APA was completed, at latest, when the Board members of TAC Financial ratified the APA on May 20, 2011.  *See Direct Benefits*, 2020 WL 1890507, at *15.  In so holding, the Court largely relied upon case law interpreting the statute of limitations for the identical cause of action under the federal Securities Act, 15 U.S.C. § 77m, which demonstrated that, under the federal Securities Act, delivery of the bargained-for security instrument is not the *sine qua non* of a completed securities sale.  *See Direct Benefits*, 2020 WL 1890507, at *9-12.  Because the APA was a final, enforceable agreement upon its execution, this Court held that the "violation" at issue under Count III occurred upon its ratification by the TAC Financial Board, rendering Plaintiffs' April 22, 2013 suit untimely.  *Id.* at *12-15.  Moreover, because any "sale" of securities to Gellene, through the issuance of stock options, also occurred, at latest, on May 20, 2011, the Court deemed Gellene's unlawful sale claim similarly time-barred.  *Id.* at *15-17.

Defendants did not raise the statute of limitations issue as to Count I, under the federal Securities Act.  *See* ECF 192, 208.  However, Federal Rule of Civil Procedure 56(f)(2) provides that "[a]fter giving notice and a reasonable time to respond, the court may . . . grant the motion [for summary judgment] on grounds not raised by a party."  *See also Celotex Corp.*, 477 U.S. at 326 ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence.").  Thus, on April 16, 2020, this Court entered an Order notifying Plaintiffs of its intent to consider granting summary judgment in Defendants' favor as to Count I, on statute of limitations grounds, given that the Court's prior ruling on Count III largely relied on the same law that would apply to Count I.  ECF 211.  On April 30, 2020, Plaintiffs responded to the Court's notice, and "concede[d] that any arguments they would make as to an effective date of the [f]ederal statute of limitations . . . would be the same as had been made" in reference to the statute of limitations issue raised under Maryland law.[5]  ECF 212 at 1.  Plaintiffs, correctly, saw "no reason to believe that the Court would rule differently with regard to the [f]ederal claims made in Count One."  *Id.*

Thus, the Court hereby adopts and incorporates the rationale in its previous ruling on Count III, *see Direct Benefits*, 2020 WL 1890507, at *9-15, and finds that, under the federal Securities Act, any "sale" contemplated under the APA, both as to Direct Benefits and Gellene, was completed by May 20, 2011.  Plaintiffs did not file suit until April 22, 2013, outside of the one-year statute of limitations contained in 15 U.S.C. § 77m.  Because § 77m requires that both prescribed limitations periods be met, *see Morley*, 610 F. Supp. at 815, Count I is time-barred.  Summary judgment in Defendants' favor as to Count I is therefore appropriate.

---

[5] Plaintiffs do not concede, of course, "the conclusions of law and fact made by the Court in its April 16, 2020 Memorandum Opinion."  ECF 212 at 1.

### B.      Counts II, IV, V, VII, and VIII:  The Fraud Claims

At the heart of Plaintiffs' Third Amended Complaint are five fraud claims. Count II alleges that Defendants engaged in fraudulent behavior during the negotiation of the APA, in violation of section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j, and Securities & Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5.  As relevant here, section 10(b) of the Securities Exchange Act prohibits the "use or employ" of "any manipulative or deceptive device" in the sale of securities, regardless of whether they are registered or unregistered.  15 U.S.C. § 78j(b).  Rule 10b-5, in turn, provides that a seller employs such a "manipulative or deceptive device" when it "make[s] any untrue statement of a material fact or omit[s] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b); *see* 15 U.S.C. § 78j(b) (delegating the authority to define what constitutes a "manipulative or deceptive device" to the SEC Commissioner).    Count VIII asserts that Eder is liable for TAC Financial's misrepresentations and omissions under a theory of director liability.  ECF 77, ¶¶ 119-26; *see* 15 U.S.C. § 78t(a) (providing that any person who exercised control over the defendant company may be held jointly and severally liable for the company's misrepresentations and omissions).

Count IV asserts that Defendants violated the Maryland Securities Act's prohibition on fraudulent statements made in connection with the sale of securities.  ECF 77, ¶¶ 97-101. Notably, the Maryland Securities Act's bar on fraudulent statements made in connection with securities transactions mirrors Rule 10b-5, *see* Md. Code Ann., Corps. & Ass'ns § 11-301(b) (West 2020), and the Act explicitly provides plaintiffs with a private right of action that mirrors federal law, *see id.* § 11-703(a)(1)(ii).

13

Counts V and VII assert a cause of action for "Common Law Fraud" and "Fraud in the Inducement," respectively. ECF 77, ¶¶ 102-05, 114-18. Under Maryland law, "[f]raud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement." *Sass v. Andrew*, 152 Md. App. 406, 432 (2003) (quoting *Iverson v. Johnson Gas Appliance Co.*, 172 F.3d 524, 529 (8th Cir. 1999)). In any fraud action, the plaintiff must prove five elements:

    (1)    that the defendant made a false representation to the plaintiff;
    (2)    that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth;
    (3)    that the misrepresentation was made for the purpose of defrauding the plaintiff;
    (4)    that the plaintiff relied on the misrepresentation and had the right to rely on it; and
    (5)    that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Id.* at 429; *see also, e.g.*, *Rozen v. Greenberg*, 165 Md. App. 665, 674-75 (2005) (reciting nearly identical elements for fraud in the inducement). Only those false representations of material facts – facts upon which "a reasonable person would rely in making a decision" – are actionable. *Id.* at 429-30. Moreover, Maryland law considers two circumstances in which a fraud claim will lie for omitted facts: (1) if there was a duty to disclose a material fact; or (2) if the omitted fact "materially qualif[ies] representations made to another." *Id.* Given the near identical nature of the elements of fraud under the Maryland Securities Act and Maryland common law, it is appropriate to consider whether summary judgment is appropriate as to all counts under the principles governing federal Rule 10b-5 claims. *See, e.g.*, *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204 (4th Cir. 1994) (affirming a trial court's dismissal of a complaint asserting fraud claims under the Securities Exchange Act, the Maryland Securities Act, and under Maryland common law, and citing exclusively to federal case law interpreting the federal act).

The Supreme Court has long held that, while not explicit from its text, section 10(b) implicitly provides civil plaintiffs a private right of action. *E.g., Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971). To establish a section 10(b) and Rule 10b-5 violation, Plaintiffs must demonstrate: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009) (emphasis omitted) (quoting *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

Defendants only contest three of these elements at this stage. First, they argue that they made no material misrepresentation or omission of fact. ECF 192-1 at 18-24; ECF 208 at 4-14. Second, they assert that Plaintiffs unjustifiably relied upon any alleged misrepresentation or omission. ECF 192-1 at 24-29; ECF 208 at 14-26. Finally, Defendants posit that Plaintiffs cannot competently prove any of their claimed damages. ECF 192-1 at 37-38.

### 1.    The Alleged Misrepresentations Made by Defendants

As a threshold matter, to establish liability under Rule 10b-5, Plaintiffs must show that Defendants either (1) made statements that were "misleading as to a material fact," or (2) failed to disclose a material fact. *Basic Inc. v. Levinson*, 485 U.S. 224, 231, 238 (1988) (emphasis omitted); *see* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b) (implementing 15 U.S.C. § 78j(b)). Necessarily, then, for any statement claimed to be false or misleading, Plaintiffs must produce sufficient evidence to create a genuine issue of fact as to its false or misleading nature. It is axiomatic, however, that liability will flow only for misrepresentations of material, not "insignificant," statements of fact. A misrepresentation is material "if there is a substantial

likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the [true] fact." *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999) (citing *Basic*, 485 U.S. at 231-32).  The materiality inquiry, then, is an objective one.  *Gasner v. Bd. of Supervisors of the Cty. of Dinwiddie*, 103 F.3d 351, 356 (4th Cir. 1996).  The focus is on what a reasonable investor would do, and courts presume that the reasonable investor "is neither an ostrich, hiding her head in the sand from relevant information, nor a child, unable to understand the facts and risks of investing." *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 656 (4th Cir. 2004).

"[M]ateriality is a 'fact-specific inquiry,' which 'depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Hillson Partners*, 42 F.3d at 209 (quoting *Basic*, 485 U.S. at 240).  Indeed, "the 'total mix' of information available varies on a fact-specific and case-by-case basis." *Greenhouse*, 392 F.3d at 656.  However, this does not render the Court powerless to decide questions of materiality at the summary judgment stage; "[t]he only requirement is that no reasonable jury could find it substantially likely that a reasonable investor would find the fact at issue material in the 'total mix' of information." *Id.* at 657.  The Court's analysis therefore begins with each alleged misrepresentation made by Defendants during the course of the APA's negotiations.

### i.      18,000 "Revenue-Generating" Cards

Plaintiffs claim that Defendants falsely informed them that as of April, 2011, TAC Financial had 18,000 "revenue generating" prepaid debit cards.  ECF 77, ¶ 13(a)-(j); ECF 203 at 9.  This statement was included in the February, 2011 "Discussion Document" given to Plaintiffs prior to the due diligence period.  *See* ECF 192-32.  In that document, TAC Financial stated,

"[W]e have grown our revenue generating cards from 53 cards in 2008 to approximately 18,000 at the end of 2010 with average revenue per month per card of $7.00 at a gross margin of just under 50%." *Id.* at 6.

Plaintiffs' argument regarding falsity depends upon a different metric – the number of "active" cards, which is the method the parties used to calculate the number of cards to be transferred by Plaintiffs under the APA. The APA specified that Direct Benefits had "at least 7,000 revenue generating Money Manager Cards, all of which are [] currently valid, in use and subject to the fee and payment obligations applicable to such cards." ECF 192-29 at 11 (APA § 3.5). Also, only those New MMCs that had "at least one transaction on the card within 60 calendar days after the card ha[d] been issued" would be included in the total number of New MMCs transferred, for the purposes of determining the final number of stocks to be given to Plaintiffs. *Id.* at 8-9 (APA § 2.5(a)). If this definition is applied to the statement TAC Financial made in the Discussion Document, according to Plaintiffs, TAC Financial's number of active cards would only be about 4,500. ECF 203 at 9; *see* ECF 202-15 (excerpt from March, 2011 FIS Report, showing that TAC Financial only had 4,489 cards being actively used).[6] Therefore, Plaintiffs argue, TAC Financial's statement that it had 17,000 revenue generating cards was misleading, because only about 4,500 of those cards were actually being used. ECF 203 at 9.

This, however, does not make TAC Financial's statement about how many *revenue-generating* cards it had *at the end of 2010* false or materially misleading. Plaintiffs do not dispute any of Eder's sworn statements regarding the industry definition of "revenue-generating." Eder explains that in the industry, "revenue-generating" is known to have two

---

[6] Defendants launch a number of evidentiary objections to this FIS Report, ECF 208 at 4-5, but those objections need not be decided, given that this statement ultimately is not going to provide a basis for a fraud claim.

potential meanings: (1) "all cards that generate revenue, both negative and positive," and (2) only those cards that have a "positive transaction," one from which TAC can collect a fee. ECF 192-4, ¶ 22 (Eder Decl.). Even the evidence Plaintiffs point to in their Third Amended Complaint, ECF 77, ¶ 13(b), is only probative of other card issuers' definition of *active*, not *revenue-generating*, cards. Eder's uncontroverted testimony shows, therefore, that the industry generally recognizes the definition of "revenue-generating" cards that TAC Financial utilized, and not the one that Plaintiffs attempt to utilize. Thus, a reasonable investor in the prepaid debit card industry, under these circumstances, would not have been misled by this representation of fact. Moreover, it does not appear that TAC Financial's representation was actually false. The evidence submitted shows that as of October, 2010, TAC Financial had 17,859 cards that "generated a service fee." *Id.* ¶ 23; ECF 208-1 at 8. The Offering Memorandum increases this number to "over 19,000," ECF 192-22 at 10 (Offering Memo § I), but Plaintiffs provide no evidence to contravene this statistic. Indeed, the number of "active" cards TAC Financial had in April, 2011, is not relevant to the number of revenue-generating cards it had at the end of 2010. Because TAC Financial's represented number of revenue-generating cards was neither false nor misleading, it cannot serve as the basis for securities fraud liability.

### ii.     "At a Gross Margin of Just Under Fifty Percent"

Plaintiffs claim there is a second falsity in the same above-referenced portion of the Discussion Document – the representation of "a gross margin of just under 50%." ECF 192-32 at 6; ECF 203 at 13. Plaintiffs allege in the Third Amended Complaint that this is false, because "TAC's actual gross profit margin for 2010 was 29%." ECF 77, ¶ 13(k). This claim fails. A plain reading of the full statement demonstrates that the gross margin assertion relates

specifically to TAC's revenue generating cards.  ECF 192-32 at 6.  The statement does not portend to represent the gross profit margin for TAC Financial's entire business in 2010.

Even assuming that the Discussion Document statement regarding gross margin did refer to TAC Financial's overall gross profit margin, this statement was not material, because it did not impact the "total mix" of information available to Plaintiffs during the due diligence period. Plainly, TAC Financial disclosed to Plaintiffs its P&L Statement for 2010, which provided the figures necessary to calculate TAC Financial's overall gross profit margin for 2010.  ECF 192-27 at 28-30; *see id.* at 2 (Mar. 4, 2011 transmission email from William Ater to Roy Eder and Tom Loftus).   As reflected in the 2010 P&L Statement, TAC Financial's total revenue was $1,113,569.70, and its total cost of goods sold was $820,345.09, resulting in a gross margin of $293,224.61.  *Id.* at 28.  Expressed as a percentage, TAC Financial's gross profit margin for 2010 was 26.33%.  *See id.* (calculated by dividing gross margin by total revenue).  Because a reasonable investor is presumed to not be "an ostrich, hiding her head in the sand from relevant information," this Court cannot find any materiality in the gross profit margin figure represented in the Discussion Document, to the extent that Plaintiffs assert it represents TAC Financial's overall gross profit margin for 2010. *Greenhouse*, 392 F.3d at 656.[7]

---

[7] Plaintiffs also appear to contend that the fifty percent gross margin figure is also false, because the actual gross contribution margin of TAC Financial cards in 2010 was twenty-four percent. ECF 203 at 13.  This claim is found nowhere in the Third Amended Complaint.  ECF 77, ¶¶ 12-13.  This omission is fatal.  "In any private action" under the Securities Exchange Act of 1934, "the complaint *shall specify* each statement alleged to have been misleading [and] *the reason or reasons why the statement is misleading*."  15 U.S.C. § 78u-4(b)(1) (emphasis added).  Plaintiffs cannot now assert a new allegedly misleading statement at the summary judgment phase. Indeed, the document Plaintiffs rely on for this alleged misrepresentation has been on the public court docket since June 17, 2013.  *See* ECF 15-1; ECF 203-4 (attaching an excerpt of ECF 15-1). If Plaintiffs wished to pursue a damages claim based on this alleged misrepresentation, they could have included it in the Third Amended Complaint.

iii.   **63,000 Members in the United States, Canada, United Kingdom, Puerto Rico, and Mexico**

Plaintiffs next focus their attention on a statement made in a one-page TAC Financial Marketing Document ("the Marketing Document"), which was sent to them during due diligence on March 3, 2011.  ECF 192-23 at 55; *see id.* at 2 (Mar. 3, 2011 transmission email from Roy Eder to Tom Loftus).  The Marketing Document describes TAC Financial's mission to "provide un-banked and under-served working adults affordable financial and benefit services for both themselves and their families."  *Id.*  In addition to its direct deposit debit card services, the Marketing Document advertises additional services TAC Financial offers, including online account management, "Non-Qualified and Qualified Affordable Healthcare Programs," and "Discount Auto Insurance."  *Id.*  In the final paragraph of the document, TAC Financial asserts, "Over the past 18 months, TAC has grown to 63,000 Members in the U.S., Canada, the United Kingdom, Puerto Rico, and Mexico."  *Id.* at 55.

In the Third Amended Complaint, Plaintiffs claim that the TAC Financial's representation of 63,000 members is false, because "TAC [Financial] did not have any substantial revenue attributed to 63,000 Members in 2010 from 'Non-Qualified and Qualified Affordable Healthcare Programs' or 'Discount Auto Insurance Services.'"  ECF 77, ¶ 15. According to Plaintiffs, "[t]he 63,000 Members was more likely the number of cards issued by TAC at sometime during 2010 . . . ."  *Id.*  This claim fails.  As initial matter, there is nothing in the Marketing Document that would allow a reasonable juror to discern any representation made by TAC Financial about the amount of revenue derived from its healthcare and auto insurance services.  *See* ECF 192-23 at 55.  The Marketing Document merely advertises the services that TAC Financial offered at the time, and planned to offer in the future.  *Id.*

However, Plaintiffs' more substantive claim, that TAC Financial's statement regarding having 63,000 Members at the time of the APA's execution, survives summary judgment.  In context, a reasonable factfinder could conclude that the statement represents the number of individuals who utilize both TAC Financial's prepaid debit card services, and its additional benefits services.  At his deposition, however, Eder testified that the Marketing Document was created "sometime in 2010," and that the "63,000 Members" figure referred to the number of cards TAC Financial had activated in the eighteen months since it had begun issuing cards in "November [or] December" of 2008.   ECF 203-5 at 185:10-23, 187:2-15 (Eder Dep. Aug. 29, 2014).[8]  Defendants' sworn Interrogatory responses initially corroborated this assertion, *see* ECF 203-7 at 18 (TAC Financial's Resp. Pls.' Interrog. No. 13), but Defendants later supplemented their response to state that the "63,000 Members" figure "refers to the growth of TAC's *issued* cards through April, 2010," *id.* at 18-19 (Supp. Resp.) (emphasis added).  TAC Financial data shows that by April, 2010, TAC Financial had 69,804 issued cards, but only 33,683 activated cards.  ECF 208-1 at 18.  The Offering Memorandum discloses growth to 92,000 issued cards, and 52,000 activated cards.  ECF 192-22 at 10 (Offering Memo. § I).

Setting aside the question of whether "Members" referred to issued or activated cards, it still remains a factual issue whether a reasonable investor would have been misled by the general reference to "Members," given that the statement came in the context of the number of users of *all* of TAC Financial's purported services, not just its prepaid debit card services.  While Eder may have testified that the document was created sometime in 2010, there is nothing on the face

---

[8] Defendants attempt to explain away what they perceive as discrepancies in Eder's deposition testimony as being caused by Eder's terminal brain cancer.  ECF 208 at 7-8.  While the Court does not doubt the severity of Eder's then-existing illness, the Court cannot make such inferences or credibility determinations in Defendants' favor at the summary judgment stage. *See, e.g.*, *Anderson*, 477 U.S. at 255.

of the document that would give any reader such an indication.  *See* ECF 192-23 at 55.

Moreover, Defendants point to the fact that its 2010 P&L Statement, given to Plaintiffs,

disclosed just over $3,000 in healthcare revenue.  ECF 192-1 at 20 (citing ECF 192-27 at 28).

But given the repeated statements and explanations that Defendants provided to Plaintiffs

regarding the expanding benefits platform, *see, e.g.*, ECF 192-34 at 2 (email from Loftus to

Gellene recounting a conversation Loftus had with Cleary regarding how the benefits platform

works), a reasonable factfinder could find that an objective investor would be misled by this

statement.

Further complicating matters is the fact that the statement also intimates that these

"Members" reside in Canada, the UK, Puerto Rico, and Mexico.  ECF 192-23 at 55; *see* ECF

203 at 10.  Defendants initially argue that Plaintiffs "reckless[ly] assum[e]" that TAC Financial

had a sizeable international customer base, because the 2010 P&L Statement indicates only

$52,000 in international fee revenue.  ECF 192-1 at 21-22 (citing ECF 192-27 at 28).  But, as

Plaintiffs point out, international fee revenue is only derived from a United States-based

customer's use of a card internationally; a foreign customer is not charged for transactions in

their home country.  ECF 202, ¶ 30 (Gellene Cert.).  Moreover, in an interrogatory response,

TAC Financial noted that it is only authorized to "transact business," and has only "conducted

business," in the United States.  ECF 203 at 10; ECF 203-7 at 26-27 (TAC Financial's Supp.

Resp. Pls.' Interrog. No. 20).  In fact, as Gellene learned in the course of his work with TAC

Financial, TAC Financial did not have any internationally-based cardholders.  ECF 202, ¶ 53.

Thus, the issue becomes the fact that TAC Financial represented that it had an international

customer base, when the evidence, reading the facts in a light most favorable to Plaintiffs, would

allow a reasonable factfinder to conclude that there were no international customers.

Based on these facts, Plaintiffs have adduced sufficient evidence to create a genuine issue of material fact as to the misleading nature of this statement, as well as its materiality.

### iv.     Projected Revenue of $3 Million in 2011

In the February, 2011 Discussion Document, TAC Financial also states: "We finished 201[0] at $1.1M in revenues and expect to triple revenues in 2011 to approximately $3M in revenues."[9]  ECF 192-32 at 6.  In the P&L statements given to Plaintiffs during due diligence, Defendants also listed their forecasted revenue for 2011 as $3,052,852.  ECF 192-27 at 37. Plaintiffs claim that this forecast was false and/or misleading.  ECF 77, ¶ 13(n); ECF 203 at 10.

In Rule 10b-5 cases, the Fourth Circuit has drawn "a clear distinction between a company's strict 'duty to accurately report . . . its *past* results,' on the one hand, and the company's relative freedom to 'prognosticat[e]' or make 'predictions of its *future* business prospects,' on the other hand."  *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994) (quoting *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 287, 289 (4th Cir. 1993)).  Typically, projections of future performance are only actionable if (1) they are "supported by specific statements of fact" that are themselves false or misleading, *Raab*, 4 F.3d at 290 (discussing *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090-97 (1991)), (2) they are "worded as guarantees," *id.* (quoting *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993)), or (3) the company otherwise lacked a reasonable basis for making the projection, *see Hillson Partners*, 42 F.3d at 213-14; *see also Raab*, 4. F.3d at 290.[10]

---

[9] The parties agree that the phrase "We finished 2011" should read "We finished 2010." ECF 192-1 at 12; ECF 202, ¶ 31 (Gellene Cert.).

[10] Federal law also provides a statutory safe-harbor for "forward-looking statements," such as revenue projections, that are unaccompanied by cautionary language, unless the forward-looking statement was made "with actual knowledge" that the statement was false or misleading. *See* 15

To be sure, TAC Financial's revenue projection is not, in any way, worded as a guarantee. It merely states, "We finished 201[0] at $1.1M in revenues *and expect* to triple revenues in 2011 to approximately $3M in revenues." ECF 192-32 at 6 (emphasis added). Instead, Plaintiffs appear to argue that TAC Financial lacked a reasonable basis for predicting $3 million in revenue in 2011. *See* ECF 203 at 10. Plaintiffs point to three pieces of evidence supporting their view. First, they cite an email from Will Ater, TAC Financial's CFO, on January 18, 2011, which states:

> 2011 is going to have some pretty large shifts based upon where we are exiting 2010. The cash flow will be changed to match the payment agreement with FIS and our recent agreement with PDNB as well as funding timing. My gut is telling me the P&L will likely drop below $3M based upon the run rate for Ardyss and the delayed launches. We can probably get back over $3M if we assume a major pipeline increase with the sales efforts beginning. I'll assume that occurs if the P&L indeed drops below $3M and I'll assume the increase from the sales efforts takes place in the 3rd [quarter].

ECF 203-8. Second, Plaintiffs rely on a document Ater provided to Eder in March, 2011, entitled "Cash Flow Forecast – Hedge Revenue," which forecasted TAC Financial's monthly cash balance for the year 2011. ECF 203-9. In the forecast, Ater listed the total "TAC Base Revenue" for 2011 as $1,596,693; the "TAC Ardyss Revenue" for 2011 as $1,321,441; and the "Direct Benefits Revenue" for 2011, assuming that the acquisition went through, as $681,227. *Id.* These three figures together purport to forecast a revenue of $3,599,411. *See id.* Ater also included a "Revenue Adjustment" figure of $961,616, which "allow[ed] analysis to see cash requirements if revenue slides to the right." *Id.* Subtracting this number from the original revenue forecast would, hypothetically, bring TAC Financial's forecasted 2011 revenue to $2,637,795. *See id.* In the March, 2011 P&L Statements, TAC Financial listed its 2011 revenue

---

U.S.C. § 78u-5(c)(1)(B). Defendants, however, do not invoke this statutory safe-harbor in their brief. *See* ECF 192-1 at 17-18; ECF 208 at 9-10.

forecast as $3,052,852.  ECF 192-27 at 37.  Finally, Plaintiffs point to TAC Financial's 2010 and 2011 Monthly P&L statements, which indicate the following monthly revenue trends from September, 2010 to April, 2011 (the time of the APA's ratification), ECF 208-1 at 11; ECF 202-11 to -12:

| Month | TAC Financial Revenue (overall) | TAC Financial Revenue from Ardyss |
|---|---|---|
| September, 2010 | $111,901 | $94,795 |
| October, 2010 | $106,337 | $97,731 |
| November, 2010 | $99.341 | [unavailable] |
| December, 2011 | $90,291 | [unavailable] |
| January, 2011 | $76,703 | $67,534 |
| February, 2011 | $70,579 | $60,947 |
| March, 2011 | $95,901 | $59,357 |

Defendants argue that its $3 million revenue projection for 2013 was not misleading because its business had not materially declined by March, 2011, given that from January, 2010 to March, 2011, revenues increased by 137 percent.  ECF 208 at 9-11.  Indeed, TAC Financial's revenues increased from just over $28,000 in 2009, to over $1.1 million in 2010.  ECF 192-27 at 26, 28.  Defendants further assert that the Cash Flow Forecast document is not probative of TAC Financial's revenue projection because "[n]owhere does the document state that TAC had lowered its 2011 revenue projection.  If anything, it shows the opposite:  the document forecasts combined 2011 revenues of nearly $3.6 million, about $550,000 more than the $3.05 million appearing in the financial statements."  *Id.* at 10.  Defendants write off Ater's statements in his March, 2011 email as predicting "no change at all to TAC's net revenue projection for 2011."  *Id.*

Defendants' arguments overlook a number of key data points.  First, while TAC Financial's March, 2011 revenues did increase to $95,901, the 2011 Monthly P&Ls (which were not disclosed to Plaintiffs) shows that this is largely because of $25,413 in "Other Revenue."

25

ECF 202-12.  All the while, the monthly revenue TAC Financial derived from its major client, Ardyss, steadily declined from September, 2010 ($94,975) to March, 2011 ($59,357).  *See id.*; ECF 208-1 at 11; *see also infra* Section III.A.2.v.  Yet according to Ater's Cash Flow Forecast, TAC Financial anticipated that monthly Ardyss revenue would more than double by December, 2011, to over $150,000 that month.  ECF 203-8.  Additionally, Ater projected TAC's monthly "Base Revenue" to increase more than *thirty-two* times from January, 2011 ($8,917) to December, 2011 ($320,675), for a total projected "Base Revenue" for 2011 of $1,596,693.  *Id.*  Yet from December, 2009 to October, 2010, TAC Financial's base revenue never exceeded $1,259 per month.  ECF 208-1 at 11.  This must also be read in conjunction with the fact that, despite TAC Financial's recent foray into the health insurance realm, that new sector generated only a little over $3,000 in revenue in 2011.  ECF 192-27 at 28.

In essence, reading the evidence in a light most favorable to Plaintiffs, three months into 2011, TAC Financial projected to triple its revenues, despite the fact that revenues from Ardyss cardholders, the customer comprising over 75% of TAC Financial's consolidated revenues in 2010, declined by over one-third from September, 2010, to March, 2011.  Notwithstanding this consistent decline, TAC Financial's revenue projection inherently relied on an immediate rebound in revenue from Ardyss cardholders.  The revenue projection was also based on thirty-fold increases in at least one aspect of its business that hardly ever saw marked growth throughout 2010.  On top of all of this, TAC Financial's CFO expressed doubts about its ability to reach its $3 million revenue projection, and largely relied upon an assumption of a "major pipeline increase" from a new sales effort to keep this projection alive.  None of these facts were ever disclosed to Plaintiffs.  Considering these facts, Plaintiffs have created a genuine issue of material fact as to TAC Financial's basis for projecting $3 million in revenue in 2011, thereby

creating an issue of fact as to the actionability of the revenue projection. *See Marx v. Computer Scis. Corp.*, 507 F.2d 485, 487-90 (9th Cir. 1974) (finding a genuine issue of material fact as to the reasonable basis for a company's revenue projection; the evidence showed that months prior to the projection, the company considered writing off a costly project in development, and actually did so after making the revenue projection, but the company failed to consider this possibility in making the projection, and the write off was "largely, if not wholly" why the revenue projection did not come to fruition); *City of Ann Arbor Employees' Ret. Sys. v. Sonoco Prods. Co.*, 827 F. Supp. 2d 559, 562-68, 576-77 (D.S.C. 2011) (finding that a genuine issue of material fact existed as to the basis for forward-looking statements in press releases, because the plaintiff provided evidence that the defendant-company made productivity estimates much higher than in previous years, despite (1) having lost a substantial number of customers in the previous year, (2) reducing prices charged to current customers in order to stay competitive, and (3) one manager's expressing "significant concerns" with the forecasted estimates); *S.E.C. v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 345-48, 350-54 (S.D.N.Y. 2011) (granting summary judgment in the SEC's favor and holding that a company's multi-million dollar profit projections were materially misleading, because the company was operating at a loss at the time the projections were made); *see also Selbst v. McDonald's Corp.*, Nos. 04 C 2422, 04 C 3635, 04 C 3661, 2005 WL 2319936, at *1-4, *8-10 (N.D. Ill. Sept. 21, 2005) (finding that the plaintiffs adequately alleged materially misleading revenue projections, because those within McDonald's continued to adhere to the projections, despite having knowledge of several factors that were causing McDonald's to experience "declining financial results and declining growth").

Finally, Defendants appear to argue that the cautionary language contained in the Offering Memorandum mitigates the potentially misleading nature of the revenue projection.

*See* ECF 208 at 11 ("We are a new company with a limited operating history, limited revenues and assets, and an unproven business plan." (quoting ECF 192-27 at 15)).  This argument is unpersuasive.  As United States District Judge Catherine C. Blake, of this District, has explained, under the judge-made "bespeaks caution" doctrine, "cautionary language in an offering document, as part of the 'total mix' of information, may negate the materiality of" a forward looking statement.  *In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 625 (D. Md. 2010) (quoting *Recupito v. Prudential Sec., Inc.*, 112 F. Supp. 2d 449, 455 (D. Md. 2000)).  However, the cautionary language must "contain detailed and meaningful cautionary language tailored to the specific risks the company faces." *Id.* (quoting *Recupito*, 112 F. Supp. 2d at 455).  Here, the cautionary language in the Offering Memorandum speaks broadly of TAC Financial having "limited revenues and assets," "an unproven business plan," and no "large active client base."  ECF 192-27 at 15-16 (Offering Memo. §§ 3.1-3.2).  Bearing in mind that "the adequacy of cautionary language is a question of fact," *Lefkoe v. Jos. A. Bank Clothiers*, No. WMN-06-1892, 2007 WL 6890353, at *5 n.10 (D. Md. Sept. 10, 2007), based on the evidence set forth above, Plaintiffs have produced sufficient evidence to allow a reasonable juror to find that the materiality of TAC Financial's revenue projection was not properly mitigated by these broad, non-specific risk statements, *see Sonoco*, 827 F. Supp. 2d at 526.

### 2.    The Alleged Omissions Made by Defendants

Next, Plaintiffs allege a host of material facts Defendants omitted from the APA negotiations.  An important distinction must be made at the outset.  While an omitted fact must be material for liability to flow under the Security Exchange Act, it does not automatically follow that every omission of a material fact is actionable.  *See Singer v. Reali*, 883 F.3d 425, 440 (4th Cir. 2018) (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)). Rule

10b-5, which implements section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), only deems unlawful the omission of a "material fact necessary *in order to make the statements made, in light of the circumstances under which they were made, not misleading*."   17 C.F.R. § 240.10b-5(b) (emphasis added).   Thus, as the Fourth Circuit has held, "[i]n order for there to be liability for omissions or nondisclosure, . . . a 'duty to speak' must exist."   *Walker v. Action Indus., Inc.*, 802 F.2d 703, 706 (4th Cir. 1986).   "Silence, absent a duty to disclose, does not violate section 10(b) and Rule 10b-5."   *Schatz v. Rosenberg*, 943 F.2d 485, 490 (4th Cir. 1991) (citing *Chiarella v. United States*, 445 U.S. 222, 228 (1980)); *accord Basic*, 485 U.S. at 239 n.17.

Generally, a duty to disclose facts under Rule 10b-5 can arise in two ways.   First, a duty can arise from the relationship between the parties, such as an agency or fiduciary relationship.   *See Dirks v. S.E.C.*, 463 U.S. 646, 658 (1983); *Chiarella*, 445 U.S. at 231-33 & n.14.   Section 10(b) and Rule 10b-5 do not create the duty itself.   *Chiarella*, 445 U.S. at 235 ("We hold that a duty to disclose under [section] 10(b) does not arise from the mere possession of nonpublic market information.").   Rather, the duty arises "only when a party has legal obligations other than a mere duty to comply with the general antifraud proscriptions in the federal securities laws."   *Dirks*, 463 U.S. at 657 (citation omitted); *see Singer*, 883 F.3d at 440.   Second, a duty to disclose can arise from a party's previous statements made in the course of negotiations, if the failure to disclose additional facts will make those previous statements misleading.   *Matrixx Initiatives*, 563 U.S. at 44; *see also Singer*, 883 F.3d at 440 ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." (quoting *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d

Cir. 2014))); *Taylor v. First Union Corp.*, 857 F.2d 240, 243-44 (4th Cir. 1988) (noting that a duty to disclose arises "when silence would make other statements misleading or false").

In either context, liability will only attach for failures to disclose *material* facts.  An omitted fact is "material" if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Basic*, 485 U.S. at 231-32 (internal quotations omitted) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)); *accord Matrixx Initiatives*, 563 U.S. at 38.  The issue of materiality "is generally not resolved on summary judgment," *Cremi v. Brown*, 955 F. Supp. 499, 509 (D. Md. 1997), given the fact-specific nature of the inquiry, *see Hillson Partners*, 42 F.3d at 209.  As noted previously, however, if no reasonable factfinder could find the statement material, then summary judgment is appropriate. *See Greenhouse*, 392 F.3d at 657.

### i.    Lack of a Diversified Client Base

Plaintiffs first assert that Defendants failed to disclose the fact that the majority ("over 70%") of TAC Financial's business came from one client, Ardyss.  ECF 203 at 11.  Defendants argue, however, that this was disclosed to Plaintiffs in the Offering Memorandum.  ECF 208 at 13.  Section III of the Offering Memorandum contains a number of enumerated risks associated with investing in TAC Financial.   ECF 192-22 at 15-20.  Defendants point to the discussion contained in the first two enumerated risks:  "We are a new company with a limited operating history, limited revenues and assets, and an unproven business plan"; and "As a development stage company, we face many of the risks normally associated with a new business."  ECF 192-22 at 15 (Offering Memo. §§ 3.1-3.2).  In these sections, TAC Financial explains that it "does not have a long history of operations or a large active client base based on which its business and

operations can be evaluated," *id.* (Offering Memo. § 3.1), and that the uncertainties that it faces as a new business "include . . . developing a customer base," *id.* at 16 (Offering Memo. § 3.2).

Defendants' arguments are unpersuasive.  The disclosure of the fact that a company lacks a *large* client base does not equate to the disclosure of the fact that a company lacks a *diverse* client base.  It is quite reasonable, for example, for an investor to believe that TAC Financial lacked a large number of clients (given the disclosed number of 52,000 activated cards), but that those cards were used by individuals employed by several different employers using TAC Financial's services.

Indeed, the SEC's registration requirements support Plaintiffs' contention that this omitted fact made other disclosures misleading, and that this omitted fact could be deemed material.  Had Defendants filled out a registration statement for the securities at issue here, Regulation S-K, promulgated by the SEC, would have required Defendants to disclose Ardyss to Plaintiffs.  *See* 17 C.F.R. § 229.101(c)(viii) (requiring registrants to disclose "[t]he dependence . . . upon a single customer, or a few customers, the loss of any one or more of which would have a material adverse effect on the segment [of the registrant's business]," as well as the name of any customer  equal, or exceed, ten percent of the registrant's consolidated revenues).  Evidence produced by both sides indicates that Ardyss easily exceeded this threshold.  *See* ECF 202-12 at 2 (indicating that for January to March, 2011, Ardyss accounted for $187,838 of TAC Financial's $242,783 in revenue); ECF 208-1 at 23 (listing only two clients generating prepaid debit card revenue, Ardyss and Zrii, with Ardyss generating $202,526 in revenue in September and October, 2010, and Zrii generating only $12,925 in that same timeframe).

Thus, had TAC Financial issued a registration statement for the securities at issue, and failed to disclose that Ardyss constituted over ten percent of its aggregate revenue, its

registration would likely be deemed misleading, per 17 C.F.R. § 229.101(c)(viii).  Defendants offer no persuasive argument as to why unregistered securities should be subject to a different standard.  Plaintiffs have therefore produced sufficient evidence to create a genuine issue of material fact as to whether, in disclosing their total revenue figures for 2009 and 2010, then, TAC Financial had a duty to disclose the lack of diversity within its small client base, in order to prevent its revenue figures from being misleading.

**ii.       Debt Owed to FIS and TAC Employees**

Plaintiffs next assert that Defendants failed to disclose the precise amounts of debt that TAC Financial owed to its contracted prepaid debit card processor, FIS, and to its employees in unpaid wages.  ECF 203 at 14-15.  Even accepting the assertion that the precise amounts are material, *see id.*, Plaintiffs have not produced sufficient evidence for a reasonable juror to conclude that TAC Financial had a duty to disclose this information in the first place.  The P&L Statements that TAC Financial produced during discovery cumulatively listed all of TAC Financial's debts as "Accounts Payable" in one lump sum of $589,178.78, and included wages owed to its employees in the "Other Current Liabilities" category.  ECF 192-27 at 35; ECF 203-2, ¶ 30 (Eder Decl.).  Plaintiffs do not challenge TAC Financial's employment of this tactic generally, but only as to the fact that it did not independently specify the amount of the debt owed to FIS, and the amount owed to employees.  *See* ECF 203 at 14-15.  This is not the governing standard – the question is whether the omitted fact makes *previous* disclosures misleading.  The flaw in Plaintiffs' argument is that they fail to point to any of Defendants' statements that are made misleading by the omission of the precise amount of debt owed to FIS and to TAC Financial employees, other than their post-hoc desire to have known these precise amounts *ex ante*.  *See, e.g.*, *Taylor*, 857 F.2d at 243-44.  This alone does not create a duty to

32

disclose. *See Singer*, 883 F.3d at 440. Thus, these omitted facts cannot be the premise for Rule 10b-5 liability.

### iii.      Default Letter Received from FIS

Next, Plaintiffs assert that Defendants failed to disclose the fact that TAC Financial defaulted on the debt owed to FIS in the middle of March, 2011, during the APA negotiations at issue. ECF 203 at 9, 16-17. Plaintiffs' Preliminary Due Diligence Request List – which Loftus indicated was "more of a 'wish list' rather than a mandate" – included a request for "[a] list of all concluded litigation and other litigation and other legal proceedings, a list (and status) of all threatened or pending litigation, proceedings, investigations, inquiries or disputes involving the Company or its assets." ECF 192-20 at 2 (March 3, 2011 email from Loftus to Cleary); *id.* at 5 (Due Diligence List). The Due Diligence List also requested "[a] schedule (and any related agreements) of all material transactions involving the Company and any affiliates of the Company." *Id.* at 6. Pursuant to that latter request, TAC Financial produced its agreement with FIS on March 4, 2011. ECF 192-27 at 2 (transmission email); *id.* at 3-25 (the FIS Agreement). Twelve days later, on March 16, 2011, FIS sent a letter to TAC Financial, indicating that TAC Financial was in default of the agreement. ECF 203-18 at 3 ("the FIS Default Letter"). According to FIS, TAC Financial failed to pay a significant number of invoices "for card production related expenses." *Id.* at 3-4. Unless TAC Financial remitted full payment on or before April 17, 2011, FIS would consider the agreement between it and TAC Financial "terminated," and would "pursue all available legal remedies." *Id.* at 4.

Neither party addresses whether Defendants had a duty to disclose the FIS Default Letter. Nonetheless, Plaintiffs have produced sufficient evidence to create a genuine issue of material fact as to Defendants' duty to disclose the FIS Default Letter during the APA negotiations.

While Plaintiffs characterized their due diligence list as "more of a 'wish list,'" the evidence shows that TAC Financial addressed many of the specified items, even ones which were not applicable.  *See* ECF 192-22 at 3; ECF 192-23 at 2; ECF 192-24 at 2; ECF 192-25 at 2; 192-26 at 2; ECF 192-27 at 2 (listing eight different line items TAC Financial was responding to, including two which were "N/A"), ECF 192-28 at 2 (March 3, 2011 email from Cleary to Loftus, proposing a call between the two, to discuss "what [TAC Financial has] sent, what is not applicable, and what remains outstanding, if anything," given that "[t]here are many items on [Direct Benefits's] list that are 'non-applicable'").  A triable issue of fact remains whether TAC Financial represented that there was no threatened litigation against it or its assets.  Moreover, a triable issue of fact remains as to whether TAC Financial was required to disclose the FIS Default Letter in order to fulfill its duty "to tell the whole truth" with regards to all agreements related to "all material transactions involving the company."  *Singer*, 883 F.3d at 440 (citation omitted).

A triable issue of fact also remains as to the materiality of the FIS Default Letter.  While TAC Financial was not in default on March 4, under these circumstances, where FIS provides the card processing services that are necessary for TAC Financial card users to access their funds, a reasonable investor might find the total mix of information significantly altered by the fact that TAC Financial had defaulted on its agreement with its card processor.  *Cf. SEC v. Goldstone*, 952 F. Supp. 2d 1060, 1222-25 (D.N.M. 2013) (deeming immaterial a mortgage lender and real estate investment trust's statements, in a 2007 Form 10-K filed with the SEC that it "successfully" met its margin calls; the statement was true at the time, and the only subsequent events impacting its veracity were events of default, but not an actual declaration of default – the latter being the only "material" event under the *Matrixx Initiatives* standard).

#### iv.      Eder's Personal Bankruptcy

Plaintiffs also base Defendants' Rule 10b-5 liability on their failure to disclose Eder's personal bankruptcy in 2008.  ECF 77, ¶ 47; ECF 203 at 11.  According to Eder's deposition testimony, in the late 1990s, a business he was involved with was sold, which required him to "close another part of our business."  ECF 203-10 at 53:9-11 (Eder Dep., Aug. 28, 2014).  At the time, advice he received from lawyers was "bad advice, and so in 2008 I hired – I went down and spoke to somebody here in San Diego, a lawyer, and he just said, do Chapter 7, and get rid of this.  So I took that advice and that's why we did it."  *Id.* at 53:20-24.  The resulting debt, which was discharged, totaled "[a] couple hundred thousand" dollars.  *Id.* at 54:2-7.  Eder did not, during the instant APA negotiations, advise those at TAC Financial leading the due diligence effort to inform Plaintiffs of this bankruptcy proceeding.  *Id.* at 54:14-21.

Defendants argue that Eder's personal bankruptcy is immaterial.  ECF 208 at 13-14.  In doing so, they cite to Item 401 of Regulation S-K, which, at the time of the events germane to Plaintiffs' claims, required the disclosure of a "director or executive officer['s]" personal bankruptcy, if it occurred "during the past ten years and [is] material to an evaluation of the ability or integrity of" the director or executive officer.  17 C.F.R. § 229.401(f)(1) (2011).  Based on this, Defendants assert that there is "no evidence" that Eder's personal bankruptcy was material.  Defendants also cite to Plaintiffs' Due Diligence requests, and argue that since Plaintiffs did not ask for the disclosure of bankruptcy proceedings, Eder's bankruptcy proceedings were not material.  ECF 208 at 14.

Both arguments miss the mark.  As several courts have held, personal bankruptcies of corporate directors can be material in evaluating securities transactions.  *See, e.g.*, *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 770-71 (11th Cir. 2007) (reversing a trial court's

determination, at the summary judgment stage, that a director's personal bankruptcy stemming from a business unrelated to the director's new business venture was immaterial, because knowledge of this "clearly would have been helpful to a reasonable investor assessing the quality and extent of [the director's] experience"); *SEC v. Weintraub*, No. 11-21549-CIV, 2011 WL 6935280, at *3-5 (S.D. Fla. Dec. 30, 2011) (granting, *inter alia*, summary judgment in the SEC's favor as to a director's failure to disclose the material fact that he filed for personal bankruptcy four years prior to the offer letters at issue); *Shepherd v. S3 Partners, LLC*, No. C-09-0105 RMW, 2011 WL 4831194, at *4 (N.D. Cal. Oct. 12, 2011) (denying a defendant's motion for summary judgment based, *inter alia*, on the fact that the defendant did not dispute that a director failed to disclose a personal bankruptcy matter); *SEC v. Enters. Sols., Inc.*, 142 F. Supp. 2d 561, 575-76 (S.D.N.Y. 2001) (accepting the concession that a personal bankruptcy matter was material and should have been disclosed). Especially in a case such as this, in which TAC Financial lauded the previous professional experience and successes of Eder in its Offering Memorandum, ECF 192-22 at 29, a reasonable juror might well conclude that, in the eyes of an objective investor, the total mix of information presented in the Offering Memorandum would be impacted by Eder's Chapter 7 proceedings. *See Merchant Capital*, 483 F.3d at 770-71.

### v.   Decline in Revenue Prior to Execution of APA

Finally, Plaintiffs allege that Defendants failed to disclose TAC Financial's declining revenues in the months leading up to the APA's execution. ECF 77, ¶ 19; ECF 203 at 8. Defendants' counterargument is couched in general terms:  while recognizing that TAC Financial's revenue declined from January, 2011 to March, 2011, Defendants argue that the 2010 and 2011 Monthly P&Ls show "a 137-percent increase in TAC's revenue from January to

December 2010, and an even greater increase from January[,] 2010 to March[,] 2011." ECF 208 at 10-11.  Defendants' arguments are unpersuasive.

Plaintiffs do not just take issue with the fact that Defendants failed to disclose TAC Financial's declining revenues generally, but also with the fact that TAC Financial's revenue from its largest client, Ardyss, dropped by seventeen percent by the end of April, 2011, the month in which the APA was executed.  ECF 203 at 8.  The evidence supports this contention: between June, 2010, and October, 2010, revenue from cards issued to Ardyss customers stayed consistent, between approximately $96,000 and $105,000.  ECF 208-1 at 11.  By January, 2011,[11] however, revenue from Ardyss cards fell to $67,534.  ECF 202-12 at 2.  This trend continued through February ($60,947), March ($59,357), and April, 2011 ($56,377), despite the fact that March revenues overall increased to $95,501, because of an additional $25,413 in "Other Revenue."  *Id.*

This does not, however, address the key question that must be determined:  whether Defendants had a duty to disclose the decline in revenue from Ardyss cards.  To be sure, TAC Financial's decline in revenue in the opening months of 2011 does not make its revenue totals for 2009 and 2010 misleading.  At the time TAC Financial provided its 2009 and 2010 Yearly P&Ls to Plaintiffs, the yearly revenue figures represented in those spreadsheets were accurate, and a subsequent decline would not make those revenue totals themselves false or misleading.

However, TAC Financial used the increasing revenue totals from 2009 and 2010, in part, to justify its projection of *tripled* revenues in 2011, and its other statements of future growth.  *See, e.g.*, ECF 192-27 at 37; ECF 192-32 at 6.  In *Walker*, the Fourth Circuit observed the SEC's then-new position of allowing securities dealers to voluntarily provide prospective buyers with

---

[11] The revenues generated from Ardyss cards from November and December, 2010, were not provided to the Court.

future financial projections.   802 F.2d at 707.   Ultimately, the court held that, under the circumstances of that case, there was no duty to disclose a financial projection.  *Id.* at 709-10. However, the court noted that "if a company undertakes projection disclosures, it must make the full disclosures necessary to avoid making the statements misleading."  *Id.* at 710.  As described above, a reasonable juror could conclude that TAC Financial's $3 million revenue projection for 2011 was materially misleading, due, in large part, to its failure to disclose the steady decline in revenue from its Ardyss-issued cards.   Thus, under these facts, a reasonable juror could conclude both that TAC Financial had a duty to disclose the decline in revenue from its Ardyss-issued cards, and that this omitted fact was material.

### 3.     Plaintiffs' Reliance on Defendants' Misrepresentations and Omissions

Next, Defendants argue that Plaintiffs cannot prove that they justifiably relied on the material misrepresentations and omissions that Defendants made during the due diligence period. ECF 192-1 at 24-29.   "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element" of a securities fraud claim, because "[i]t ensures that, for liability to arise, the 'requisite causal connection between a defendant's misrepresentation and a plaintiff's injury' exists as a predicate for liability."  *Stoneridge Inv. Partners, LLC v. Sci.-Atl.*, 552 U.S. 148, 159 (2008).  As the Fourth Circuit has recognized, however, "[a]n investor's reliance on a broker's omission or misstatement is never justified when the 'investor's conduct rises to the level of recklessness.'"  *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1028 (4th Cir. 1997) (quoting *Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993)).   A plaintiff-investor is "reckless" if he "intentionally refuse[s] to investigate in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow," *id.* (quoting *Dupuy v. Dupuy*, 551 F.2d 1005,

1020 (5th Cir. 1977)), or, in other words, if he "'possesses information sufficient to call [a mis-]representation into question,' but nevertheless 'close[s] his eyes to a known risk,'" *id.* (quoting *Teamsters Local 282 Pension Tr. Fund v. Angelos*, 762 F.2d 522, 530 (7th Cir. 1985)).

As an initial matter, Plaintiffs argue that, pursuant to the Supreme Court's decision in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972), they are entitled to a presumption of reliance, because Defendants omitted disclosures of material facts in the face of a duty to disclose. ECF 203 at 15-16. In this District, there remains some doctrinal uncertainty regarding the applicability of the *Affiliated Ute* presumption in cases such as this, in which Plaintiffs allege both the existence of material misrepresentations and omitted facts. Initially, in *Cox v. Collins*, the Fourth Circuit held that "[t]he *Affiliated Ute* presumption of reliance is not warranted in a Rule 10b-5 case when the plaintiff alleges both nondisclosure and positive misrepresentation instead of only nondisclosure as in *Affiliated Ute*." 7 F.3d 394, 395-96 (4th Cir. 1993) (citing *Cavalier Carpets, Inc. v. Caylor*, 746 F.2d 749, 756-57 (11th Cir. 1984); *Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356 (5th Cir. 1987)). But in *In re Mutual Funds Investment Litigation*, United States District Judge J. Frederick Motz, of this District, examined the *Cavalier Carpets* and *Finkel* decisions underlying the Fourth Circuit's holding in *Cox*, and concluded that "a more precise and accurate statement of the rule is that the *Affiliated Ute* presumption applies only where a plaintiff's claim is *primarily* based upon material omissions." 384 F. Supp. 2d 845, 863-64 (D. Md. 2005). Courts in this District differ in their adherence to Judge Motz's reading of *Cox*. *Compare, e.g.*, *Burt v. Maasberg*, No. ELH-12-0464, 2013 WL 1314160, at *26 (D. Md. Mar. 31, 2013) (adopting the *In re Mutual Funds* rationale), *with, e.g.*, *Sherwood Brands, Inc. v. Levie*, No. RDB-03-1544, 2006 WL 827371, at *12 n.7 (D. Md. Mar. 24, 2006) (adhering to *Cox*, without discussing *In re Mutual Funds*). Ultimately, this Court need

not take a position one way or the other.  Even assuming that Plaintiffs are not entitled to the *Affiliated Ute* presumption in this case, a genuine issue of material fact nonetheless exists as to Plaintiffs' reliance on Defendants' misrepresentations and omissions.

To determine whether a plaintiff's reliance is justifiable, the Fourth Circuit instructs courts to employ an eight-factor test:

> (1) [t]he sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Myers v. Finkle*, 950 F.2d 165, 167 (4th Cir. 1991) (citations omitted).  No single factor is dispositive, and "consideration of all factors is necessary."  *Id.*  As explained below, consideration of these factors could lead a jury to rationally conclude that Plaintiffs' reliance on Defendants' misrepresentations and omissions was justified, precluding an entry of summary judgment in Defendants' favor.

The first factor, the sophistication and expertise of Plaintiffs in financial and securities matters, "has long been a critical element" in the reliance analysis.  *Banca Cremi*, 132 F.3d at 1029.  Courts generally measure investor's sophistication through his wealth, age, education, professional status, investment experience, and business background, *Myers*, 950 F.2d at 168, though some of these considerations are not "perfectly suited for application to an institutional investor," *Banca Cremi*, 132 F.3d at 1029.  Here, while neither Direct Benefits nor Gellene have extensive experience in securities investment, they do have extensive experience in what is ultimately most relevant to this case:  analysis of a prepaid debit card business's business model.  Gellene, who was approximately forty-four years old at the time of the APA's execution, has an MBA from Vanderbilt University in Business Administration, and was directly involved in

starting up two different businesses prior to founding Direct Benefits in 2005. ECF 192-6 at 10:18-19, 17:22-18:12, 21:15-25:16 (Gellene Dep.). Gellene served as Direct Benefits's Managing Member from its inception, building from the ground up the same prepaid debit card business that Defendants operated. *Id.* at 25:17-31:20; ECF 202, ¶ 5. In fact, TAC Financial reiterated its desire to bring Gellene on as a TAC Financial officer as a part of the merger, given his experience in the prepaid debit card industry. *See, e.g.*, ECF 192-32 at 7 (February, 2011 Discussion Document) ("TAC recognizes Andrew's industry expertise and knowledge of the Payroll Card industry. We envision Andrew joining TAC as a member of the Executive team and functioning as a Vice President of Business Development/Product Management."); ECF 192-34 at 2 (Mar. 10, 2011 Email from Loftus to Gellene) ("Larry [Cleary] echoed Roy [Eder]'s sentiment that the main reason they are doing this deal is to make you a part of the management team and that they feel they need what you bring to the table."). This same analysis largely applies to Direct Benefits, since, at the time of the APA, Gellene was one of two Direct Benefits employees, and many of Direct Benefits's investors did not have an active role in managing the day-to-day operations of the prepaid debit card business. *See* ECF 192-6 at 29:6-30:18, 39:13-42:11. This factor therefore counsels in favor of finding that Plaintiffs are "sophisticated investors," notwithstanding their lack of dealings in securities.

The second and fourth factors also do not favor Plaintiffs. There was no relationship between Direct Benefits and TAC Financial prior to December, 2010. This was simply an arms-length transaction. Nor are there any facts that would indicate that Defendants owed any fiduciary duties to Direct Benefits or Gellene. Plaintiffs do not contest these observations. *See* ECF 203 at 17-18. Thus, like in *Banca Cremi*, this is not a case in which Defendants exploited a

previous business or fiduciary relationship in order to take advantage of a relationship of previously-developed trust.  *See* 132 F.3d at 1029.

The third, fifth, and sixth *Myers* factors, which encompass Plaintiffs' access to the relevant information, the Defendants' concealment of the alleged fraud, and the Plaintiffs' opportunity to detect the alleged fraud, all favor Plaintiffs.  As described above, a reasonable factfinder could conclude that there was nothing in the due diligence materials to alert Plaintiffs to the fact that Ardyss accounted for over 75% of Defendants' business, or that the revenues from that client were consistently declining from September, 2010 to March, 2011.  These omitted facts, a factfinder could also conclude, prevented Plaintiffs from detecting the potentially misleading nature of Defendants' $3 million revenue projection.  It is also rational, based on the evidence discussed above, that Plaintiffs also could not have discovered from the due diligence materials the default letter FIS sent to Defendants, or the fact that Eder recently filed for bankruptcy that related to an outstanding debt from a failed previous business venture.  While Defendants are correct that TAC Financial's 2010 P&L Statement reflected a number of facts, including that TAC Financial operated at a loss of nearly $840,000 in 2010, and that it had nearly $1.1 million in liabilities at the end of 2010, *see* ECF 192-1 at 26-27, these observations are not probative of the facts that Plaintiffs claim were materially misrepresented and/or omitted.  While Defendants will certainly be entitled to argue at trial that a reasonable investor would have made further due diligence requests and followed up on many of those red flags, given the evidence that Plaintiffs have adduced and the nature of the claimed misrepresented and omitted facts, the Court cannot conclude that, as a matter of law, Plaintiffs were reckless in failing to further investigate the nature of TAC Financial's business.

The evidence relevant to the seventh *Myers* factor, whether Plaintiffs initiated and/or sought to expedite the transaction, is contradictory.  On the one hand, Gellene was the one who approached Eder and TAC Financial and began talks about a partnership, and was also the one who suggested that the parties move straight to a merger.  ECF 202, ¶¶ 12-14, 16-17.   On the other hand, the facts show that TAC Financial was the one who initially proposed the expedited timeline for completing the transaction.  *Id.* ¶ 17; ECF 202-3 at 2 (Feb. 10, 2011 email from Cleary to Gellene) ("We would like to get this deal complete by the end of this quarter.").  Plaintiffs, though, accepted this proposition, ECF 202, ¶¶ 18-19, and there is evidence to show that Direct Benefits was motivated to complete the transaction on the same timeline, *see* ECF 192-9 at 3 (Internal Direct Benefits Update, Mar. 4, 2011) ("Given our cash situation with [Prepaid Solutions] we do not have any more time to consider proposals."); ECF 192-36 at 2 (Mar. 29, 2011 email from Loftus to Cleary asking for "an E.T.A. on your review/finalization of the full [APA]"); ECF 192-37 (Apr. 8, 2011 email from Gellene to Eder asking for an update on the signing of the APA).  While Plaintiffs may not ultimately succeed in convincing a jury that this factor counsels in favor of a finding of justifiable reliance, there is sufficient evidence to create a genuine issue of material fact.

The final *Myers* favor considers whether the misrepresentations of fact were general or specific.  Both the alleged misrepresentations and omissions were of a specific nature.  The facts allow for the conclusion that Defendants misrepresented the fact that they had an international customer base, and that they reasonably expected to garner $3 million in revenue in 2011.  A reasonable juror could also find that Defendants omitted a number of specific facts, namely, that Ardyss represented the vast majority of TAC Financial's consolidated revenues; that revenues from Ardyss-issued cards were materially declining in the months leading up to the APA; that

43

the company was in default to a business partner who was vital to TAC Financial's operations; and that Eder was involved in a bankruptcy proceeding just years prior.  If Plaintiffs are successful on these claims at trial, this factor would bolster their reliance argument.  *See Banca Cremi*, 132 F.3d at 1031 ("[A] general statement creates *less* justifiable reliance than would a specific statement."); *Hillson Partners*, 42 F.3d at 215 (explaining that circumstances which justify investor reliance on forward-looking predictions include instances in which "a company has made specific dollar predictions" and there were allegations of "specific evidence, other than timing, demonstrating that those predictions had no factual basis").

In sum, while factors one, two, and four appear to weigh in Defendants' favor, a reasonable juror could determine that factors three, five, six, seven, and eight counsel in favor of finding that Plaintiffs justifiably relied on Defendants' misrepresentations and non-disclosures of several facts.  "While the issues presented ultimately may be resolved against [Plaintiffs], resolution by summary judgment [is] thus inappropriate."  *Myers*, 950 F.2d at 165

### 4.     The Control Liability Claim Against Eder

As noted, Plaintiffs assert that Eder, as a controlling person of TAC Financial, is jointly and severally liable for the material misrepresentations and omissions made to Plaintiffs.  ECF 77, ¶¶ 119-25; *see* 15 U.S.C. § 78t(a).  Eder's argument in favor of summary judgment is premised upon this Court entering summary judgment on the underlying securities fraud claims.  ECF 192-1 at 37.  Because, as described above, genuine issues of material fact remain for trial on the section 10(b) and Rule 10b-5 claims, summary judgment in Eder's favor on the control liability claim is inappropriate.

### C.      Count VI:  Breach of Contract

Count VII of the Third Amended Complaint alleges that Defendants violated several warranty provisions of the APA, thereby constituting a breach a contract.  ECF 77, ¶¶ 106-13.  The parties agree that, pursuant to section 7.7 of the APA, ECF 192-29 at 22, California law governs Plaintiffs' breach of contract claim.  ECF 192-1 at 32 n.8; ECF 203 at 28.  Defendants argue that the undisputed facts show that there was no breach.  ECF 192-1 at 32-37.  As explained below, this Court partially agrees.

#### 1.      Fair Presentation of Financial Condition

Plaintiffs first assert that Defendants violated section 4.5 of the APA.  ECF 77, ¶¶ 13-22, 29-30.  That section provided:

> **Section 4.5 Financial Statements.**  [TAC] has delivered to [Direct Benefits] (a) the unaudited balance sheet of [TAC] (the "Buyer Balance Sheet") as of December 31, 2010 (the "Balance Sheet Date") and related statements of operations for the twelve-month period ended December 31, 2010.  The Buyer Financial Statements were prepared in accordance with the books and records of [TAC] and fairly present the financial condition of [TAC] and the results of its operations as of the relevant dates thereof and for the periods covered thereby.

ECF 192-29 at 15.

Plaintiffs do not dispute that the 2010 Balance Sheet disclosed all of TAC Financial's liabilities.  Rather, they argue, without reference to any case law, that the Balance Sheet unfairly represented TAC Financial's financial condition because it, and the P&L Statement, failed to itemize the specific debts owed to FIS and to TAC Financial employees, and failed to "disclose that the company [was] in precipitous decline."  ECF 203 at 28.  In interpreting whether TAC Financial "fairly present[ed]" its financial condition in its 2010 Balance Sheet and P&L Statement, the Court is mindful that it must apply the plain meaning of the term "fairly present,"

unless it determines that the term is ambiguous. *See, e.g.*, *Perez-Encinas v. AmerUs Life Ins. Co.*, 468 F. Supp. 2d 1127, 1133 (N.D. Cal. 2006) (discussing California law).

The decision of the United States Bankruptcy Court for the District of Colorado in *In re Mercury Companies, Inc.*, cited by Defendants, is instructive. There, the court was tasked with interpreting a provision of a stock purchase agreement that warranted that the financial statements provided by the seller "fairly present the financial condition and results of operations of the Purchased Companies as of the date thereof and for the periods covered thereby." Case No. 08-23125 MER, Adversary No. 10-01133 MER, 2015 WL 5920163, at *5-6 (Bankr. D. Colo. Oct. 9, 2015). The court determined that the meaning of "fairly present" was plain, and required that the disclosing entity's financial statements present the entity's financial condition "equitably, honestly, impartially, reasonably, and with substantial correctness." *Id.* at *6 (citations omitted). This Court finds this rationale persuasive, and adopts the same definition of "fairly present," as that term is used in the APA between Direct Benefits and TAC Financial.

Applying that definition, the *Mercury* court concluded that the financial statements at issue fairly presented the entity's financial condition, despite their failure to disclose $8.6 million in contingent future liabilities. *Id.* at *6-7. The financial statements, the court reasoned, were created in the ordinary course of business, not in anticipation of an acquisition, and were intended only to report the financial condition of the company as of June 30, 2008. *Id.* The contingent future liabilities at issue, however, were not incurred until after that date. *Id.* at *6. Thus, the fact that they were not included in the financial statements could not render them "dishonest or substantially incorrect" for the purpose of the warranty provision in the stock purchase agreement, though the court noted that the failure to disclose those liabilities could

cause the financial statements "to be incorrect or dishonest in the merger and acquisition setting." *Id.*

Conversely, courts have determined that financial statements do not fairly represent an entity's financial condition where they fail to disclose liabilities incurred prior to the compilation of the financial statement, or otherwise made misrepresentations in reporting already accumulated incomes and losses. *See, e.g.*, *Feldman Family Tr. v. Mut. of Enumclaw Ins. Co.*, No. 2:13-cv-01087-LDG (PAL), 2015 WL 1470586, at *3-4 (D. Nev. Mar. 30, 2015) (concluding that a financial statement did not fairly represent the entity's financial condition, because misrepresentations of certain expenses caused the entity's "net tax receivable" figure to be enhanced by over $450,000); *Carolet Corp. v. Garfield*, 339 Mass. 75, 77-78 (1959) (affirming the defendant's liability for breach of contract where the financial statements failed to disclose debts owed to two individuals, salaries owed to employees, and taxes owed to the state and federal government).

Based on all of the facts here, the Court finds, as a matter of law, that the 2010 Balance Sheet and P&L statement fairly presented the financial condition of TAC Financial, as it existed on December 31, 2010.  To be sure, the documents did not indicate the presumed decline in revenue from Ardyss-issued cards in November and December, 2010, and did not precisely itemize the specific debts owed to FIS and to TAC Financial employees.  However, the statements exhaustively list each of the costs TAC Financial incurred, as compared to all of the sources of revenue, for the year 2010.  Further, as noted, there is no evidence that TAC Financial did not disclose any debts incurred for that year.  As such, Plaintiffs were well aware, based on a plain reading of the statements, that TAC Financial was incurring significant operating losses, and could not feasibly have been current on all of its liabilities.  *Compare with In re Digital Res.,*

*LLC*, 246 B.R. 357, 361-64, 366 (8th Cir. Bankr. App. Panel 2000) (affirming the bankruptcy court's finding that a financial statement, which disclosed a net operating *profit* of $102,000, did not fairly disclose the company's financial condition; the statement failed to reflect the fact that, for the last three quarters of the relevant year, the company lost $37,000 in income, and while the statement reflected all accounts receivable, the seller falsely represented that it was "reasonably current" on those accounts, "a significant portion" of which were actually over 75 days old). FIS's eventual declaration of a default in March, 2011, does not mean that TAC Financial's financial statements for the year 2010 unfairly represented its financial condition at that time. *See In re Mercury*, 2015 WL 5920163, at *5-6.  Therefore, summary judgment in Defendants' favor as to the breach of contract claim based on section 4.5 of the APA is appropriate.

### 2.      Absence of Undisclosed Liabilities

Plaintiffs also claim that Defendants violated section 4.6 of the APA.  ECF 77, ¶¶ 21, 31-32.  Section 4.6 warranted as follows:

> **Section 4.6 Absence of Undisclosed Liabilities.**   Except as and to the extent reflected or reserved against in the Buyer Balance Sheet, [TAC] has not had any material accrued or contingent liability or liabilities or obligations (contractual or otherwise) arising out of any transaction or state of facts existing prior to or on the date hereof or arising other than in the ordinary course of business since the Balance Sheet Date (whether such liability is accrued, to become due, contingent or otherwise) in excess of $200,000 in the aggregate, except that [TAC] has continued to incur operating losses since the Balance Sheet Date. [TAC] has no subsidiaries and does not own, directly or indirectly, any interest in any joint venture, strategic alliance, corporation, association or business entity.

ECF 192-29 at 15.

Plaintiffs again premise liability on the fact that Defendants failed to disclose the precise amount of the debt owed to FIS.  ECF 203 at 29.  But, notably, section 4.6 only requires the disclosure of debts in excess of $200,000 that were not otherwise disclosed in the 2010 Balance Sheet.  ECF 192-29 at 15.  Plaintiffs do not dispute that the "Accounts Payable" figure in the

Balance sheet includes the full amount of the debt owed to FIS, but rather argue that section 4.6 imposes a duty to disclose the precise amount owed to FIS.  No such language, however, exists. Accordingly, the undisputed facts show that Defendants did not breach section 4.6 of the APA.

### 3.      Absence of Certain Developments

Next, Plaintiffs assert that Defendants breached section 4.7 of the APA.  ECF 77, ¶¶ 13-20, 33-34.  That section warranted:

> **Section 4.7 Absence of Certain Developments.**  Since the Balance Sheet Date, there has been (i) no material adverse change in the condition (financial or otherwise) of [TAC] or in the business, operations, financial condition, assets, liabilities, prospects or contractual rights of [TAC] except that [it] has continued to incur operating losses on approximately the same basis as during prior months since the date of Buyer Balance Sheet . . . .

ECF 192-29 at 16.[12]  A genuine issue of material fact exists as to whether Defendants have breached this provision, given the number of fact issues surrounding the material adverse changes in TAC Financial's business Plaintiffs allege, including the decline in revenue from its majority client (Ardyss), and the receipt of the FIS Default Letter in mid-March, 2011. Summary judgment in Defendants' favor is therefore inappropriate.

### 4.      Compliance with Law

Plaintiffs further allege that Defendants breached section 4.9 of the APA, by failing to comply with all relevant laws.  ECF 77, ¶¶ 49-50.  Specifically, section 4.9 provides, in full:

> **Section 4.9 Compliance with Law.** [TAC] has complied in all material respects with all Laws and Orders applicable to it, its operations, properties, assets, products and services and its business and [TAC] is not in violation of or in default under any such law, ordinance, legal requirement, rule, regulation or Order, which noncompliance, violation, or default would be expected to have a material adverse effect on [TAC's] business or results of operations or [its] ability to consummate the transactions contemplated hereby.

---

[12] The Court has omitted five other enumerated conditions that are listed in section 4.7, *see* ECF 192-29 at 16, but none of those are implicated on the facts presented here.

ECF 192-29 at 16.

Plaintiffs' argument in favor of breach is premised solely on Defendants' failure to register the securities sold to Plaintiffs. ECF 77, ¶¶ 49-50; ECF 203 at 30. As described above, however, Plaintiffs' sale of unregistered securities claim is untimely. *See supra* Section III.A. "[T]he Court cannot use breach of contract to offer a remedy for a fraud . . . claim that is no longer timely." *KST Data, Inc. v. DXC Tech.*, No. CV 2:17-07927 SJO (SK), 2019 WL 650419, at *10 (C.D. Cal. Jan. 8, 2019), *appeal docketed*, No. 19-55422 (9th Cir. Apr. 12, 2019). Even assuming that, on the merits, Defendants were required to register the securities at issue, Plaintiffs fail to provide any evidence tending to show that Defendants lacked a good faith basis for its position that the private offering exemption, 15 U.S.C. § 77d(a)(2), applied to the transaction. Indeed, Plaintiffs have not provided, nor could this Court find, any authority to support the notion that a seller's warranty that his business currently operates in compliance with the law is violated immediately upon a sale of unregistered securities any time that a court determines, *ex post*, that the securities did not meet the private offering exemption. Thus, summary judgment in Defendants' favor as to Plaintiffs' claim arising under section 4.9 of the APA is warranted.

### 5.    Information Supplied to Direct Benefits

Finally, Plaintiffs allege that Defendants violated section 4.11 of the APA. ECF 77, ¶¶ 13-22, 35-36. That section provided:

> **Section 4.11 Information Supplied to Seller.** Neither this Agreement, the other Transaction Documents nor any document, certificate, or statement furnished to [Direct Benefits] hereunder by or on behalf of [TAC], contains any untrue statement of a material fact, and none of this Agreement, the other Transaction Documents or such other documents, certificates and statements omits to state a material fact necessary in order to make the statements contained herein or therein not misleading.

50

ECF 192-29 at 16.   Defendants argue that liability under this provision can only flow from misrepresentations of material fact made in documents exchanged "hereunder" – that is, in documents exchanged *in conjunction with* the APA itself.   ECF 192-1 at 36-37.   This argument lacks merit.

A similar argument was considered, and rejected, by the United States District Court for the Southern District of California in *Oak Industries, Inc. v. Foxboro Co.*   In that case, the plaintiffs purchased a subsidiary corporation from the defendant via a stock purchase agreement. 596 F. Supp. 601, 602 (S.D. Cal. 1984).   The plaintiffs thereafter sued the defendant-seller, alleging that it made fraudulent statements in the course of the parties' dealings leading up to the execution of the stock purchase agreement.   *Id.* at 602-03.   As relevant here, the plaintiffs brought a breach of contract claim under California law, alleging that the defendant violated the following warranty provision in the agreement:   "There is no fact known to [Foxboro] or Adec which materially adversely affects or may in the future (so far as can now be reasonably foreseen) materially adversely affect, the business, properties, operations or condition of Adec which has not been disclosed herein or in a Schedule furnished herewith."   *Id.* at 606.   The agreement also contained a merger clause.   *Id.* at 607.

The defendant argued that any misrepresentations made in the stock purchase agreement negotiations were not actionable, because based on the contractual language, only misrepresentations made in the contract itself supported a breach of contract action.   *Id.*   The court rejected this argument.   *Id.* at 607-09.   The court explained that under California law, "[e]xtrinsic evidence is generally admissible to prove fraud in the inducement of the instrument . . . even where the instrument itself purports to contain the entire agreement, contains a provision that no representations have been made other than those stated within the agreement, or contains

a written waiver of oral representations." *Id.* at 607 (citations omitted).  Thus, the court held that "defendant's reliance solely upon the contractual language to defeat plaintiffs' causes of action for breach of contract . . . and breach of implied warranty cannot entitle defendant to summary judgment." *Id.* at 609.

*Oak Industries* is on all fours here.  Even agreeing with Defendants' plain meaning interpretation of the term "hereunder" in section 4.11 of the APA, California law allows evidence of material misrepresentations of fact made in the course of dealings leading up to the APA's execution to be admitted to show a breach of contractual warranty provisions guaranteeing that no such misrepresentations were made.  Therefore, summary judgment in Defendants' favor is inappropriate.

### D.  Plaintiffs' Evidence of Damages

Finally, Defendants appear to argue that summary judgment is appropriate because Plaintiffs cannot competently prove their damages.  ECF 192-1 at 37-38.  In their Rule 26(a)(1) disclosures, Plaintiffs offer the following methods of calculating damages arising from the fraud claims:

(1)  Direct Benefits was due 990,000 shares of TAC Financial common stock under the APA.  Because Eder "claims that TAC is worth $1.50 per share," damages are $1,485,000;

(2)  Direct Benefits's assets "were at the minimum worth 60% of TAC Financial at the time of the APA," since Direct Benefits transferred 7,000 New MMCs to TAC Financial under the APA, and TAC Financial only had approximately 4,500 actively used cards at that time.  Based on Eder's valuation of TAC Financial of "$10,000,000," Direct Benefits's assets transferred are worth $6,000,000; and

(3)  "Public companies trade between $300-$600 per actively used card."  Thus, because TAC Financial held 10,000 actively used New MMCs (which Direct Benefits claims as its own assets), the damages range between $3,000,000 and $6,000,000.

ECF 192-38 at 13-14.  Plaintiffs alter these calculations in their Opposition, asserting that the value of the assets transferred is simply the number of shares Direct Benefits was entitled to under the APA, multiplied by the agreed-upon value of those shares ($1.10 per share).  ECF 203 at 34-35.

Defendants' primary argument is that Plaintiffs' damages calculations inherently rely on the value of TAC Financial at various points in time.  ECF 192-1 at 37.  Because Plaintiffs have designated no experts, and because Gellene is not competent to offer lay testimony "about statements by Mr. Eder regarding TAC's value," Defendants argue that Plaintiffs have no admissible evidence on the issue of damages.  *Id.* at 38.  Plaintiffs counter, however, that pursuant to Federal Rule of Evidence 701, Gellene is competent to testify as to the value of the assets that he worked to create and generate value for.  ECF 203 at 33-35.  Defendants offer no reply.  *See* ECF 208.

As to the securities fraud claims, at least, Defendants' argument lacks merit.  In *Miller v. Asensio & Co., Inc.*, the Fourth Circuit held that "to establish 10b-5 liability, a plaintiff need only prove that defendant's misrepresentation was a *substantial* cause of the loss."  364 F.3d 223, 232 (4th Cir. 2004).  In other words,

> in a given case, a jury could properly conclude that (1) the plaintiff proved the defendant's fraud constituted a *substantial* cause of plaintiff's loss and so find the defendant liable but (2) the plaintiff failed to provide a method to discern by "just and reasonable inference" the amount of plaintiff's loss *solely* caused by defendant's fraud, and so refuse to award the plaintiff any damages.

*Id.* (internal citation omitted).  Thus, even assuming that Gellene is not competent to testify about the value of Direct Benefits's assets at the time of the APA, Plaintiffs' inability to provide a means for the jury to determine the loss Plaintiffs incurred will not bar a finding of liability.  However, under Maryland law, damages are a required element of a common law fraud claim, so

Plaintiffs' inability to provide any testimony on damages at all would be fatal to Plaintiffs' two common law fraud claims.  *E.g.*, *Schwartzbeck v. Loving Chevrolet*, 27 Md. App. 139, 145-46 (1975).  Accordingly, some discussion of the evidentiary issues raised is warranted at this stage.

Defendants' only argument is that Plaintiffs could not offer lay testimony "about statements by Mr. Eder regarding TAC's value—information that was neither under Mr. Gellene's control nor within his particularized knowledge either as president of Direct Benefits or as vice president of product management for TAC."  ECF 192-1 at 38.  But Defendants do not contest that Plaintiffs could properly offer testimony about the value attributed to TAC Financial based on the valuation of shares given in the APA, as a means of valuing the assets Direct Benefits's transferred.

Moreover, Defendants do not offer any argument to contravene Plaintiffs' assertion that Gellene would be qualified, under Federal Rule of Evidence 701, to testify about the value of Direct Benefits's assets.  As this Court has observed, Rules 701 and 702 draw a "critical distinction" between lay witness and expert witness testimony, *Al-Sabah v. Agbodjogbe*, No. SAG-17-730, 2019 WL 6498049, at *3 (D. Md. Dec. 3, 2019), though the line between the two "can be a fine one," *Lord & Taylor, LLC v. White Flint, L.P.*, 849 F.3d 567, 575 (4th Cir. 2017) (internal citation and quotations omitted).  Under Rule 701, lay witnesses may give opinion testimony that is "rationally based on the witness's perception" and helpful to the jury in its factfinding mission, so long as it is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Indeed, the Advisory Committee has explained that "most courts have permitted the owner or officer of a business to testify to the *value* or projected profits of the business, without the necessity of qualifying the witness as an . . . expert," because of the witness's "particularized knowledge" that is obtained "by virtue of his or her position in

the business." Fed. R. Evid. 701 Advisory Committee's note to 2000 amendment (emphasis added); *see also Lord & Taylor*, 849 F.3d at 576 (reciting these same provisions).

Here, given Gellene's extensive experience in the prepaid debit card industry, and his direct involvement in the advertisement of Direct Benefits to other potential investors, the Court believes, on the current, limited record before it, that Gellene's damages testimony would be admissible in some form at trial. Fed. R. Civ. P. 56(c)(2); *see Lord & Taylor*, 849 F.3d at 574-76 (affirming a trial court's admission of lay testimony from a Lord & Taylor executive in charge of "store design, store construction, and facilities," that construction costs resulting from the plaintiff's breach of contract would "fall between $30 and $36 million," because the executive's testimony was predicated on his previous experience and personal knowledge and perception"); *MCI Telecomms. Corp. v. Wanzer*, 897 F.2d 703, 706 (4th Cir. 1990) (reversing a trial court's exclusion of an accountant's opinion regarding projected profits, offered under Rule 701, because "[s]he was testifying on the basis of records kept by her personally under her control, and her projection of profits under the lease as prepared by her was predicated on her personal knowledge and perception"). The only case that Defendants cite to the contrary, *Signature Flight Support Corp. v. Landow Aviation Ltd. Partnership*, is inapposite, for in that case, the corporate officer who proposed to provide a profits projection under Rule 701 had no personal knowledge of the facts that went into the profits projection. No. 1:08cv955 (JCC), 2009 WL 2762146, at *4 (E.D. Va. Aug. 26, 2009). In fact, the plaintiff in that case merely attempted to have the officer recount the conclusions made in a report authored by an expert that the court had previously excluded from testifying. *Id.* at *1, *4-5. The Court notes, however, that just because Gellene can offer the proposed testimony does not equate to a holding that Plaintiffs will, at trial, successfully "provide a method to discern by 'just and reasonable inference' the amount of

[their] loss *solely* caused by [Defendants'] fraud," let alone that their proposed measures of damages are proper ones under the securities laws.

**IV.     CONCLUSION**

For the reasons set forth above, Defendants' Motion for Partial Summary Judgment, ECF 192, is GRANTED IN PART and DENIED IN PART. A separate Order will be filed herewith.


Dated:  May 28, 2020                                        _____/s/_____
                                                            Stephanie A. Gallagher
                                                            United States District Judge